# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- x

ALFRED FAIT, Individually and on Behalf of : \
All Others Similarly Situated, :

              Plaintiff, :

           -against- :

REGIONS FINANCIAL CORPORATION, : \
et al., :

              Defendants. :

--------------------------------------------------------- x

09 Civ. 3161 (LAK)

ECF Case

 

## THE REGIONS PARTIES' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

SULLIVAN & CROMWELL LLP \
David B. Tulchin (DT 5557) \
William J. Snipes (WS 3076) \
Claire E. Hunter (CH 0531) \
Florence J. Goal (FG 1002) \
125 Broad Street \
New York, New York 10004-2498 \
(212) 558-4000

*Attorneys for Defendants Regions Financial Corporation, Regions Financing Trust III, C. Dowd Ritter, Samuel W. Bartholomew, Jr., George W. Bryan, David J. Cooper, Earnest W. Deavenport, Jr., Don DeFosset, James R. Malone, Susan W. Matlock, Charles D. McCrary, Claude B. Nielson, Jorge M. Perez, Lee J. Styslinger, III, Spence L. Wilson and John R. Roberts*

October 27, 2009

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................2

THE COMPLAINT ........................................................................................4

    A.    The Parties ..............................................................................4

    B.    The Accounting Issues ............................................................5

    C.    Regions' 2006 Acquisition of AmSouth ....................................9

    D.    The Allegedly "False and Misleading" Disclosures .................11

STANDARD ON THIS MOTION ...................................................................20

ARGUMENT ..............................................................................................21

  I.     MR. FAIT HAS NO AUTHORITY TO PROSECUTE THIS ACTION .............21

  II.    THE AMENDED COMPLAINT FAILS TO PLEAD ANY
        ACTIONABLE MISREPRESENTATIONS .......................................23

    A.    The Amended Complaint Fails to Allege that Any Statement Was
          False or Misleading at the Time the Registration Statement
          Became Effective .....................................................................24

    B.    Plaintiff Does Not Adequately Allege Materiality ...................31

  III.   THE AMENDED COMPLAINT FAILS TO PLEAD A SECTION 15
      CLAIM ....................................................................................34

CONCLUSION ...........................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acito* v. *IMCERA Group, Inc.*,
    47 F.3d 47 (2d Cir. 1995) .......................................................................................25

*Ashcroft* v. *Iqbal*,
    129 S. Ct. 1937 (2009) ..........................................................................................21

*Bay Harbour Mgmt. LLC* v. *Carothers*,
    282 Fed. Appx. 71 (2d Cir. 2008) ........................................................................24

*Bell Atlantic Corp.* v. *Twombly*,
    550 U.S. 544, 127 S. Ct. 1955 (2007) ..................................................................21

*DiLeo* v. *Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) ................................................................................28

*First Nationwide Bank* v. *Gelt Funding Corp.*,
    820 F. Supp. 89 (S.D.N.Y. 1993) ...........................................................................8

*First Nationwide Bank* v. *Gelt Funding Corp.*,
    27 F.3d 763 (2d. Cir. 1994) ....................................................................................8

*Garber* v. *Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008) ..................................................................35

*Ganino* v. *Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) ............................................................................33, 34

*Halperin* v. *eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002) ................................................................................32

*Harris* v. *Ivax Corp.*,
    998 F. Supp. 1449 (S.D. Fl. 1998) .......................................................................32

*Harris* v. *Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1998) .........................................................................32, 33

*Hinerfeld* v. *United Auto Group*,
    No. 97 Civ. 3533, 1998 WL 397852 (S.D.N.Y. July 15, 1998) ...................27, 29, 31

*In re BankAmerica Corp. Sec. Litigation*,
    263 F.3d 795 (8th Cir. 2001) ................................................................................21

**Table of Authorities**
*(continued)*

**Page(s)**

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ...........................................................................32, 34

*In re CIT Group, Inc. Sec. Litig.*,
  349 F. Supp. 2d 685 (S.D.N.Y. 2004) .................................24, 25, 26, 27, 29

*In re Donald J. Trump Casino Sec. Litig.*,
  793 F. Supp. 543 (D.N.J. 1992) ....................................................................24

*In re Donald J. Trump Casino Sec. Litig.-Taj Majal Litig.*,
  7 F.3d 357 (3d Cir. 1993) ...............................................................................24

*In re Merck & Co., Inc. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005) ....................................................................31, 32

*In re NovaGold Resources, Inc. Secs. Litig.*,
  629 F. Supp. 2d 272 (S.D.N.Y. 2009) ..........................................................33

*In re NTL, Inc. Sec. Litig.*,
  347 F. Supp. 2d 15 (S.D.N.Y. 2004) .............................................................33

*In re Worldcom, Inc. Sec. Litig.*,
  346 F. Supp. 2d 628 (S.D.N.Y. 2004) ..........................................................31

*Kramer* v. *Time Warner Inc.*,
  937 F.2d 767 (2d Cir. 1991) .............................................................................4

*Milman* v. *Box Hill Sys. Corp.*,
  72 F. Supp. 2d 220 (S.D.N.Y. 1999) .............................................................24

*Novak* v. *Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .....................................................................24, 26

*Pew* v. *Cardarelli*,
  No. 03 Civ. 742, 2005 WL 3817472 (N.D.N.Y. March 17, 2005) ............32

*Pew* v. *Cardarelli*,
  164 Fed. Appx. 41 (2d Cir. 2006) .................................................................32

*Rombach* v. *Chang*,
  355 F.3d 164 (2d Cir. 2004) ...........................................................................23

*Roth* v. *Jennings*,
  489 F.3d 499 (2d Cir. 2007) .............................................................................4

*Rubin* v. *MF Global, Ltd.*,
  634 F. Supp. 2d 459 (S.D.N.Y. 2009) .....................................................32, 33

## Table of Authorities

*(continued)*

Page(s)

*Rubke* v. *Capitol Bancorp*,
    551 F.3d 1156 (9th Cir. 2009) ...................................................................25

*SEC* v. *First Jersey Sec.*, *Inc.*,
    101 F.3d 1450 (2d Cir. 1996) ..............................................................34, 35

*Shapiro* v. *UJB Financial Corp.*,
    964 F.2d 272 (3d Cir. 1992) ...............................................12, 25, 26, 27

*Shields* v. *Citytrust Bancorp*, *Inc.*
    25 F.3d 1124 (2d Cir. 1994) .....................................................3, 27, 28

*Sterling Heights Police & Fire Retirement Sys.* v. *Vodafone Group Pub. Co.*,
    No. 07 Civ. 9921, 2009 WL 1456846 (S.D.N.Y. May 20, 2009) ..............24

*Sutton* v. *Wachovia Sec.*, *LLC*,
    208 Fed. Appx. 27 (2d Cir. 2006) .............................................................20

*Virginia Bankshares Inc.* v. *Sandberg*,
    501 U.S. 1083, 111 S. Ct. 2749 (1991) ...................................................29

### RULES

Fed. R. Civ. P. 9(b) ...............................................................................28

Fed. R. Civ. P. 12(b)(6) .....................................................................1, 21

### STATUTES

15 U.S.C. § 77k ....................................................................................2, 23

15 U.S.C. § 77l ............................................................................................2

15 U.S.C. § 77o ....................................................................................2, 34

15 U.S.C. § 77z ...................................................................................22, 32

15 U.S.C. § 78u–4 ......................................................................................3

### OTHER AUTHORITIES

Alan Greenspan, Chairman of the Board of Governors of the Federal Reserve
    System, Remarks at a symposium sponsored by the Federal Reserve Bank of
    Kansas City, Jackson Hole (Aug. 30, 2002) ............................................10

Alan Greenspan, Testimony before the House Committee of Government
    Oversight and Reform (Oct. 23, 2008) ....................................................10

**Table of Authorities**

*(continued)*

**Page(s)**

Andrew Sorkin & Vikas Bajaj, *Shift for Goldman and Morgan an End of an Era*,
The New York Times, Sept. 21, 2008 ......................................................................18

Application of FASB Statements No. 5 and No. 114 to a Loan Portfolio,
Emerging Issues Task Force Topic D-80 (2009) ...........................................................8

*Business Combinations*, Statement of Financial Accounting Standards No. 141
(Fin. Accounting Standards Bd. 2007) .........................................................................9

David Enrich & Don Fitzpatrick, *Wachovia Chooses Wells Fargo, Spurns Citi*,
The Wall Street Journal, Oct. 4, 2008 .........................................................................18

David Herszenhorn, *Bailout Plan Wins Approval; Democrats Vow Tighter Rules*,
The New York Times, Oct. 4, 2008 ..............................................................................18

*Goodwill and Other Intangible Assets*, Statement of Financial Accounting
Standards No. 142 (Fin. Accounting Standards Bd. 2001) ......................................6, 7

Luis Betancourt, Christian Johnson & Sharon Nowakowski,
*Mortgage Banking Activities and Mortgage-Backed Securities*, in 5208
Accounting Policy & Practice Portfolios (BNA 2008) ................................................8

*Markets Rattled by Bank Worries*,
BBC News, March 17, 2008 .......................................................................................17

Matthew Karnitschnig, Deborah Soloman, Liam Pleven & John Hilsnrath,
*U.S. to Take Over AIG in $85 Billion Bailout; Central Banks Inject Cash as
Credit Dries Up*, The Wall Street Journal, Sept. 16, 2008 ........................................17

Randall Forsyth, *Credit Markets Freeze as Money Markets Ease*,
Barron's, Oct. 27, 2008 ..............................................................................................18

Robin Sidel, David Enrich & Don Fitzpatrick,
*WaMu is Seized, Sold Off to J.P. Morgan, In Largest Failure in U.S. Banking
History*, The Wall Street Journal, Sept. 26, 2008 ......................................................18

SEC Staff Accounting Bulletin No. 102, 17 C.F.R. Pt. 211 (2009) ...........................8, 12

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
ALFRED FAIT, Individually and on Behalf of : 
All Others Similarly Situated,             : 
                                           : 
                  Plaintiff,               : 
                                           : 09 Civ. 3161 (LAK)
                  -against-                : 
                                           : ECF Case
REGIONS FINANCIAL CORPORATION, et : 
al.,                                       : 
                                           : 
                  Defendants.              : 
                                           : 
------------------------------------------------------- x

### THE REGIONS PARTIES' MEMORANDUM IN SUPPORT OF THEIR
### MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Pursuant to Rule 12(b)(6), Fed. R. Civ. P., defendants Regions Financial

Corporation ("Regions"); Regions Financing Trust III[1]; and the directors of Regions

(collectively, the "Regions Parties") submit this memorandum in support of their motion

to dismiss the First Amended Complaint in this action.

---

[1]    In the First Amended Complaint ("Amended Complaint" or "Am. Compl.," a
copy of which is annexed to the Declaration of Claire E. Hunter, executed on
October 27, 2009 ("Hunter Decl.") as Ex. A), plaintiff asserts that the entity that
issued the securities at issue was "Regions Financing Capital Trust III." (Am.
Compl. ¶¶ 1, 28.)  This is one of several basic errors made by Mr. Fait.  The name
of the entity that issued the securities (hereafter "Trust Preferred Securities") was
and is "Regions Financing Trust III," as the Prospectus to which Mr. Fait refers
plainly indicates.  (*See* Prospectus Supplement filed with the SEC on April 28,
2008, Hunter Decl. Ex. B.)  Further, as shown below, the person who was
appointed Lead Plaintiff in this action -- Howard Rensin -- has never filed an
amended complaint (and his time for doing so has expired), while Mr. Fait, the
only party who purports to bring the First Amended Complaint, has no authority
to do so.  *See* pp. 21-23, *infra*.

## PRELIMINARY STATEMENT

The Amended Complaint fails to state a claim under Sections 11, 12(a) or 15 of the Securities Act of 1933 ("1933 Act") (15 U.S.C. § 77k, 15 U.S.C. § 77l and 15 U.S.C. § 77o).  A plaintiff proceeding under those statutes must allege that the relevant offering documents contained statements that were false and misleading at the time they were made.  Here, plaintiff alleges, with the benefit of 20-20 hindsight, that events subsequent to the issuance of the securities at issue show that the Regions Parties' April 2008 judgments in estimating goodwill and loan loss reserves were mistaken.

According to plaintiff, Regions' April 2008 Registration Statement and Prospectus Supplement for the offering (the "Offering Documents") were false and misleading because they incorporated by reference financial statements that overstated goodwill and underestimated loan loss reserves.  (Am. Compl. ¶ 12.)  Mr. Fait relies for this assertion on the fact that in January 2009 -- nine months after the offering -- Regions took a $6 billion goodwill impairment charge and increased its loan loss reserves to $1.150 billion.  (Am. Compl. ¶ 126.)  In an astounding burst of *post-hoc* thinking, Mr. Fait asserts that adjustments made by the issuer after the stunning events in the financial markets in the fall of 2008 show that the Offering Documents were "false and misleading" when issued.  (Am. Compl. ¶¶ 11-12, 127.)

Mr. Fait's Sections 11 and 12(a) claims should be dismissed for two reasons.  *First*, the Amended Complaint fails to plead any actionable misrepresentation. It asserts that Regions' goodwill valuation and provision for loan loss reserves must have been inaccurate in April 2008 because subsequent events caused Regions to adjust those

estimates in January 2009.  This states no claim, especially where there is no allegation of

fraud, dishonesty or recklessness.  (Am. Compl. ¶¶ 230, 241.)[2]

        Both goodwill and loan loss reserves are inherently matters of judgment.

The Amended Complaint does not allege that there was anything improper about the

methodology Regions used to calculate goodwill or loan loss reserves in its 2007

Form 10-K (filed with the Securities and Exchange Commission on February 27, 2008)

("2007 10-K") under relevant accounting standards.[3]  Instead, Mr. Fait contends that

Regions' management used assumptions that later proved to be too optimistic.  (Am.

Compl. ¶¶ 12, 153, 156, 168, 176.)  An allegation that Regions' judgment was too

optimistic as of April 2008 -- because Regions failed, for example, to anticipate the

collapse of the housing market -- does not state a claim.  As the Second Circuit has

stated, "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or

defeatist view of the future; subject to what current data indicates, they can be expected

to be confident about their stewardship and the prospects of the business that they

manage."  *Shields* v. *Citytrust Bancorp, Inc.* 25 F.3d 1124, 1129-30 (2d Cir. 1994).

        *Second*, no alleged misrepresentation was in any event material.  The

alleged misstatements were forward-looking and accompanied by cautionary language,

rendering them immaterial as a matter of law under the "bespeaks caution" doctrine and

the safe harbor of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4

("PSLRA").  Further, where there is no significant, lasting drop in share price following

---

[2]      "Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct."  (Am. Compl. ¶ 230; *see also* ¶ 241.)

[3]      The 2007 10-K is attached to the Hunter Decl. as Ex. C.

the release of information into the market, the information is not material.  The drop in price of the Trust Preferred Securities immediately after the January 2009 announcement was *de minimis*, and even that small decline lasted only a few days.

Finally, the Section 15 claim against the director defendants should be dismissed because no primary violation has been adequately plead.

## THE COMPLAINT[4]

### A.    The Parties

Alfred Fait, the sole plaintiff in whose name the Amended Complaint was filed, purports to have acquired Trust Preferred Securities pursuant or traceable to the April 2008 Offering Documents (Am. Compl. ¶ 32),[5] and he alleges that he was appointed Lead Plaintiff by Order dated June 29, 2009.  (Am. Compl. ¶ 32, Hunter Decl. Ex. A.)  This latter assertion is demonstrably false; the June 29 Order appointed Howard M. Rensin, as Trustee, as Lead Plaintiff.  (The June 29 Order and the relevant docket entry (item 23) are annexed to the Hunter Declaration as Ex. E and Ex. F.)

Mr. Fait alleges violations of Sections 11, 12(a) and 15 of the Securities Act of 1933 against Regions, its subsidiary Regions Financing Trust III, its directors, its auditors and the investment banks that underwrote the offering.  (Am. Compl. ¶ 1.)

---

[4]    In ruling on a motion under Rule 12, Fed. R. Civ. P., this Court may consider the well-pleaded allegations of the complaint, documents incorporated by reference into the complaint, and public records and documents required to be filed with regulators.  *Roth* v. *Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *Kramer* v. *Time Warner Inc*., 937 F.2d 767, 774 (2d Cir. 1991).

[5]    In a certification filed with the Court as an attachment to his original complaint on April 1, 2009, Mr. Fait states that he acquired the Trust Preferred Securities on April 25, 2008.  The original complaint and certification are annexed to the Hunter Decl. as Ex. D.

Regions is a Delaware corporation and a regional bank holding company with its principal executive offices in Birmingham, Alabama. (Am. Compl. ¶¶ 33, 2.) In 2006, Regions acquired AmSouth Corporation ("AmSouth"), another bank holding company. (Am. Compl. ¶¶ 4-5.)

Regions Financing Trust III is a Delaware statutory trust, a wholly-owned subsidiary of Regions, and the issuer of the Trust Preferred Securities. (Am. Compl. ¶¶ 3, 34.) Each of the director defendants[6] was a member of the board of directors of Regions in 2008, and signed Regions' 2007 10-K and the relevant Registration Statement. (Am. Compl. ¶¶ 35-48.)

**B.    The Accounting Issues**

*Goodwill.* Under Generally Accepted Accounting Principles ("GAAP"),[7] when one company acquires another, the acquiror may record on its books an asset called goodwill (or excess purchase price), which represents the difference between the purchase price and the fair value of the assets acquired. (Am. Compl. ¶ 145.) As plaintiff asserts, "Goodwill is considered to be an asset because future economic benefits are expected from it in combination with the future benefits of the other assets acquired in the acquisition." (Am. Compl. ¶ 146.) According to plaintiff, goodwill is thus

---

[6]    The members of the Board of Directors of Regions who are named as defendants are C. Dowd Ritter, Samuel W. Bartholomew, Jr., George W. Bryan, David J. Cooper, Earnest W. Deavenport, Jr., Don DeFosset, James R. Malone, Susan W. Matlock, Charles D. McCrary, Claude B. Nielson, Jorge M. Perez, Lee J. Styslinger, III, Spence L. Wilson and John R. Roberts. Those persons are sometimes referred to herein collectively as "the Director Defendants."

[7]    The Amended Complaint describes GAAP as "those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time." (Am. Compl. ¶ 143.)

intended to reflect the expected contribution of the assets of the acquired company to future earnings growth of the combined entity. (Am. Compl. ¶ 146.) The estimation of these future economic benefits is necessarily a matter of judgment, reflecting management's opinion based on assumptions and projections about the combined entity's future performance. Mr. Fait asserts that when Regions acquired AmSouth in November 2006, it "paid a premium" over fair value and, as a result, initially recorded $6.2 billion of goodwill (Am. Compl. ¶ 152), which plaintiff alleges "vastly overstated the future benefit AmSouth would provide." (Am. Compl. ¶ 144.)

When goodwill is recorded for an acquisition, the acquiror is thereafter required to test that goodwill for impairment. (Am. Compl. ¶ 147, quoting Statement of Financial Accounting Standards ("SFAS") No. 142, a copy of which is annexed to the Hunter Decl. as Ex. G.) Impairment testing must take place annually or "more often when events or circumstances arise that indicate the goodwill could be impaired." (Am. Compl. ¶ 147.)[8] The impairment test is a two-step process. First, a company compares the fair value of a reporting unit[9] to carrying value. (Am. Compl. ¶ 148.) If the fair value of the unit exceeds its carrying amount, then goodwill is not impaired. (Am. Compl.

---

[8]    Under GAAP, goodwill should be tested "more often" -- *i.e.*, between the annual tests -- if "an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount." (Am. Compl. ¶ 147.) There are no well-pleaded allegations that might show that Regions was required to test for impairment between December 31, 2007 and April 28, 2008.

[9]    A reporting unit is a component of the company that "constitutes a business for which discrete financial information is available and segment management regularly reviews the operating results of that component." (SFAS No. 142, Hunter Decl. Ex. G. at ¶ 30.)

¶ 148.)  Second, if the carrying value exceeds its fair value, then a second step is taken to measure the amount of impairment.  (Am. Compl. ¶ 148.)

According to SFAS No. 142, which is cited at length in the Amended Complaint, fair value is the amount at which the unit as a whole could be bought or sold in a current transaction between willing parties either by referring to a market source or using the net present value of the expected values of estimated future net cash flows. (SFAS No. 142, Hunter Decl. Ex. G at ¶¶ 23-24.)  Unless there is an offer to purchase the reporting unit (in which case there is an objective measure of fair value), the calculation of fair value is based on management's estimates of future performance.  (SFAS No. 142, Hunter Decl. Ex. G at B42 (noting that "judgment is required in estimating the period of expected cash flows").)  This estimation process depends on matters that are inherently subjective.  (SFAS No. 142, Hunter Decl. Ex. G at B151 (noting "the subjectivity inherent in measuring the fair value of a reporting unit").)

Mr. Fait asserts that, at the time of the AmSouth acquisition in 2006, more than 71% of the fair value of the assets Regions acquired was attributable to AmSouth's loan portfolio, which was "overstated due to its gross understatement of its loan loss reserves" (Am. Compl. ¶ 153) and that Regions failed to adjust the goodwill it recorded in its 2007 10-K "despite growing evidence indicating that serious problems existed at the time of the [2006] acquisition with AmSouth's loan portfolio."  (Am. Compl. ¶ 154.) In other words, according to Mr. Fait, management's estimate of the fair value of the AmSouth loan portfolio was too high because it was too optimistic (or not pessimistic enough) about the future performance of the loans.  Plaintiff concedes that Regions performed the annual impairment test of goodwill required by GAAP "at year end 2007"

(Am. Compl. ¶ 156) but he alleges that the "assumptions" used to value the AmSouth

loan portfolio were "so unreasonable that it resulted in no impairment charge related to its

AmSouth operations."  (Am. Compl. ¶ 156.)

       ***Loan Loss Reserves.***  Loan loss reserves are a part of a company's

financial statement.  Under GAAP, a company is required to have adequate reserves for

estimated losses for (1) loans specifically identified as being impaired and (2) loans with

specific characteristics that indicate probable losses.  (Am. Compl. ¶ 166.)  In addition, a

company must reserve for "estimated credit losses inherent in the remainder of the

portfolio based on current economic events and circumstances."  (Am. Compl. ¶ 166.)

Determining loan loss reserves at a fixed point in time necessarily reflects management's

then-current judgment about future loan losses.  (Am. Compl. ¶ 167 (quoting SEC Staff

Accounting Bulletin ("SAB") No. 102, annexed to the Hunter Declaration as Ex. H,

stating that "[i]t is critical that loan loss allowance methodologies incorporate

management's current judgments about the credit quality of the loan portfolio"); *see also*

Am. Compl. ¶ 174 (quoting Emerging Issues Task force ("EITF") Topic No. D-80 ("The

important consideration is whether the allowance reflects an estimate of probable

losses.")); *First Nationwide Bank* v. *Gelt Funding Corp.*, 820 F. Supp. 89, 95 (S.D.N.Y.

1993) ("[T]he taking of loan loss reserves is based on managerial guesswork about the

future."), *aff'd*, 27 F.3d 763 (2d Cir. 1994).[10]

---

[10]     *See also* Luis Betancourt, Christian Johnson & Sharon Nowakowski, *Mortgage Banking Activities and Mortgage-Backed Securities*, in 5208 Accounting Policy & Practice Portfolios, at A-603 (BNA, 2008) (estimating loan loss reserves necessarily involves "considerable judgment" and is more "of an art . . . [than] a science"), annexed to the Hunter Decl. as Ex. I.

Plaintiff alleges that Regions' loan loss reserves from the first quarter of 2007 through the first three quarters of 2008 were inadequate because they did not reflect "the high risk of loss inherent in its mortgage loan portfolio, which included AmSouth's ARMs [adjustable rate mortgages] from the over-stimulated Florida real estate lending market between 2004 and 2006" (Am. Compl. ¶ 168) and because Regions ignored the "probable loss characteristics" of loans in Florida and Georgia. (Am. Compl. ¶ 176).

### C.    Regions' 2006 Acquisition of AmSouth

In May 2006, Regions announced an agreement to acquire AmSouth. (Am. Compl. ¶ 68.)  The deal closed in November 2006 (Am. Compl. ¶ 73) and was, as Regions then disclosed, accounted for under GAAP as a "purchase" by Regions of AmSouth.  (Am. Compl. ¶ 69.)  The Merger Proxy Statement also disclosed that AmSouth's assets (including intangible assets) would be recorded at their fair value as of the time of the acquisition.  (Am. Compl. ¶ 69.)  As the Amended Complaint acknowledges, under GAAP, "[g]oodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination" (Am. Compl. ¶ 145) and Regions' Proxy Statement disclosed that, consistent with this approach, "[a]ny excess of purchase price over the net fair value of AmSouth assets and liabilities is recorded as goodwill (excess purchase price)."  (Am. Compl. ¶ 69.)  Consequently, as required by GAAP rules (SFAS No. 141, Hunter Decl. Ex. J at ¶ 34), Regions recorded $6.2 billion of goodwill from the acquisition.  (Am. Compl. ¶ 152.)

Mr. Fait alleges that Regions was "one of the nation's top 15 banks" before it acquired AmSouth in 2006 (Am. Compl. ¶ 60), but that "Regions' timing [in acquiring AmSouth] was terrible" because it paid "a huge premium for a company" that

was later to be "decimated by the impending collapse" of the housing market, "especially in Florida and Georgia." (Am. Compl. ¶ 4.) With perfect hindsight, Mr. Fait says that these problems arose in large measure because "south Florida real estate was in bubble territory" in 2006. (Am. Compl. ¶¶ 62, 64.)[11]

Mr. Fait also asserts that when Regions' "shareholders overwhelmingly approved" the merger on October 3, 2006, they had no "knowledge of the impending financial catastrophe." (Am. Compl. ¶ 70.) Although the significance of this admission may be lost on plaintiff, defendants agree that the shareholders of Regions -- including Regions' directors and officers -- had no reason to believe that a "financial catastrophe" was imminent. The Court can take judicial notice that the CEOs and directors of almost every major financial institution in our country also failed to predict the events of the second half of 2008. Even Alan Greenspan, the former Chairman of the Board of Governors of the Federal Reserve Board, testified to Congress on October 23, 2008 that "this [financial] crisis . . . has turned out to be much broader than anything I could have imagined."[12] A lawsuit that depends on the notion that Regions should have predicted events that even Dr. Greenspan could not have "imagined" is entirely illogical.

---

[11]   It is often the case that one can recognize a "bubble" only after it bursts. *See*, *e.g.*, Remarks by Mr. Alan Greenspan, Chairman of the Board of Governors of the Federal Reserve System, at a symposium sponsored by the Federal Reserve Bank of Kansas City, Jackson Hole, August 30, 2002, annexed to Hunter Decl. as Ex. K (noting the difficulty of "identify[ing] a bubble until after the fact – that is, when its bursting confirmed its existence").

[12]   Alan Greenspan, Testimony before the House Committee of Government Oversight and Reform (October 23, 2008), available at http://oversight.house.gov/documents/20081023100438.pdf, annexed to Hunter Decl. as Ex. L.

D.     **The Allegedly "False and Misleading" Disclosures**

*Regions' April 28, 2008 Offering Documents.*  On April 28, 2008, Regions Financing Trust III issued 13.8 million shares of Trust Preferred Securities at $25 per share in a registered public offering (the "April 2008 Offering").  (Am. Compl. ¶¶ 25, 3; Prospectus Supplement, Hunter Decl. Ex. B.)[13]  The Offering Documents incorporated by reference Regions' 2007 10-K, filed on February 27, 2008, and other SEC filings made by Regions before April 28, 2008.  (Am. Compl. ¶¶ 16, 18.)

*Regions' 2007 10-K.*  The Amended Complaint alleges that the 10-K was "negligently false and misleading" because Regions had "only marginally increased its loan loss reserves" and "did not write down any of the massive goodwill" from the AmSouth merger.  (Am. Compl. ¶¶ 10, 104.)  As shown above, goodwill and loan loss reserves are not static facts but are estimates based on management's judgment as it evolves and is informed by changes in the economic environment.  *See* pp. 5-9, *supra.*

From 2006 to 2007, Regions nearly quadrupled its provision for loan loss reserves -- from $142.4 million in 2006 to $555 million in 2007 -- based on management's evolving estimate of expected losses in the Company's loan portfolio.  (Am. Compl. ¶¶ 10, 19.)  The 2007 10-K disclosed that this increase reflected management's estimate of likely or possible defaults in its mortgage loan portfolio.  (Am. Compl. ¶ 10, quoting 2007 10-K.)  Mr. Fait alleges that Regions' provision for loan loss reserves was too low because it was "probable that a significantly greater portion" of Regions' real estate loans would default.  (Am. Compl. ¶ 171.)

---

[13]     These are hybrid securities with characteristics of equity and debt.  (Am. Compl. ¶ 2.)

As Mr. Fait later recognizes, loan loss reserves are based on "management's current judgments about the credit quality of the loan portfolio." (Am. Compl. ¶ 167, citing SAB No. 102, Hunter Decl. Ex. H.)  Consistent with GAAP, Regions' 2007 10-K disclosed that its estimate of expected loan losses was calculated based on a long list of constantly changing variables, including "management's judgment of current economic conditions and their expected impact on credit performance." (*See* Am. Compl. ¶ 105, quoting 2007 10-K.)  This entailed a detailed review by management of, among other things, the status and condition of "individual loans"; the level of and trends in loan charge-offs, non-performing loans and past-due loans; the value of collateral; and the mix of assets in the portfolio. (Am. Compl. ¶ 21, quoting 2007 10-K.) To perform this review, management was required to exercise judgment about, for example, the collectibility of loans, the extent of expected delinquencies, the rate of expected loan defaults, and the adequacy of collateral to cover defaults (SAB No. 102, Hunter Decl. Ex. H at 4-5) -- much of which is dependent on the creditworthiness of debtors at the time the judgments are made. (Prospectus Supplement, Hunter Decl. Ex. B at S-iii.)[14]

The 2007 10-K also disclosed a year-over-year increase in goodwill, from $11.2 billion to $11.5 billion, "with the increase driven by finalizing the purchase price adjustments related to the AmSouth merger." (Am. Compl. ¶ 104.)  Plaintiff asserts that this "vastly overstated the future benefit AmSouth would provide" (Am. Compl. ¶ 144),

---

[14]    The valuation of loan loss reserves "require[s] quantitative and qualitative analyses of the past and present status of loans" but "the economic judgments made in setting loan loss reserves can be validated only at some future date." *Shapiro* v. *UJB Financial Corp.*, 964 F.2d 272, 281 (3d Cir. 1992).

although he admits that Regions tested its goodwill at year-end 2007, as required, and that, in its judgment, there had been no impairment.  (Am. Compl. ¶ 156.)  Plaintiff also quotes the 2007 10-K as cautioning that "[a]dverse changes in the economic environment, declining operations, or other factors could result in a decline in the implied fair value" of Regions' goodwill.  (Am. Compl. ¶ 104.)

In Mr. Fait's judgment in 2009, Regions' goodwill was overstated and its provision for loan loss reserves was understated as of April 28, 2008.  His opinion is based on events that occurred after that date -- events that, he says, should have been anticipated.  In other words, defendants should have realized as of April 28 that the "financial catastrophe" of later that year (Am. Compl. ¶ 70) was inevitable and imminent.

**_Other SEC Filings Before the April 2008 Offering._**  Even before the April 2008 Offering, Regions disclosed the considerable risk to its mortgage portfolio. On January 3, 2008, Regions disclosed that it had increased its provision for loan loss reserves to $360 million during the fourth quarter of 2007 -- up by $270 million from the prior quarter.  (Am. Compl. ¶ 99.)  Regions then indicated that its "decision [to increase loan loss reserves] was prompted by weakening credit quality, primarily in its residential builder loan portfolio."  (_Id_.)  Regions also reported that (a) it was "experiencing a sharp slowdown in real estate demand, especially in parts of Florida and Georgia," (b) it expected that "weakness in the homebuilder segment will continue well into 2008," and (c) "non-performing asset and charge-off levels will continue to increase as the year progresses."  (Form 8-K filed with the SEC on January 3, 2008, Hunter Decl. Ex. M.)

When Regions announced its 2007 fourth quarter earnings on January 22, 2008, it disclosed that the continued decline in real estate demand had "significantly

affected" its earnings.  (Form 8-K filed with the SEC on January 22, 2008, Hunter Decl. Ex. N.)  Regions disclosed again the three-fold increase to loan loss reserves it had announced 19 days earlier, and reiterated that it "[e]xpect[ed] additional charge-off and non-performing asset increases in 2008 as [the] housing downturn continues."  (*Id.*)

In its first quarter 2008 earnings report, filed with the SEC on April 15, 2008, Regions reported additional net charge-offs for its real estate portfolios; losses due to declining home values; and increases in its non-performing assets.  (Form 8-K filed with the SEC on April 15, 2008, Hunter Decl. Ex. O.)  The earnings report disclosed that the results were being "primarily driven" by "the housing down cycle in some of the Company's markets, including Florida and Atlanta" and a "challenging credit environment."  (*Id.*; *see also* January 22, 2008 8-K, Hunter Decl. Ex. N.)  Regions reported that it was taking "steps to proactively deal with credit risks" and predicted its "[n]on-performing assets and net charge-off levels are expected to continue upward in 2008 as the strained economic climate continues."  (*Id.*)

**Risk Disclosures in the Offering Documents.**  In the Offering Documents and documents incorporated by reference therein, Regions clearly disclosed the risks associated with a possible further decline in the housing market.  In the Prospectus Supplement, under a section captioned "Recent Developments," Regions disclosed that its "[n]et loan charge-offs," which had increased in the first quarter of 2008, were "primarily driven" by the "housing market slowdown in the United States."  (Hunter Decl. Ex. B at S-21.)  Regions also then disclosed management's view that "[n]on-performing assets and net charge-off levels are expected to continue upwards in 2008 as the strained economic climate continues."  (*Id.*)

The Prospectus Supplement also disclosed that the forward-looking statements contained or incorporated by reference in the Offering Documents were based on "management's expectations," "assumptions" and "estimates," which in turn were based on uncertainties that "may cause actual results to differ materially from the views, beliefs, and projections expressed in such statements." (*Id.* at S-iii.) Among these uncertainties were "Regions' ability to achieve the earnings expectations related to [the acquisition of] AmSouth" -- which depended in part on "the continued growth of the markets that [AmSouth] serve[s]," and "[p]ossible changes in the creditworthiness of customers and the possible impairment of collectibility of loans." (*Id.*) It also disclosed that "[p]ossible changes in general economic and business conditions in the United States in general and in the communities Regions serves in particular" could impact these expectations, assumptions, and estimates. (*Id.*)

Regions also warned of these same risks and uncertainties in its 2007 10-K. (Hunter Decl. Ex. C at 1.) The 10-K specifically disclosed that the "overall economic environment" was the "largest factor influencing" the performance of its loan portfolio. (*Id.* at 63.) It noted that "[h]ousing weakened considerably during 2007 and the risk of recession is significantly increasing due to the negative impact housing is having on the overall economy" (*id.*) and that "[w]ithin the Regions footprint, the housing slowdown has been relatively severe" and that "[m]anagement anticipates that the housing industry will remain weak throughout 2008." (*Id.*)

***The "Financial Catastrophe."*** Following the April 2008 Offering, the U.S. financial markets deteriorated, triggering a financial crisis of severity and scope not seen since the early 1930s. As a matter of law, events after April 28, 2008, are irrelevant

- 15 -

to this case; management's judgments about goodwill and loan loss reserves must be evaluated as of the date of the April 2008 Offering. *See* pp. 24-25, *infra*. Of course, a decision in early 2009 to write down goodwill and to increase loan loss reserves based on intervening events does not make the 2008 numbers false or misleading. Regions was not a guarantor of a prosperous future.

The unraveling of the financial markets took place months after the April 2008 Offering, mostly during the second half of 2008. The Amended Complaint relies on hindsight to assert that events before the April 2008 Offering should have been recognized as harbingers of the financial crisis to come. (Am. Compl. ¶¶ 74-83, 86, 90-91, 93-97, 108.) Plaintiff cites, for example, Ameriquest Mortgage's announcement in May 2006 that it would be closing its retail offices (Am. Compl. ¶ 76), bankruptcy filings of two subprime lenders in December 2006 and April 2007 (Am. Compl. ¶¶ 81, 86), bankruptcy filings of two mortgage lenders in August 2007 (Am. Compl. ¶¶ 93, 94) and the March 16, 2008 announcement that Bear Stearns would be acquired by J.P. Morgan in order to avoid bankruptcy (Am. Compl. ¶ 108). But only in retrospect does it appear that these occurrences were the beginnings of a chain of events leading to what plaintiff alleges was a "financial catastrophe." (Am. Compl. ¶ 70.) Mr. Fait fails to even allege that a single economist or industry analyst or financial institution predicted before April 28, 2008 the stunning collapse that occurred later that year.

Indeed, the stock market shows that the pre-April 28 events were not widely viewed as a harbinger of an impending financial disaster. The day after the government-orchestrated sale of Bear Stearns to J.P. Morgan on March 16, 2008, the

Dow Jones Industrial Average closed up 21.16 points.[15]  Moreover, Regions' stock price

remained fairly stable during this period, closing at $20.25 on March 14 and at $21.72 on

March 20.  (*See* Bloomberg chart of Regions' stock price from March 14-April 30,

Hunter Decl. Ex. Q.)  From March 14 (just before the Bear Stearns deal) to April 28,

Regions' stock closing price ranged from $18.56 to $22.28, and closed above $22 on

Friday, April 25 and Monday, April 28.  (Hunter Decl. Ex. Q.)  The downturn seems

"impending" or "inevitable" only in hindsight.

   The more serious events that led to or constituted the "catastrophe" took

place later.  For example, Mr. Fait points to the FDIC's seizure of IndyMac Bank; but

this occurred on July 11, 2008.  (Am. Compl. ¶ 112.)  Even later, on September 7, 2008,

the U.S. government seized the country's two largest mortgage finance companies,

Fannie Mae and Freddie Mac.  (Am. Compl. ¶ 115.)  On September 14, Merrill Lynch

agreed to be acquired by Bank of America, and the next day, Lehman Brothers filed for

bankruptcy protection.  (Am. Compl. ¶ 116.)  During the same week, American

International Group, the country's biggest insurer, was bailed out by the Federal

Reserve.[16]  On September 21, Goldman Sachs and Morgan Stanley converted themselves

into bank holding companies to increase their deposit-taking capacity so as to shore up

---

[15] *See Markets Rattled by Bank Worries*, BBC News, March 17, 2008,
http://newsvote.bbc.co.uk/mpapps/pagetools/print/news.bbc.co.uk/2/hi/
business/7300017.stm, annexed to Hunter Decl. as Ex. P.

[16] *See* Matthew Karnitschnig, Deborah Solomon, Liam Pleven & Jon Hilsnrath, *U.S.
to Take Over AIG in $85 Billion Bailout; Central Banks Inject Cash as Credit
Dries Up*, The Wall Street Journal, September 16, 2008,
http://online.wsj.com/article /SB122156561931242905.html, annexed to Hunter
Decl. as Ex. R.

their balance sheets.[17]  Washington Mutual was seized by regulators on September 25,

2008 (Am. Compl. ¶ 117), becoming the largest bank to be taken over by regulators in

U.S. history,[18] and Wachovia agreed to be acquired by Wells Fargo on October 3.[19]

On the same day, Congress established a $700 billion bailout fund.[20]

Later that month, credit markets around the world froze, as lenders stopped lending and

investors rushed to safer investments like Treasury bills.[21]

There is no allegation, nor could there be, that defendants should have

predicted such an unprecedented series of events.[22]  The Amended Complaint expressly

disclaims (Am. Compl. ¶¶ 230, 241) any allegation that Regions' April 2008 judgments

about goodwill and loan loss reserves were knowingly false or recklessly made.  Those

valuations were well within the range of reasonable judgment (*see* pp. 30-31, *infra*).

---

[17]    *See* Andrew Sorkin & Vikas Bajaj, *Shift for Goldman and Morgan an End of an Era*, The New York Times, September 21, 2008, http://www.nytimes.com/2008/ 09/22/business/22bank.html, annexed to Hunter Decl. as Ex. S.

[18]    *See* Robin Sidel, David Enrich & Don Fitzpatrick, *WaMu Is Seized, Sold Off to J.P. Morgan, In Largest Failure in U.S. Banking History*, The Wall Street Journal, September 26, 2008, http://online.wsj.com/article/SB12223841558 6576687.html, annexed to Hunter Decl. as Ex. T.

[19]    *See* David Enrich & Don Fitzpatrick, *Wachovia Chooses Wells Fargo, Spurns Citi*, The Wall Street Journal, October 4, 2008, http://online.wsj.com/article/ SB122303190029501925.html, annexed to Hunter Decl. as Ex. U.

[20]    *See* David Herszenhorn, *Bailout Plan Wins Approval; Democrats Vow Tighter Rules*, The New York Times, October 4, 2008, http://www.nytimes.com/2008/10/04/ business/economy/04bailout.html, annexed to Hunter Decl. as Ex. V.

[21]    *See* Randall Forsyth, *Credit Markets Freeze as Money Markets Ease*, Barron's, October 27, 2008, http://online.barrons.com/article/SB122488817411068297. html, annexed to Hunter Decl. as Ex. W.

[22]    Ruminations of analysts and journalists after the events of September 2008 (*see*, *e.g.*, Am. Compl. ¶¶ 121, 122, 125) are also of no significance.  None of them claim -- or could claim -- that they knew in April what was coming.

Lacking any basis for alleging that the Offering Documents were false or misleading when the Trust Preferred Securities were issued, Mr. Fait refers to a June 17, 2008 letter from the Securities and Exchange Commission and argues that, in the letter, "the SEC questioned the validity of Regions' goodwill balance" as of the end of 2007. (Am. Compl. ¶ 157.)  This is not correct.  *First*, the SEC did not "question the validity" of the goodwill valuation, but instead asked about process, including whether Regions had taken into consideration the fact that its stock had been trading below the company's book value.  (June 17, 2008 letter, Hunter Decl. Ex. X at 2.)

*Second*, and in any event, Mr. Fait's allegations about the SEC's June 17, 2008 letter are misleading.  As he must know, Regions promptly responded with a full explanation of its goodwill impairment testing.  (July 1, 2008 letter, Hunter Decl. Ex. Y.) The July 1 letter stated that, during the fourth quarter of 2007, Regions

> noted a trend of lower trading value relative to book value. However, management could not conclude that this was a long-term trend, particularly when our stock price was trading above book value in the fourth quarter of 2007. Further, given the relatively small difference between our stock price and our book value per share, we determined that a potential buyer would offer a control premium for our business franchise that would adequately cover these differences between trading prices and book value.

(Hunter Decl. Ex. Y at 4.)  The SEC appeared to find this entirely satisfactory, writing on July 10, 2008 that it had "no further comments" on the subject.  (July 10, 2008 letter, Hunter Decl. Ex. Z.)[23]  *Third*, the SEC's letter only asked for additional disclosures in

---

[23]    The July 1, 2008 and July 10, 2008 letters have been publicly available on the SEC's website since the time they were filed.  (*See* www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001281761&type=& dateb=& owner=exclude&start=80&count=40, reflecting filing dates of July 1, 2008 and

future filings, but did not direct Regions to restate or amend any prior filings.  And the Amended Complaint does not allege that there have been any such restatements.

*Regions' January 2009 Disclosure.*  On January 20, 2009, Regions announced that it would take a $6 billion charge for impairment of goodwill and increase loan loss reserves to $1.150 billion.  (Am. Compl. ¶ 126.)  The write-down of goodwill occurred as a result of annual impairment testing that occurred at the end of 2008.  (Form 8-K filed with the SEC on January 20, 2009 (the "January 2009 Disclosure"), Hunter Decl. Ex. AA.)  These adjustments reflected the severe changes in economic conditions affecting Regions' business after April 28, 2008.

Regions' January 2009 Disclosure was made, according to the Amended Complaint, before the market opened that day.  (Am. Compl. ¶ 126.)  When trading began on January 20, the Trust Preferred Securities opened at $20.70 and, although the price fell during that day to $18.45, it closed at $20.50 on January 28.  (*See* Hunter Decl. Ex. BB.)  The price has since risen, and has been consistently above $22 in the last three months, higher even than just before the January 20 disclosure.  (*See* Hunter Decl. Ex. CC.)

## STANDARD ON THIS MOTION

Under Fed. R. Civ. P. 12(b)(6), a complaint should be dismissed if it fails to plead sufficient grounds to entitle plaintiff to relief.  *Bell Atlantic Corp*. v. *Twombly*,

---

July 10, 2008 respectively.)  And it is "well established that a district court may rely on matters of public record in deciding a motion to dismiss."  *Sutton* v. *Wachovia Sec., LLC*, 208 Fed. Appx. 27, 29 (2d Cir. 2006) (internal quotations and citation omitted).

550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007).  A complaint must plead facts stating a

plausible claim for relief.  *Id.* at 545 (plaintiff must plead "allegations plausibly

suggesting (not merely consistent with)" an "entitle[ment] to relief").  When the factual

allegations are implausible, no matter how detailed, no claim for relief has been stated.

Although a "claim has facial plausibility where the pleaded factual context allows the

court to draw the reasonable inference that the defendant is liable for the misconduct

alleged," *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1940 (2009), the mere possibility that a

plaintiff might prove some facts in support of its claims is insufficient to survive a motion

to dismiss.  *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974.  "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice."

*Iqbal*, 129 S. Ct. at 1949.

## ARGUMENT

### I.    MR. FAIT HAS NO AUTHORITY TO PROSECUTE THIS ACTION

Congress adopted the PSLRA to prevent people with little at stake from

bringing securities law claims whenever companies suffer business reversal.  *In re*

*BankAmerica Corp. Sec. Litigation*, 263 F.3d 795, 799 (8th Cir. 2001) (affirming the

district court's "chastis[ing of] the [Milberg Weiss] firm for engaging in 'precisely the

sort of lawyer-driven machinations the PSLRA was designed to prevent'").  The PSLRA

sought to prevent "abusive practices" in securities class actions by, among other things,

appointing the person with the largest financial interest as lead plaintiff.  15 U.S.C. § 77z-

1(a)(3)(B)(iii).  The PSLRA sets out a procedure for appointing lead plaintiff in "each

private action arising under the [Securities Act] that is brought as a plaintiff class action

pursuant to the Federal Rules of Civil Procedure."  15 U.S.C. §77z-1(a)(1).  Once the

lead plaintiff is appointed, he or she -- subject to the Court's approval -- selects and retains lead counsel. 15 U.S.C. §77z-1(a)(3)(B)(v).

The lead plaintiff device is not "merely procedural"; it confers on the appointed person "the right to steer [the] litigation." *In re BankAmerica*, 263 F.3d at 801. "The lead plaintiff's control over aspects of litigation such as discovery, choice of counsel, assertion of legal theories, retention of consultants and experts, and settlement negotiations gives the lead plaintiff decisional muscle that other members of the class lack." *Id.* Under the PSLRA, only the lead plaintiff may make strategic decisions and prosecute the action.

Mr. Fait filed the initial complaint on April 1, 2009, represented by the firm of Coughlin Stoia Geller Rudman & Robbins LLP (the "Coughlin Firm"). (Complaint, Hunter Decl. Ex. D at 20.) On April 28, 2009, this Court entered an Order providing that within 60 days after appointment of a lead plaintiff, that person could file an amended complaint. (Order, April 28, 2009, Hunter Decl. Ex. DD.)

On June 1, 2009, Trustee Howard M. Rensin filed a motion to be appointed lead plaintiff and for approval of the Coughlin Firm as lead counsel. (Hunter Decl. Ex. EE.) Mr. Rensin was the only person who asked to be appointed lead plaintiff, and on June 17, 2009, he filed a notice of non-opposition to his motion for appointment as lead plaintiff. (Hunter Decl. Ex. FF.) On June 30, 2009, this Court entered an Order appointing Mr. Rensin lead plaintiff (Hunter Decl. Ex. E), as the docket reflects (Hunter Decl. Ex. F). Yet Mr. Rensin has taken no further action. He did not file an amended complaint. Instead, Alfred Fait filed the Amended Complaint, through the Coughlin

Firm, and he there asserts -- falsely -- that he was appointed lead plaintiff.  (Am. Compl. ¶ 32.)

The process established in the PSLRA for the appointment of lead plaintiff would mean nothing if someone other than the lead plaintiff appointed by the Court were permitted to file an amended complaint and then to prosecute the action.  As a result, this Court should dismiss this action on the ground that Mr. Fait lacks authority to pursue it or file the Amended Complaint.[24]

## II.    THE AMENDED COMPLAINT FAILS TO PLEAD ANY ACTIONABLE MISREPRESENTATIONS

In order to establish a violation of Section 11 or 12(a), plaintiff must show that the April 2008 Registration Statement and Prospectus "contained an untrue statement of a material fact or omitted to state a material fact . . . necessary to make the statements therein not misleading."  *Rombach* v. *Chang*, 355 F.3d 164, 168 n.2 (2d Cir. 2004) (internal quotations omitted, citing 15 U.S.C. § 77k).  The Amended Complaint does not meet that standard for two reasons.  *First*, it fails to allege that any statement in the Offering Documents was false or misleading at the time the Registration Statement became effective in April 2008.  *Second*, even if it had sufficiently alleged that a misstatement was made, any such misstatement was, as a matter of law, not material.

---

[24]    There is nothing unfair about enforcing this Court's June 29 order appointing Mr Rensin as lead plaintiff.  The Coughlin Firm never asked this Court to substitute Mr. Fait for Mr. Rensin as lead plaintiff or sought authority to proceed in a way other than this Court's June 29 order directed.

A. **The Amended Complaint Fails to Allege that Any Statement was False or Misleading at the Time the Registration Statement Became Effective**

The allegation that the April 2008 Offering Documents were false and misleading because nine months later Regions wrote down goodwill and increased loan loss reserves does not state a claim. Only misstatements made at the time of the offering are actionable under Sections 11 and 12(a). *Milman* v. *Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 234 (S.D.N.Y. 1999) ("[S]tatements made after the date of the Box Hill Offering are not actionable under" Sections 11 and 12.). "The securities laws do not provide a cause of action premised upon a hindsight review of faulty predictions as to business success." *Sterling Heights Police & Fire Retirement Sys*. v. *Vodafone Group Pub. Co.*, No. 07 Civ. 9921, 2009 WL 1456846, at *5 (S.D.N.Y. May 20, 2009); *see also In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 551 (D.N.J. 1992) ("[I]n determining whether the statements are actionable, the court must . . . determine whether the statement was false when made.") (internal quotations and citation omitted), *aff'd*, *In re Donald J. Trump Casino Sec. Litig.-Taj Majal Litig.*, 7 F.3d 357 (3d Cir. 1993).

"[F]raud by hindsight" is not actionable. *Bay Harbour Mgmt. LLC* v. *Carothers*, 282 Fed. Appx. 71, 75 (2d Cir. 2008) (internal quotations omitted) (rejecting allegation that defendant "must have known, before the offering" of inaccurate valuation of "goodwill because later financial reports contained lower valuations"); *see also Novak* v. *Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."); *In re CIT Group Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690 (S.D.N.Y. 2004) (simply "because defendants decided to

increase loan loss reserves just three weeks after the IPO" does not support an inference that reserves were "inadequate").  The fact that the valuations of goodwill and loan loss reserves were later adjusted does not support the assertion that the April 2008 statements were then false.

### 1.    The Statements in Question Were Matters of Judgment and Opinion About Future Performance

Plaintiff's allegations that goodwill was overvalued and that loan loss provisions were too low in the 2007 10-K are based on the assertion that Regions failed to anticipate fully the housing market decline.  In this connection, plaintiff chronicles various events in 2006 and 2007, including the bankruptcy filings of certain mortgage lenders and reports about the decline of the housing markets.  (Am. Compl. ¶¶ 74-97.) But none of that suffices to plead that Regions should have been able to predict the future more accurately.[25]  *See* pp. 15-19, *supra*.  The fact that Regions' judgment about market conditions or future financial health turned out -- in hindsight -- to have been too optimistic is not actionable.  *See Acito* v. *IMCERA Group, Inc*., 47 F.3d 47, 53 (2d Cir. 1995) ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud."); *Shapiro*, 464 F.2d at 283 (allegation that "UJB failed to reveal that loan loss reserves

---

[25]    Plaintiff also alleges that Regions' first quarter Form 10-Q for 2008, filed with the SEC on May 7, 2008 (Am. Compl. ¶ 110), its second quarter Form 10-Q for 2008, filed with the SEC on August 7, 2008 (Am. Compl. ¶ 114), and its third quarter Form 10-Q for 2008, filed with the SEC on October 30, 2008 (Am. Compl. ¶ 124), were false and misleading.  Allegations of misstatements made in documents after the April 2008 Offering are irrelevant because Section 11 and 12(a) claims cannot be based on statements made after the offering.  *See*, *e.g.*, *Rubke* v. *Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1164 (9th Cir. 2009).  Mr. Fait certified (Certificate, attached to Complaint, Hunter Decl. Ex. D) that he purchased 600 shares of the Trust Preferred Securities on April 25, 2008, before any of these statements were made.

were inadequate in light of the 'high risk of noncollectibility'" is not actionable because it only "charges defendants with essentially failing to predict the future"). As the Second Circuit has explained, "corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak*, 216 F.3d at 309 (2d Cir. 2000).

Regions clearly disclosed in its 2007 10-K that its estimate of credit losses, including loan loss reserves, was based on management's judgment of "current and historical loss experience for each pool [of loans] and management's judgment of current economic conditions and their expected impact on credit performance." (Am. Compl. ¶ 105, quoting Regions' 2007 10-K.) As this Court noted at the May 29 status conference in this action, "a loan loss reserve, by its very nature, is somebody's opinion of what fraction of the stated value of the loans . . . will prove to be uncollectable." (Transcript of May 29, 2009 status conference, Hunter Decl. Ex. GG at 6.)

Courts have recognized that statements about a company's prospects, projections, estimates of expected losses and the like are subjective opinions based on management's experience and judgment and, unless they are worded as guarantees of a particular result, such statements are not actionable under the securities laws. For example, in *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d at 687, 689, Judge Sprizzo dismissed Sections 11 and 12(a) claims that were based on a "$200 million loan loss charge" taken three weeks after a public offering, holding that CIT's statement that its "loan loss reserves . . . are adequate" is "not actionable under the securities laws if they simply represented a failure on the part of defendants to correctly gauge the adequacy of the loan loss reserves." Judge Sprizzo also noted that the offeror had disclosed that the

"reserve for credit losses [might not] be adequate over time to cover credit losses in [the] portfolio" and that where, as here, loan loss reserves are not worded "so as to create guarantees on the part of the defendants," they are not actionable. *Id.* at 689. Not only did Regions not make a guarantee, it expressly warned in its 2007 10-K that it might suffer losses if its "assumptions or judgments" were wrong and cautioned that if its "assumptions or judgments are wrong, our allowance for credit losses may not be sufficient to cover our actual credit losses." (Hunter Decl. Ex. C at 15.) The 10-K also warned that "[a]dverse changes in the economic environment, declining operations of the business unit, or other factors could result in a decline in the implied fair value of" goodwill. (Hunter Decl. Ex. C at 30.) And Regions expressly stated *before* the offering, that it expected further increases in loss reserves. *See supra* at pp. 13-14.

Judge Patterson also dismissed Sections 11 and 12(a) claims based on an issuer's alleged "failure to anticipate the extent of necessary reserves," holding that "even if it amounts to mismanagement, [it] is not actionable under federal securities laws." *Hinerfeld* v. *United Auto Group*, No. 97 Civ. 3533, 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998). In *Shapiro*, the Third Circuit held that a claim that loan loss reserves "were not maintained at an adequate level . . . is plainly an allegation of inactionable mismanagement" and would only run afoul of securities laws if the defendant "knows they are inadequate" when the statements are made. 464 F.2d at 282, 284.

Courts have also reached the same conclusion in cases involving fraud allegations under Section 10(b). In *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1126 (2d Cir. 1994), the Second Circuit rejected a Section 10(b) claim based on defendant's announcement of a $40 million increase in loan loss reserves only two

months after announcing that it anticipated a "year of record earnings." Plaintiff there

alleged that defendant "should have known" earlier of the weakness in its loan portfolio

but the court held that "misguided optimism [in setting loan loss reserves] is not a cause

of action." 25 F.3d at 1129. Likewise, in *DiLeo* v. *Ernst & Young*, 901 F.2d 624, 625,

626 (7th Cir. 1990), the Seventh Circuit affirmed dismissal of a Section 10(b) claim that

loan loss reserves were not "increase[d] . . . fast enough" in connection with "Continental

Illinois Bank's financial distress during the 1980s." The court observed that the

"[s]ecurities laws do not guarantee sound business practices and do not protect investors

against reverses." *Id*. at 627. As Judge Easterbrook explained, basing a securities law

claim on allegations that a company waited too long to take a write-down is illogical:

> For any bad loan the time comes when the debtor's failure
> is so plain that the loan is written down or written off. No
> matter when a bank does this, someone may say that it
> should have acted sooner. If all that is involved is a dispute
> about the timing of the writeoff, based on estimates of the
> probability that a particular debtor will pay, we do not have
> fraud; we may not even have negligence.

*Id*. at 627. All these principles apply here: Because plaintiff has done no more than

plead a *post hoc* disagreement with the timing of Regions' adjustments to loss reserves,

he has not pled a claim based on the April 2008 Offering.

> **2.    Because Plaintiff Disclaims any Allegation of Fraud, He Cannot
> Adequately Allege any Misrepresentation in the Valuation of
> Goodwill or Loan Loss Reserves**

Mr. Fait expressly "excludes and disclaims any allegation that could be

construed as alleging fraud or intentional or reckless misconduct." (Am. Compl. ¶ 230;

*see also* ¶ 241.) In doing so, he seeks to avoid the application of a heightened pleading

standard pursuant to Rule 9(b) Fed. R. Civ. P. and the PSLRA, presumably because he

recognizes that he could not meet such a standard. However, absent an allegation of fraud, plaintiff cannot make out a violation of Section 11 or 12(a) because the alleged misstatements were inherently about matters of judgment and opinion.

The Supreme Court has held that statements of "reasons, opinions or beliefs" are not actionable under the securities laws unless (i) the statements are in fact "defective" (*i.e*., incorrect or false) and (ii) the speaker "did not hold the beliefs or opinions expressed." *Virginia Bankshares, Inc*. v. S*andberg*, 501 U.S. 1083, 1090, 1096, 111 S. Ct. 2749, 2757, 2760 (1991) (rejecting section 14(a) claim attacking statements in a proxy that minority shareholders will achieve a "high" value and get a "fair" price for their stock). In other words, opinions that misstate or mislead are actionable under the securities laws only if the speaker knew they were wrong when stated. Thus, when a complaint under Sections 11 or 12(a) "does not allege that the adequacy of [defendant's] reserves were affirmatively and intentionally misrepresented," it should be dismissed. *Hinerfeld*, 1998 WL 397852, at *7 n.9 (dismissing Sections 11 and 12(a) claims for failing to state a claim); *see also In re CIT Group Sec. Litig.*, 349 F. Supp. 2d at 690. As this Court stated on May 29, "[i]f I say to you today, I think it will rain in Wichita tomorrow, it may well be that tomorrow it will not rain in Wichita, but that doesn't make my opinion today false. I may honestly hold that opinion. And you couldn't recover against me for giving you that opinion, unless you were able to prove that at the time I gave you that opinion I, in fact, did not hold it." (Transcript of May 29, 2009 Status Conference, Hunter Decl. Ex. GG at 6-7.) This summarizes the issue perfectly.

Without a fraud allegation, the complaint here argues only that the judgment of management -- on matters that inherently involve opinion about the future --

turned out to be wrong.  This gets Mr. Fait nowhere, particularly given the warnings in the Offering Documents of future uncertainties.  *See* pp. 14-15, *supra*.

> ### 3.    The Allegations that Regions' 2007 10-K Violated GAAP Do Not State a Claim

Mr. Fait alleges that Regions' goodwill valuation in its 2007 10-K was false and misleading because it was "not prepared in conformity with GAAP."  (Am. Compl. ¶ 142.)  He asserts that, although the correct methodology was employed, goodwill was overstated and the provision for loan loss reserves was too low because the assumptions made about the future performance of Regions' loan portfolios were unreasonable.  (Am. Compl. ¶¶ 156, 168.)

> #### a.    Regions' Decision Not to Impair Goodwill in its 2007 10-K Did Not Violate GAAP

Mr. Fait asserts that following an acquisition GAAP requires that goodwill be tested "at least annually for impairment, and more often when events or circumstances arise that indicate the goodwill could be impaired."  (Am. Compl. ¶ 147.)

It is undisputed that Regions performed an annual impairment test at year-end 2007.  (Am. Compl. ¶ 156.)  Mr. Fait does not allege that the testing methodology was in any way inappropriate.  Rather, he says that the Regions' assumptions were "so unreasonable that it resulted in no impairment charge related to its AmSouth operations" (Am. Compl. ¶ 156) and elsewhere asserts that this was because "AmSouth's loan portfolio was grossly overstated due to its gross understatement of its loan loss reserves." (Am. Compl. ¶ 153.)  Even assuming that this is any more than rank speculation, it amounts simply to a *post hoc* criticism of management's judgment in making

assumptions about the likely future performance of AmSouth's loan portfolio, not a

misstatement.  At best this is a mismanagement claim, not a securities law claim.

> **b.    Regions' Provision for Loan Loss Reserves in its 2007 10-K Did Not Violate GAAP**

According to the Amended Complaint, GAAP requires Regions to have

adequate reserves for estimated losses for: (1) loans specifically identified as being

impaired, (2) loans with specific characteristics that indicate probable losses, and (3)

"estimated credit losses inherent in the remainder of the portfolio based on current

economic events and circumstances."  (Am. Compl. ¶ 166.)  Further, plaintiff alleges that

the methodology for determining loan loss reserves must "incorporate management's

current judgments about the credit quality of the loan portfolio."  (Am. Compl. ¶ 167.)

Plaintiff merely asserts that he disagrees with management's judgments because, he

believes, the provision for loan loss reserves in the 2007 10-K "did not reflect the high

risk of loss inherent in its mortgage loan portfolio."  (Am. Compl. ¶ 168.)  This

hindsight-based second-guessing of management's judgment about the credit quality of

its loan portfolios is insufficient to state a claim.  *Hinerfeld*, 1998 WL 397852, at *7.

> **B.    Plaintiff Does Not Adequately Allege Materiality**

Even if the Amended Complaint had alleged a misstatement, plaintiff fails

to adequately allege that any misstatement was material.  "The standard for materiality

under Sections 11 and 12(a) of the Securities Act is identical to that under Section 10(b)

of the Exchange Act."  *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 658 n.38

(S.D.N.Y. 2004) (internal quotations and citations omitted).  "[I]n efficient markets

materiality is defined as 'information that alters the price of the firm's stock.'"  *In re*

*Merck & Co. Inc. Sec. Litig.*, 432 F.3d 261, 274 (3d Cir. 2005) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997)).  "[I]nformation important to the market will be reflected in the stock's price." *Id.  See also Burlington*, 114 F.3d at 1425 ("[I]nformation important to reasonable investors . . . is immediately incorporated into stock prices.").

>  (i)    **The Alleged Misstatements are Immaterial Under the "Bespeaks Caution" Doctrine**

Under the bespeaks caution doctrine, statements in an offering are immaterial as a matter of law if reasonable investors would not "'consider them important in light of adequate cautionary language' in the relevant offering." *Rubin* v. *MF Global, Ltd.*, 634 F. Supp. 2d 459, 467 (S.D.N.Y 2009) (citing *Halperin* v. *eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)).  Also, under the PSLRA's safe-harbor provision, there can be no liability based on forward-looking statements that are (i) identified as forward-looking statements and are accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements or (ii) immaterial.  *Pew* v. *Cardarelli*, No. 03 Civ. 742, 2005 WL 3817472, at *5 (N.D.N.Y. March 17, 2005) (citing 15 U.S.C. §§ 77z-2(a), (c)(1)(A)), *aff'd*, 264 Fed Appx. 41 (2d Cir. 2006).

Goodwill valuation and impairment decisions are necessarily predictive and properly considered forward-looking statements.  *Harris* v. *Ivax Corp.*, 998 F. Supp. 1449, 1453 (S.D. Fl. 1998) ("The decision not to factor in the goodwill writeoff . . . was also necessarily forward-looking; it reflected the judgment of the corporation that goodwill was strong and that no such writeoff would be necessary"), *aff'd*, 182 F.3d 799

(11th Cir. 1999).  Likewise, loan loss provisions reflect management's judgment that the allowance is "adequate to cover losses inherent in the loan portfolio" that may materialize in the future.  (Am. Compl. ¶¶ 10, 19.)  Although goodwill and loan loss reserves are not expressly identified as forward-looking statements in the Offering Documents and the 2007 10-K, those documents say that forward-looking statements may be identified by words such as "believe," "expect," "anticipate," "project" and "other similar expressions."  (Prospectus Supplement, Hunter Decl. Ex. B at S-iv; 2007 10-K, Hunter Decl. Ex. C at 2.)

Regions disclosed in its 2007 10-K credit risks that could affect its loan loss provisions and the market risks that could affect its goodwill valuation.  (Hunter Decl. Ex. C at 66-67, 87; *see* pp. 14-15, *supra*.)  Further, the 2007 10-K characterizes both goodwill (Hunter Decl. Ex. C at 87) and loan loss reserves (Hunter Decl. Ex. C at 29) as "estimates" of management -- an inherently cautionary characterization.  *In re NovaGold Resources*, *Inc. Secs. Litig.*, 629 F. Supp. 2d 272, 294 (S.D.N.Y. 2009).  Having disclosed potential risks with meaningful cautionary language, the alleged misstatements are immaterial as a matter of law.  *See Rubin*, 634 F. Supp. 2d at 467.

Finally, only allegations of fraud can defeat the PSLRA safe harbor.  *See In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 35 (S.D.N.Y. 2004) (Kaplan, J.); *NovaGold*, 629 F. Supp. 2d at 295.  But plaintiff has not even tried to satisfy this requirement -- he expressly disclaims fraud allegations.  (Am. Compl. ¶¶ 230, 241.)

**(ii)    There was No Material Drop in Share Price Following Disclosure**[26]

If any alleged misrepresentation had been material, a significant, immediate and lasting drop in price would have occurred after the January 2009 Disclosure.  On January 16, 2009, the last trading day before the announcement, the Trust Preferred Securities closed at $21.30.  On January 20, immediately after the announcement, the securities opened at $20.70 and closed at $18.45.  (Hunter Dec. Ex. BB.)  But the securities closed at $20.50 on January 28, just 80 cents below the price immediately before that announcement.  (Hunter Decl. Ex. BB.)  This is clearly *de minimis*.  In the period since the original complaint was filed on April 1, 2009, the price has been stable and in the last three months has closed consistently above $22, higher than the price before the January 2009 Disclosure.  (Hunter Decl. Ex. CC.)

If "information is not important to reasonable investors, it follows that its release will have a negligible effect on the stock price."  *Burlington*, 114 F.3d at 1425.  The fact that the price drop was so small and temporary shows the lack of materiality.

## III.    THE AMENDED COMPLAINT FAILS TO PLEAD A SECTION 15 CLAIM

Plaintiff also fails to allege a violation of Section 15 by the Director Defendants.  To establish a claim under Section 15 of the 1933 Act, a plaintiff must allege (1) a primary violation of Section 11 or 12(a) by a controlled person or entity, and (2) direct or indirect control by the defendant of the alleged primary violator.  *See SEC* v.

---

[26]    It is well-established that "the district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment."  *Ganino* v. *Citizens Utilities Co*., 228 F.3d 154, 167 n.6 (2d Cir. 2000).

*First Jersey Sec*., *Inc*., 101 F.3d 1450, 1472 (2d Cir. 1996); *Garber* v. *Legg Mason*, *Inc*.,

537 F. Supp. 2d 597, 618 (S.D.N.Y. 2008); *see also* 15 U.S.C. § 77(o).  Because plaintiff

has failed to allege a violation of Section 11 or 12(a) his Section 15 claim also fails.

<u>CONCLUSION</u>

The Amended Complaint should be dismissed with prejudice.

Dated:  New York, New York
        October 27, 2009

Respectfully submitted,


 s/David B. Tulchin
David B. Tulchin (DT 5557)
William J. Snipes (WS 3076)
Claire E. Hunter (CH 0531)
Florence J. Goal (FG 1002)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000
E-mail:  tulchind@sullcrom.com
E-mail:  snipesw@sullcrom.com
E-mail:  hunterc@sullcrom.com
E-mail:  goalf@sullcrom.com

*Attorneys for Defendants Regions Financial*
*Corporation, Regions Financing Trust III,*
*C. Dowd Ritter, Samuel W. Bartholomew,*
*Jr., George W. Bryan, David J. Cooper,*
*Earnest W. Deavenport, Jr., Don DeFosset,*
*James R. Malone, Susan W. Matlock,*
*Charles D. McCrary, Claude B. Nielson,*
*Jorge M. Perez, Lee J. Styslinger, III,*
*Spence L. Wilson and John R. Roberts*