UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| ALFRED FAIT, Individually and on Behalf of All Others Similarly Situated, ) ) ) | |
| ) | No. 09-CV-3161 (LAK) |
| Plaintiff, ) | ECF Case |
| ) | |
| v. ) ) | |
| REGIONS FINANCIAL CORPORATION, et al., ) ) ) | |
| Defendants. ) ) | |

_____


**MEMORANDUM IN SUPPORT OF ERNST & YOUNG LLP'S
MOTION TO DISMISS**


Mauricio A. España
MAYER BROWN LLP
1675 Broadway
New York, New York 10019-5820
(212) 506-2500


October 27, 2009

Stanley J. Parzen
John J. Tharp, Jr.
James C. Schroeder
J. Bishop Grewell
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, IL  60606
(312) 782-0600

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

    A.    Plaintiff's Theory ........................................................................... 3

    B.    Accounting Concepts ...................................................................... 4

    C.    The 2007 10-K ................................................................................ 5

    D.    The Claims Against E&Y .............................................................. 7

ARGUMENT ................................................................................................................... 8

I.    To State A Claim Against E&Y, The Complaint Must—But Does Not—Allege Subjective Falsity And Satisfy Rule 9(b) ............................................................. 8

    A.    To Allege A Section 11 Claim Based On The Defendant's Opinion, The Complaint Must Allege That The Opinion Is Both Objectively And Subjectively False ...................................................................... 8

    B.    An Audit Report Is An Opinion On The Company's Financial Statements, And The Company's Statements Concerning Loan Loss Reserves And Goodwill Are Also Opinions ................................................... 10

    C.    The Complaint Does Not Even Attempt To Allege Subjective Falsity Or Satisfy Rule 9(b) ................................................................... 12

II.    The Complaint's Factual Allegations Do Not State A Plausible Claim Against E&Y ........................................................................................................ 14

    A.    The Allegations In The Complaint Do Not State A Plausible Claim That E&Y Knew As Of Year-End 2007 That Regions' Business Would Do Much Worse In 2008 ...................................................................... 15

    B.    The Bespeaks Caution Doctrine Bars The Claim Against E&Y ........................ 22

    C.    The Complaint Does Not Allege Any Facts Indicating A Plausible Claim Based On Purported GAAS Violations And Internal Control Weaknesses ........ 25

CONCLUSION................................................................................................................ 27

## TABLE OF AUTHORITIES

Page

CASES

*Acceptance Ins. Sec. Litig.*, *In re*,
   423 F.3d 899 (8th Cir. 2005) ...............................................20

*Adams Golf Sec. Litig.*, *In re*,
   176 F. Supp. 2d 216 (D. Del. 2001),
   *aff'd in part and rev'd in part on other grounds*,
   381 F.3d 267 (3d Cir. 2004)...............................................19

*Alpharma Inc. Sec. Litig.*, *In re*,
   372 F.3d 137 (3d Cir. 2004)...............................................15

*AOL Time Warner, Inc. Sec. Litig.*, *In re*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004).......................................9, 10, 14

*AOL Time Warner Sec. Litig.*, *In re*,
   503 F. Supp. 2d 666 (S.D.N.Y. 2007).......................................9

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009)...............................................2, 15, 16, 21, 22, 23, 26, 27, 28

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 127 S. Ct. 1955 (2007)...............................................2, 3, 15, 16, 21, 22, 26, 27, 28

*Bily v. Arthur Young & Co.*,
   834 P.2d 745 (Cal. 1992) ...............................................11

*Bond Opportunity Fund v. Unilab Corp.*,
   2003 WL 21058251 (S.D.N.Y. May 9, 2003),
   *aff'd*, 87 F. App'x 772 (2d Cir. 2004)...............................................10

*Ciresi v. Citicorp*,
   782 F. Supp. 819 (S.D.N.Y. 1991),
   *aff'd*, 956 F.2d 1161 (2d Cir. 1992)...............................................22

*CIT Group Sec. Litig.*, *In re*,
   349 F. Supp. 2d 685 (S.D.N.Y. 2004)...............................................10, 12, 14, 19, 22, 25

*Corning Sec. Litig.*, *In re*,
   2004 WL 1056063 (W.D.N.Y. Apr. 9, 2004),
   *aff'd*, 2005 WL 714352 (2d Cir. Mar. 30, 2005) ...............................................20, 21

*Coronel v. Quanta Capital Holdings*,
   2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ...............................................16, 20

# TABLE OF AUTHORITIES
(continued)

Page

*Denny v. Barber*,
576 F.2d 465 (2d Cir. 1978)...................................................................................19

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ...........................................................................21, 22

*Fannon v. Guidant Corp.*,
2009 WL 3365972 (7th Cir. Oct. 21, 2009)............................................................15

*Fehribach v. Ernst & Young LLP*,
493 F.3d 905 (7th Cir. 2007) ..................................................................................18

*First Nationwide Bank v. Gelt Funding Corp.*,
820 F. Supp. 89 (S.D.N.Y. 1993),
*aff'd*, 27 F.3d 763 (2d Cir. 1994) ...............................................................5, 10, 12

*Global Crossing, Ltd. Sec. Litig., In re*,
313 F. Supp. 2d 189 (S.D.N.Y. 2003).............................................................10, 15

*Halperin v. eBanker USA.com*,
295 F.3d 352 (2d Cir. 2002).......................................................................23, 24, 25

*Harmonic, Inc., Sec. Litig., In re*,
2006 WL 3591148 (N.D. Cal. Dec. 11, 2006) ..................................................10, 15

*Harris v. IVAX Corp.*,
998 F. Supp. 1449 (S.D. Fla. 1998),
*aff'd*, 182 F.3d 799 (11th Cir. 1999)......................................................................13

*Herman & MacLean v. Huddleston*,
459 U.S. 375, 103 S. Ct. 683 ....................................................................................9

*Hinerfeld v. United Auto Group*,
1998 WL 397852 (S.D.N.Y. July 15, 1998) .............................................21, 22, 25

*Johnson Bank v. George Korbakes & Co.*,
472 F.3d 439 (7th Cir. 2006) ..................................................................................18

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1991).........................................................................4, 5, 18

*Landmen Partners v. Blackstone Group*,
2009 WL 3029002 (S.D.N.Y. Sept. 22, 2009)........................................................21

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Lattanzio v. Deloitte & Touche LLP*,
  476 F.3d 147 (2d Cir. 2007) ..........................................................................................9

*Madden v. Deloitte & Touche LLP*,
  118 F. App'x 150 (9th Cir. 2004) ....................................................................................9

*Monroe v. Hughes*,
  31 F.3d 772 (9th Cir. 1994) ..........................................................................................28

*Naye v. Boyd*,
  1986 WL 198 (W.D. Wash. Oct. 20, 1986) ....................................................................22

*Novagold Resources Inc. Sec. Litig.*, *In re*,
  629 F. Supp. 2d 272 (S.D.N.Y. 2009) ............................................................................26

*Olkey v. Hyperion 1999 Term Trust*,
  98 F.3d 2 (2d Cir. 1996) ..........................................................................................18, 25

*P. Stolz Family Partnership v. Daum*,
  355 F.3d 92 (2d Cir. 2004) ............................................................................................23

*Panther Partners v. Ikanos Communications*,
  538 F. Supp. 2d 662 (S.D.N.Y. 2008), *reconsideration denied*, 2008 WL 2414047
  (S.D.N.Y. June 12, 2008), *aff'd in part and vacated in part on other grounds*,
  2009 WL 2959883 (2d Cir. Sept. 17, 2009) ..............................................................18, 19

*Robin v. Arthur Young & Co.*,
  915 F.2d 1120 (7th Cir. 1990) ......................................................................................27

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ..............................................................................14, 23, 26

*Santa Fe Industries v. Green*,
  430 U.S. 462, 97 S. Ct. 1292 (1977) ..............................................................................22

*Scibelli v. Roth*,
  2000 WL 122193 (S.D.N.Y. Jan. 31, 2000) ..............................................................19, 20

*Shields v. Citytrust Bancorp*,
  25 F.3d 1124 (2d Cir. 1994) ..........................................................................................26

*Starter Corp. Sec. Litig.*, *In re*,
  1996 WL 406624 (S.D.N.Y. July 19, 1996) ..................................................................20

# TABLE OF AUTHORITIES
### (continued)

Page

*Stumpf v. Garvey*,
2005 WL 2127674 (D.N.H. Sept. 2, 2005) ............................................................................10

*Virginia Bankshares v. Sandberg*,
501 U.S. 1083, 111 S. Ct. 2749 (1991)................................................1, 9, 10, 12, 13, 14, 15

*Vivendi Universal*, *In re*,
242 F.R.D. 76 (S.D.N.Y. 2007), *reconsideration denied*,
2009 WL 855799 (S.D.N.Y. Mar. 31, 2009) ...................................................................6, 13

*Wells v. HBO & Co.*,
1994 WL 228842 (N.D. Ga. Apr. 19, 1994),
*aff'd*, 67 F.3d 314 (11th Cir. 1995)....................................................................................5, 12

*Zirkin v. Quanta Capital Holdings*,
2009 WL 185940 (S.D.N.Y. Jan. 23, 2009) ...........................................................................19

## STATUTES AND RULES

15 U.S.C. § 77k(a) ........................................................................................................................8, 9

Section 11 of the Securities Act of 1933 ........................................................................................1

Section 14 of the Securities Exchange Act of 1934........................................................................9

## OTHER AUTHORITIES

AICPA, *Codification of Statements on Auditing Standards* AU § 110.01 (2009)........................11

AICPA, *Codification of Statements on Auditing Standards* AU § 110.03 (2009)........................11

AICPA, *Codification of Statements on Auditing Standards* AU § 711 (2009)............................27

American Bankers Association, BANKING TERMINOLOGY (3d ed. 1989)..................................5, 12

Financial Accounting Standards Board, *Statement of Financial Accounting Standards* No.
114........................................................................................................................................5, 12

Financial Accounting Standards Board, *Statement of Financial Accounting Standards* No.
141........................................................................................................................................6, 12

Financial Accounting Standards Board, *Statement of Financial Accounting Standards* No.
142........................................................................................................................................6, 13

S. FLA. BUS. J. Mar. 6, 2009 (available at www.southflorida.bizjournals.com)............................17

## INTRODUCTION

The plaintiff allegedly bought securities of a subsidiary of defendant Regions Financial Corp. ("Regions"), which were sold in an April 2008 offering. The offering documents included Regions' 2007 10-K; the 10-K in turn included Regions' financial statements for the year ended December 31, 2007, which defendant Ernst & Young LLP ("E&Y") had audited. The claim against E&Y—under Section 11 of the Securities Act of 1933—is based solely on E&Y's audit report on Regions' 2007 financial statements. Plaintiff claims that those financial statements were false and misleading because in January 2009 Regions increased its loan loss reserves by $1 billion and decreased its goodwill by $6 billion—plaintiff says the same changes should have been made at year-end 2007 because it was apparent then that Regions would suffer substantial losses on real estate loans in the future due to weaknesses in the real estate market, particularly in Florida, where Regions had made many real estate loans.

The claim against E&Y is flawed for many reasons. As an initial matter, although the First Amended Complaint ("Cmplt.") (Declaration of J. Bishop Grewell, Ex. 1) attempts to plead a negligence claim against E&Y, negligence is the wrong standard. An audit report states nothing more than the auditor's opinion on the company's financial statements taken as a whole. Setting loan loss reserves and an amount for goodwill—which are done by an auditor's client— are also matters of opinion because they concern predictions about future business prospects and involve complex judgments reached after considering a host of factors. Under *Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 111 S. Ct. 2749 (1991), and subsequent decisions, securities claims based on a defendant's opinion must be dismissed unless the plaintiff alleges subjective falsity—namely, that the defendant committed fraud because it *knew* at the time that it did not believe its own opinions. As this Court pointed out during the May 29, 2009 status conference, plaintiff's claims involve matters of "opinion" and therefore "really boil down to a

1

fraud claim," which requires plaintiff to establish that the defendants "knew" that their opinions were false "at the time." Tr. May 29, 2009, at 6 (Grewell Decl., Ex. 2). Plaintiff's counsel responded by promising "we will plead fraud…in particularity." *Id.* at 7. Despite that promise, however, the plaintiff's amended complaint does not even try to satisfy the subjective falsity requirement. Instead, plaintiff expressly disavows any intention to plead fraud—and indeed, there are no allegations of fraud in the amended complaint. Plaintiff's failure to allege subjective falsity compels dismissal of the claim against E&Y.

What is more, plaintiff's claim would fail under any standard because it is a classic exercise in hindsight pleading. In essence, the thrust of the complaint is that it was obvious at the end of 2007 that the Florida real estate market and the economy would do so poorly in the upcoming year that Regions should have increased its reserves for loan losses by $1 billion and written down its goodwill by $6 billion. (If it was so obvious, it is a mystery why plaintiff nonetheless invested in a bank with a large—and fully disclosed—portfolio of Florida real estate loans.) In other words, the complaint rests on the proposition that the changes that Regions made to its reserves and goodwill in January 2009 *after* the cataclysmic events that rocked the world's economy in the fall of 2008 should have been foreseen by E&Y long *before* those events occurred.

The federal securities laws do not require clairvoyance. An auditor has no duty to tell its client about trends in the client's business, much less to accurately forecast the course of the global economy. And even if there were such a duty, the complaint provides no basis to plausibly infer that E&Y knew that Regions' loan loss reserves and goodwill were inaccurate more than a year before the global economy nearly collapsed in the fall of 2008. In its recent decisions in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court has stressed that a federal complaint must

contain enough factual allegations to set forth a claim that is plausible on its face, not one that is merely conceivable or possible.  Plaintiff's claim against E&Y fails this test badly.  Tellingly, the complaint offers no allegations about Regions' loans that would indicate that the 2007 financial statements were wrong at the time—much less that E&Y knew they were wrong.  Indeed, the complaint does not contain any allegations at all about specific loans held by Regions.  Instead, it is filled with allegations about the real estate market generally—information that was available to anyone, including the plaintiff—but that is a legally insufficient basis from which to infer that E&Y knew at the end of 2007 that Regions' loss reserves and goodwill were misstated.

The claim against E&Y fails the plausibility test for two additional reasons.  First, the risk that plaintiff asserts was hidden—that increased real estate losses might result from a weakening housing market, thereby causing Regions to increase its loan loss reserves and reduce the amount attributable to goodwill—was the subject of numerous warnings in the offering documents, and thus the bespeaks caution doctrine requires dismissal of the hindsight claim against E&Y.  And second, plaintiff fails to allege any facts at all suggesting that E&Y failed to conduct its audits in accordance with generally accepted auditing standards, so there is simply no basis to credit plaintiff's conclusory allegations to the contrary.[1]

## BACKGROUND

For purposes of this motion only, the complaint's well-pleaded factual allegations are taken as true.  *Twombly*, 550 U.S. at 555-56, 127 S. Ct. at 1964-65.  The Court also may consider the 2007 Form 10-K for the year ended December 31, 2007, which Regions filed with the SEC on February 27, 2008.  That 10-K is referred to repeatedly in the complaint, and it was incorporated by reference in the registration statement at issue in this case.  *E.g.*, Cmplt. ¶¶ 10,

---

[1]    In addition to the arguments contained in this brief, E&Y adopts the arguments made by the other defendants in their motions to dismiss.

12-13, 19-24, 192; see *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (on a motion to dismiss, a court may consider documents required to be filed with the SEC and documents on which the complaint is based).[2]

**A. Plaintiff's Theory.**  Regions provides banking and other financial services.  Cmplt. ¶ 33.  Plaintiff claims to have acquired preferred securities of Regions Financing Capital Trust III, a subsidiary of Regions, pursuant to an allegedly false and misleading registration statement issued in connection with the April 2008 offering of the securities.  *Id.* ¶¶ 1, 3, 25.  According to the plaintiff, Regions' 2007 financial statements, audited by E&Y and incorporated by reference in the registration statement, "vastly underestimated the Company's loan loss reserves" and overstated the amount of goodwill being carried on Regions' balance sheet.  *Id.* ¶ 12; see also *id.* ¶¶ 129, 139.  Plaintiff contends that although Regions increased its loan loss reserves by $1 billion and wrote down its goodwill by $6 billion in January 2009—due to the "deteriorating real estate market" in Florida and Georgia—it should have taken the same action at the end of 2007. *Id.* ¶¶ 12, 14-15, 129, 158.  Plaintiff alleges that Regions' 2007 financial statements were false because they did not include the revised amounts for loss reserves and goodwill that the company later adopted in January 2009.  *Id.* ¶¶ 12, 14, 27, 126, 129, 139, 158, 173.

Plaintiff traces Regions' problems to its November 2006 acquisition of AmSouth, a bank "heavily invested in the real estate markets in the South" that, unbeknownst to Regions, "was about to be decimated by the impending collapse in mortgage-related asset values."  *Id.* ¶¶ 4-5. Regions paid $10 billion for AmSouth, and it attributed more than $6 billion of that amount to goodwill on Regions' books.  *Id.* ¶ 5.

After the AmSouth acquisition, the real estate market in Florida and elsewhere slowed,

---

[2]    The Regions defendants have filed a copy of Regions' 2007 10-K with their motion to dismiss.  See Declaration of Claire E. Hunter, Ex. C.

resulting generally in declining real estate values and increasing numbers of foreclosures during 2007 and 2008.  *Id.* ¶¶ 6-8, 79-83, 90-91, 93-97, 103, 136.  Plaintiff makes allegations about the real estate market in general (*id.*), but the complaint does not contain any allegations concerning specific loans by Regions or AmSouth.  Nonetheless, plaintiff alleges, E&Y should have known that the general difficulties in the real estate market, including in Florida, meant that Regions' 2007 financial statements were false and misleading because the loan loss reserves were too low and the amount for goodwill attributed to the AmSouth merger was too high.  *Id.* ¶¶ 129, 139, 158, 176, 205-07, 209, 212, 214, 236.

     **B.  Accounting Concepts.**  As noted, the claims against E&Y concern Regions' loan loss reserves and goodwill.  Loan loss reserves are amounts that a bank sets aside "based on its expectations about future loan losses."  American Bankers Association, BANKING TERMINOLOGY 215 (3d ed. 1989).  Thus, "[w]hen a company sets its reserves, it is essentially making a prediction."  *Wells v. HBO & Co.*, 1994 WL 228842, at *17 (N.D. Ga. Apr. 19, 1994), *aff'd*, 67 F.3d 314 (11th Cir. 1995) (table).  "[T]he taking of loan loss reserves is based on managerial guesswork about the future economic fortune of a…real estate loan portfolio," which "depends on the economics of the real estate market."  *First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 95 (S.D.N.Y. 1993), *aff'd*, 27 F.3d 763 (2d Cir. 1994).  A loan is impaired, and thus the loss reserve should be increased, when it is "'probable'" that the loan will not be repaid in full.  Cmplt. ¶ 169 (quoting Financial Accounting Standards Board, *Statement of Financial Accounting Standards* ("SFAS") No. 114 ¶ 8, Grewell Decl., Ex. 3).  "Probable" means that "[t]he future event or events are likely to occur."  SFAS No. 114 ¶ 10.  See also Cmplt. ¶ 172 ("To calculate the Company's loss exposure, Regions was required under GAAP, to evaluate the likelihood of future cash flows (in the form of repayments of principle [sic] and interest)").

     The other accounting concept at issue here, goodwill, is defined as

> the excess of the purchase price over the fair market value of an asset. It reflects the value of intangible assets like reputation, brand name, good customer relations, good employee relations, any patents and proprietary technology, and other intangibles that improve a company's business.

*In re Vivendi Universal*, 242 F.R.D. 76, 81 n.3 (S.D.N.Y. 2007), *reconsideration denied*, 2009 WL 855799 (S.D.N.Y. Mar. 31, 2009). Put differently, goodwill is "an asset because future economic benefits are expected from it in combination with the future benefits of the other assets acquired in the acquisition." Cmplt. ¶ 146 (citing SFAS No. 141, Grewell Decl., Ex. 4). When goodwill is higher than the fair market value of an asset, it reflects the "control premium" that an acquiring company often pays for control of another company: "[s]ubstantial value may arise from the ability to take advantage of synergies and other benefits that flow from control over another entity," and consequently, the amount attributed to goodwill "is different from measuring the fair value of that entity's individual equity securities." SFAS No. 142 n.16 (Grewell Decl., Ex. 5).

**C. The 2007 10-K.** Regions' 2007 10-K stated explicitly that the faltering real estate market was expected to cause increased loan losses. Specifically, because "the weakness in the homebuilder portfolio is expected to continue well into 2008," the 10-K "anticipated that our non-performing asset and charge-off levels will continue to increase in 2008." 2007 10-K at 15; see also *id*. at 63 ("Management anticipates that the housing industry will remain weak throughout 2008"). Thus, the 10-K noted that Regions had increased its loan loss reserves by about 400%: "[d]uring 2007, the provision for loan losses from continuing operations increased to $555.0 million compared to $142.4 million in 2006"; the increase stemmed in part from "an increase in management's estimate of inherent losses in its residential homebuilder portfolio, as well as generally weaker conditions in the broader economy." *Id*. at 25 (quoted in Cmplt. ¶ 10). See also 2007 10-K at 64 (warning that Regions expects losses to "continue to rise" during 2008

6

on "real estate mortgage loans" to developers and investors, loans for "single-family residences," and "real estate construction loans").

The 10-K explained that the "increased loss rate resulted from deteriorating economic conditions during 2007, especially as related to the housing sector"; residential housing "began experiencing significant pressure toward the end of 2007," which "was due to a combination of declining residential demand and resulting price and collateral value declines in certain of the Company's markets, particularly areas of Florida and Atlanta, Georgia," where Regions' "residential homebuilder portfolio is geographically concentrated." 2007 10-K at 25, 45. Indeed, "the housing slowdown has been relatively severe in parts of Florida, and Atlanta, Georgia has also experienced pockets of overbuilding." *Id*. at 63. Moreover, the 10-K warned that "the risk of recession is significantly increasing due to the negative impact housing is having on the overall economy" and that "there has been a decrease in job creation and increases in unemployment in states within our footprint." *Id*.

The 10-K cautioned that although Regions believed "that our allowance for credit losses is adequate…if our assumptions or judgments are wrong, our allowance for credit losses may not be sufficient to cover our actual credit losses," and "[w]e may have to increase our allowance in the future…to adjust for changing conditions and assumptions, or as a result of any deterioration in the quality of our loan portfolio." *Id*. at 15. (Credit losses included both "the allowance for loan losses and the reserve for unfunded credit commitments." *Id*. at 29.) The 10-K noted that Regions faced "credit risk" related to "the value of the real estate serving as security for the repayment of loans." *Id*. at 14. Furthermore, "the effects of recent mortgage market challenges, combined with the ongoing decrease in residential real estate market prices and demand, could result in further price reductions in home values, adversely affecting the value of collateral securing the…loans." *Id*. at 15. And "[a]dverse changes in the economic conditions" of the

markets in which Regions operated—including Florida—"could negatively impact the financial results of Regions' banking operations and have a negative effect on its profitability." *Id.*

With respect to Regions' principal intangible asset, goodwill, the 10-K warned that "[a]dverse changes in the economic environment, declining operations of the business unit, or other factors could result in a decline in implied fair value of excess purchase price," in which case "a loss would be recognized." *Id.* at 30; accord *id.* at 87. The 10-K noted that Regions' ability to achieve "the benefits of the merger with AmSouth" depended on several factors, including "the continued growth of the markets that the acquired entities serve, consistent with recent historical experience." *Id.* at 15.

**D. The Claims Against E&Y.** Plaintiff asserts one claim against E&Y: an alleged violation of Section 11 of the Securities Act of 1933, which provides for liability for a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). See Cmplt. ¶¶ 229-39 (count I).

Plaintiff identifies two respects in which E&Y's 2007 audit report—on Regions' financial statements for the year ended December 31, 2007—allegedly stated incorrectly both that the financial statements satisfied generally accepted accounting principles ("GAAP") and that E&Y's audits complied with generally accepted auditing standards ("GAAS"). First, plaintiff asserts, Regions' financial statements improperly accounted for its goodwill balance, and E&Y negligently audited this item. Cmplt. ¶¶ 205, 212, 214. Second, plaintiff alleges that the financial statements improperly accounted for the company's loan loss reserves, and E&Y negligently audited this item as well.[3] *Id.* These allegations concern only E&Y's 2007 audit

---

[3] Plaintiff also alleges that "E&Y incorrectly represented that Regions maintained, in all material respects, effective internal control over financial reporting" (Cmplt. ¶ 192; accord *id.* ¶

8

report; there is no claim that E&Y's 2006 audit report was inaccurate in any way.[4]

## ARGUMENT

**I.     To State A Claim Against E&Y, The Complaint Must—But Does Not—Allege Subjective Falsity And Satisfy Rule 9(b).**

**A.     To Allege A Section 11 Claim Based On The Defendant's Opinion, The Complaint Must Allege That The Opinion Is Both Objectively And Subjectively False.**

In *Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 111 S. Ct. 2749 (1991), the Supreme

Court held that an opinion is actionable under the securities laws (in that case under Section 14

of the Securities Exchange Act of 1934) only if the opinion was both objectively and

subjectively false.  *Id*. at 1095-96, 111 S. Ct. at 2759-60.  Thus, a complaint based on "a

statement of opinion" must allege both that the opinion was "(1) not believed by the speaker, and

(2) objectively untrue."  *In re AOL Time Warner, Inc. Sec. Litig.*, 381 F. Supp. 2d 192, 243

(S.D.N.Y. 2004).  "'[T]he plaintiff must show both that the [defendants] did not actually hold the

---

218), but the internal controls allegations do not appear to be a separate basis for a claim because they are tied to the allegations concerning loan loss reserves and goodwill.  See *id*. ¶ 129 ("the Company's goodwill and earnings had been overstated since at least 2007 due to…(iii) a lack of adequate internal accounting controls"); ¶ 139(f) ("Regions was operating with woefully deficient internal controls, resulting in the Company improperly reporting its loan loss reserves and goodwill").

[4]     Although the complaint periodically cites Regions' press releases and unaudited quarterly filings with the SEC (*e.g.*, Cmplt. ¶¶ 92, 99, 110), they are not relevant to the claim against E&Y.  E&Y was not involved in preparing any of those documents, and the complaint charges E&Y with liability only for its audit report on the company's 2007 financial statements.  See *id*. at p. 76 ("E&Y's Erroneous Statements as to Regions' FY 2007 Financial Statements") (heading).  Under Section 11, accountants cannot be held liable for "parts of a registration statement which they are not named as having prepared or certified."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 386 n.22, 103 S. Ct. 683, 689 n.22 (1983).  See also *Madden v. Deloitte & Touche LLP*, 118 F. App'x 150, 153 (9th Cir. 2004) (accountant not liable under Section 11 for quarterly statements because it "did not audit or certify" them); *In re AOL Time Warner Sec. Litig.*, 503 F. Supp. 2d 666, 674-75 (S.D.N.Y. 2007) (dismissing Section 11 claim because "liability only attaches to an auditor for its certified audit opinions," not "unaudited quarterly results"); cf. *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 154-56 (2d Cir. 2007) (accountants cannot be liable under Section 10(b) for alleged misstatements in a company's unaudited quarterly statements).

belief or opinion stated, *and* that the opinion stated was in fact incorrect.'" *Id.* (quoting *Bond Opportunity Fund v. Unilab Corp.*, 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003), *aff'd*, 87 F. App'x 772 (2d Cir. 2004)). As this Court explained to plaintiff's counsel before the amended complaint was filed, an opinion is not false if the speaker "honestly hold[s] that opinion," and therefore the claims here require allegations of fraud. Tr. May 29, 2009, at 6-7.

The *Virginia Bankshares* holding has been applied repeatedly to Section 11 claims based on opinions. See *AOL*, 381 F. Supp. 2d at 243-44 (dismissing Section 11 claim concerning fairness opinion); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 210-11 (S.D.N.Y. 2003) (dismissing Section 11 claim concerning fair value opinion); *In Re Harmonic, Inc., Sec. Litig.,* 2006 WL 3591148, at *16 (N.D. Cal. Dec. 11, 2006) (dismissing Section 11 claim based on opinion that merger was in shareholders' best interests); *Stumpf v. Garvey*, 2005 WL 2127674, at *17 (D.N.H. Sept. 2, 2005) (dismissing Section 11 claim concerning analysts' reports). The *Virginia Bankshares* rule has also been the basis for dismissing a Section 11 claim concerning an opinion that a bank's loan loss reserves were "adequate." *In re CIT Group Sec. Litig.*, 349 F. Supp. 2d 685, 690 (S.D.N.Y. 2004) (explaining that the complaint pleaded no facts from which to infer that the defendants "did not believe" that the reserves were adequate).

Thus, any Section 11 claim based on the defendant's opinion must satisfy *Virginia Bankshares* and allege both that the opinion was false and that the defendant "did not actually hold the belief or opinion stated." *AOL*, 381 F. Supp. 2d at 243. As we will show next, this rule applies to the allegations against E&Y, but is not satisfied here.

### B. An Audit Report Is An Opinion On The Company's Financial Statements, And The Company's Statements Concerning Loan Loss Reserves And Goodwill Are Also Opinions.

The allegations with respect to E&Y involve matters of opinion. *First*, an audit report is nothing more than an *opinion* on the financial statements, which are prepared by the company.

"[T]he auditor's role in the financial reporting process is secondary." *Bily v. Arthur Young & Co.*, 834 P.2d 745, 763 (Cal. 1992). "The financial statements are management's responsibility. The auditor's responsibility is to *express an opinion* on the financial statements." AICPA, *Codification of Statements on Auditing Standards* AU § 110.03 (2009) (emphasis added) (Grewell Decl., Ex. 6). See also *Bily*, 834 P.2d at 763 ("an audit report is a *professional opinion* based on numerous and complex factors," which "involv[e] discretion and judgment on the part of the auditor at every stage") (emphasis added).

Furthermore, an auditor does *not* express an opinion on each individual number contained within a financial statement. Rather, the auditor expresses an opinion on the fairness of the company's financial statements "taken as a whole." *Bily*, 834 P.2d at 750. "The objective of the ordinary audit of financial statements…is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." AU § 110.01. Thus, E&Y's audit report stated: "In our opinion, the financial statements…present fairly, in all material respects, the consolidated financial position of Regions Financial Corporation and subsidiaries" and the "consolidated results of their operations and their cash flows…, in conformity with U.S. generally accepted accounting principles." 2007 10-K at 76. E&Y did not express a specific opinion on Regions' figures for loan loss reserves and goodwill—only an opinion on the financial statements as a whole.

*Second*, when Regions set its loan loss reserves and the amount attributable to goodwill, it made statements of opinion. Statements concerning loan loss reserves are opinions about what may occur in the future. As this Court said in May, "a loan loss reserve, by its nature, is somebody's opinion of what fraction of the stated value of the loans…will prove to be uncollectible." Tr. May 29, 2009, at 6. As explained earlier (at 5) and as the plaintiff concedes,

loan loss reserves are based on "expectations about future loan losses."  BANKING TERMINOLOGY at 215; see Cmplt. ¶ 172 (to calculate its "loss exposure," Regions was required "to evaluate the likelihood of future cash flows").    By their very nature, loan loss reserves involve "prediction[s]," *Wells*, 1994 WL 228842, at *17, and "guesswork about the future," which in the case of real estate "depend[] on the economics of the real estate market," *First Nationwide*, 820 F. Supp. at 95.

Moreover, loan loss reserves are increased when a loan is "impaired," and under accounting standards a loan is not considered "impaired" unless it is "probable"—that is, "likely to occur"—that the loan will not be repaid in full.  SFAS No. 114 ¶¶ 8, 10.  Accounting standards recognize that "application of the term probable in practice requires judgment" (*id*. ¶ 49), and that the "complexity" inherent in determining "expected future cash flows" from loans is "unavoidable" (*id*. ¶ 35).  See also *id*. ¶ 43 ("expected future cash flows from impaired loans are usually uncertain and creditors will be required to exercise significant judgment in developing the estimates of expected future cash flows").  The degree of judgment involved in assessing the adequacy of loan loss reserves necessarily means that a statement concerning loan loss reserves is an opinion under *Virginia Bankshares* and its progeny.  See *CIT Group*, 349 F. Supp. 2d at 690 (applying *Virginia Bankshares* to an opinion about loan loss reserves).

Statements concerning goodwill are likewise opinions.  The plaintiff admits that goodwill involves considering what might happen in the future:

> Goodwill is considered to be an asset because *future* economic benefits are expected from it in combination with the *future* benefits of the other assets acquired in the acquisition.  Goodwill is intended to reflect the going concern value of the business acquired and its expected contribution to *future* earnings growth.

Cmplt. ¶ 146 (emphasis added) (citing SFAS No. 141).  See also SFAS No. 141, Key Terms ("*Goodwill* is an asset representing the *future* economic benefits arising from other assets

12

acquired in a business combination that are not individually identified and separately recognized") (emphasis added). And attributing a value to those future benefits necessarily involves an opinion that requires exercising considerable judgment and weighing multiple factors. See *Vivendi*, 242 F.R.D. at 81 n.3 (goodwill "reflects the value of intangible assets like reputation, brand name, good customer relations, good employee relations, any patents and proprietary technology, and other intangibles that improve a company's business"); SFAS No. 142 ¶¶ 18-25 & n.16 (determining whether goodwill is impaired involves making "estimate[s]" of a company's "fair value" and consideration of the "synergies and other benefits that flow from control over another entity"). As one court put it, the notion that goodwill is "a line on a graph, on which the precise value of [a company's] goodwill can be determined at any given moment in time…bears little relation to reality." *Harris v. IVAX Corp.*, 998 F. Supp. 1449, 1453 (S.D. Fla. 1998), *aff'd*, 182 F.3d 799 (11th Cir. 1999). "[T]he value of an intangible asset like goodwill is much less exact and depends on numerous other business judgments." *Id.*

Thus, loan loss reserves and goodwill, by their nature, involve matters of opinion and judgment. And E&Y's audit report is *another* opinion, one step removed—it is an opinion on Regions' opinion concerning loan loss reserves and goodwill. At both levels, the opinions fit squarely within *Virginia Bankshares*.[5]

C.    **The Complaint Does Not Even Attempt To Allege Subjective Falsity Or Satisfy Rule 9(b).**

What we have said so far establishes that (1) under *Virginia Bankshares*, claims based on an opinion must allege that the defendant did not actually hold the opinion stated (*i.e.*,

---

[5]    As noted earlier (at 8 n.3), plaintiff's sporadic internal controls allegations do not seem to assert a separate basis for a claim, but rather are tied to the allegations concerning loan loss reserves and goodwill. If the internal controls allegations are a separate ground for the claim against E&Y, *Virginia Bankshares* applies to E&Y's opinion on internal controls and any such claim must be dismissed for the reasons stated in the text.

fraudulently misstated its opinion); (2) *Virginia Bankshares* applies to an audit report that expresses an opinion on a company's financial statements; and (3) *Virginia Bankshares* applies to a company's provisions for loan loss reserves and goodwill. Because the plaintiff thus *has to* establish fraud in order to recover against E&Y, the claim against E&Y must satisfy the stringent pleading requirements of Rule 9(b). "'[T]he plaintiff must plead with particularity why the statement of opinion was objectively and subjectively false.'" *AOL*, 381 F. Supp. 2d at 243. In fact, at the recent status conference, plaintiff's counsel, Mr. Alba, pledged to the Court that in the amended complaint, "we will plead fraud, that the statements would—we will plead it in particularity. We'll say how they knew it, when they knew it and who knew it." Tr. May 29, 2009, at 7. See also *id*. at 8 (the Court: "Okay. So your allegation is they made a statement in April of '08, which at the time they knew to be false, which is fraud, right?" Mr. Alba: "Okay").

But in the amended complaint the plaintiff has not complied with that promise, even though this complaint (89 pages) is much longer than his original complaint (20 pages). Instead, he "expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct." Cmplt. ¶ 230. This statement confirms that plaintiff has not even attempted to allege subjective falsity or satisfy Rule 9(b).[6] Indeed, the complaint has no allegations whatever that E&Y "'did not actually hold the…opinion stated'" in its audit report. *AOL*, 381 F. Supp. 2d at 243-44 (dismissing Section 11 claim because the complaint "fail[ed] to allege any facts which indicate that Morgan Stanley did not believe its stated January 2000 opinion"). Nor are there any allegations that E&Y subjectively believed that loan loss reserves were understated or that goodwill was overstated. See *CIT Group*, 349 F. Supp. 2d at 690

---

[6]    The applicability of Rule 9(b) is not affected by the complaint's attempted disavowal of any fraud claim. See Cmplt. ¶¶ 1, 230; *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud"). Otherwise, a plaintiff could easily evade the subjective falsity requirement of *Virginia Bankshares*.

(Section 11 claim dismissed because plaintiffs allege no "facts from which to infer that defendants did not believe that reserves were adequate or had no reasonable basis for such a belief"); *Global Crossing*, 313 F. Supp. 2d at 210 (Section 11 claim dismissed because "plaintiffs do not allege that the statements DLJ made about its beliefs were in fact inaccurate"); *Harmonic*, 2006 WL 3591148, at *16 (Section 11 claim dismissed because the complaint "alleges no facts showing that the [defendants] did not sincerely believe that the merger was in [the company's] best interests at the time they made the recommendation").

To state a claim against E&Y, *Virginia Bankshares* requires the plaintiff to allege, with particularity, that E&Y at the time did not actually believe the opinion stated in its audit report (that Regions' financial statements fairly presented the company's financial position, results of operation, and cash flow). Because the First Amended Complaint contains no such allegations, the claim against E&Y must be dismissed with prejudice. See *Fannon v. Guidant Corp.*, 2009 WL 3365972, at *4-5 (7th Cir. Oct. 21, 2009) (affirming dismissal of first consolidated complaint with prejudice for failure to plead securities fraud with particularity); *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 140, 153-54 (3d Cir. 2004) (affirming dismissal of consolidated amended complaint with prejudice for failure to satisfy PSLRA pleading requirements).

## II.    The Complaint's Factual Allegations Do Not State A Plausible Claim Against E&Y.

In addition to the failure to plead subjective falsity and the failure to satisfy Rule 9(b), the complaint does not state a claim against E&Y because it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). A claim has "facial plausibility" only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). But when a complaint "stops short of the line between possibility and plausibility of 'entitle[ment] to relief'"

(*Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966)—that is, where a claim is merely "'conceivable'" and "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct"—the complaint must be dismissed.  *Iqbal*, 129 S. Ct. at 1950-51 (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).  See also *Coronel v. Quanta Capital Holdings*, 2009 WL 174656, at *10 (S.D.N.Y. Jan. 26, 2009) ("To be legally sufficient,…the complaint must provide 'plausible grounds' for the allegations with 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence' to support them") (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965).

Plaintiff's theory with respect to E&Y is that the 2007 financial statements understated loan loss reserves by at least $1 billion and overstated goodwill from the AmSouth acquisition by at least $6 billion—the same amounts by which Regions increased reserves and decreased goodwill in January 2009.  See Cmplt. ¶¶ 12, 14, 27, 129, 139, 158.  Plaintiff contends that the facts that caused the January 2009 changes in those items existed on December 31, 2007.  See *id*. ¶ 129 ("the Company's goodwill and earnings had been overstated since at least 2007 due to…an inadequate level of loan loss reserves" and other factors); ¶ 139(b), (e) ("As the mortgage markets imploded in 2006 and 2007, Regions failed to adequately reserve for mortgage-related exposure"; "Regions failed to accurately and timely increase its loan loss provision by at least $1 billion during the relevant period"); ¶ 158 ("the goodwill balance was overstated by at least $6 billion at the end of 2007").  In essence, because both loan loss reserves and goodwill depend on predictions concerning future events (see pp. 5-6, 11-13, *supra*), the complaint alleges that E&Y should have been prescient and foreseen, as of year-end 2007, that Regions' real estate loans would perform much worse than anticipated in 2008.  As explained below, there are many reasons why this does not state a plausible claim against E&Y.

**A.      The Allegations In The Complaint Do Not State A Plausible Claim That E&Y Knew As Of Year-End 2007 That Regions' Business Would Do Much Worse In 2008.**

A pervasive flaw in the complaint is that it rests on the assumption that the changes that Regions made in January 2009 to its loan loss reserves and goodwill were obvious at year-end 2007 and should have been made then.  See Cmplt. ¶¶ 129, 139, 158.  Thus, plaintiff's thesis is that the changes that Regions made after the near economic meltdown in the fall of 2008—the worst economic crisis in this country since the Great Depression—should have been anticipated by E&Y at the end of 2007.  Plaintiff pretends that the events during the latter half of 2008 played no role in Regions' January 2009 changes, but Regions' announcement of those changes (which plaintiff cites, Cmplt. ¶ 126) noted the impact of recent events, including increasing unemployment:

> Continued declines in housing and residential-related construction project values, as well as rising unemployment, necessitated the [loan loss] reserve increase. Prices of Florida-based properties remain under particular pressure, with the real estate downturn rippling through the economy and propelling unemployment levels.

Regions, Jan. 20, 2009 press release (Grewell Decl., Ex. 7).  Indeed, by January 2009, Florida's unemployment rate had shot up to 8.6%, a steep rise from only 5% in January 2008.  S. FLA. BUS. J. Mar. 6, 2009 (available at www.southflorida.bizjournals.com). Plaintiff also ignores the myriad warnings in the 2007 10-K about the weakening housing market and the possibility of increased losses from real estate loans.  See pp. 23-26, *infra* (explaining that those warnings require judgment for E&Y under the bespeaks caution doctrine).  Instead, plaintiff insists, with the enviable luxury of hindsight, that E&Y should have known at the end of 2007 that 2008 would be worse than anticipated and that Regions was wrong at year-end 2007 in forecasting its future business prospects when determining its goodwill and loan loss reserves (which it

increased in 2007 by 400% over 2006, to $555 million; see 2007 10-K at 25).[7]

The claim against E&Y is full of holes. For one thing, an "auditor is not hired to assess the supply and demand conditions facing the audited firm," and thus there is "no merit" to a claim that an audit "report failed to warn [the client] of ominous trends in the [client's] business." *Fehribach v. Ernst & Young LLP*, 493 F.3d 905, 910-11 (7th Cir. 2007). An auditor "could not have been expected to know more about trends in the [client's] business than [the client]." *Id.* at 911. As the *Fehribach* court explained:

> [P]redicting [the client's] future cash flow on any basis other than the financial statements for the audit year…was not the function of the audit report. … "[A]n auditor's duty is not to give business advice; it is merely to paint an accurate picture of the audited firm's financial condition, insofar as that condition is revealed by the company's books and inventory and other sources of an auditor's opinion."

*Id.* at 910 (quoting *Johnson Bank v. George Korbakes & Co.*, 472 F.3d 439, 443 (7th Cir. 2006)).

Beyond that, plaintiff is "pleading with 20/20 hindsight," which is impermissible. *Panther Partners v. Ikanos Communications*, 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008), *reconsideration denied*, 2008 WL 2414047 (S.D.N.Y. June 12, 2008), *aff'd in part and vacated in part on other grounds*, 2009 WL 2959883 (2d Cir. Sept. 17, 2009). "'[E]ven the most exhaustively researched predictions are fallible,'" and a plaintiff must allege more than that his investment "may have turned out to be a bad one." *Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 8 (2d Cir. 1996) (quoting *Kramer*, 937 F.2d at 776). "The securities laws do not require clairvoyance in the preparation of offering documents," which "are not guarantees" against the "vicissitudes" and "volatility" of business. *Panther Partners*, 538 F. Supp. 2d at 664.

For that reason, defendants "cannot be subject to liability under the securities laws for their failure to predict in the IPO documents facts that occurred or patterns that were discerned

---

[7]    Plaintiff characterizes the 400% jump in loan loss reserves in 2007 as a "marginal[] increase[]." Cmplt. ¶ 10.

after the IPO." *In re Adams Golf Sec. Litig.*, 176 F. Supp. 2d 216, 238 (D. Del. 2001) (dismissing Section 11 claim), *aff'd in part and rev'd in part on other grounds*, 381 F.3d 267 (3d Cir. 2004). As the Third Circuit said in affirming the dismissal of one of the claims in *Adams Golf*, "the fact that looking backward, one perceives a trend does not necessarily mean that conditions were such that one year earlier the situation was sufficiently obvious." 381 F.3d at 279. In fact, Regions *did* warn in its 2007 10-K that losses on real estate loans might well increase in 2008 and it increased its loan loss reserves by 400%; it just did not know that 2008 would nearly bring the entire economy to its knees and that its losses on real estate loans would be higher than it projected. A prediction is not false simply because it does not come to pass.

Nor is it permissible "to assume that Defendants *must* have known because something did in fact occur later." *Panther Partners*, 538 F. Supp. 2d at 673. "[I]t is 'not a reasonable inference' to assume prior knowledge based upon actual knowledge at a later date." *Zirkin v. Quanta Capital Holdings*, 2009 WL 185940, at *11 (S.D.N.Y. Jan. 23, 2009) (quoting *Scibelli v. Roth*, 2000 WL 122193, at *3 (S.D.N.Y. Jan. 31, 2000)). For example, in dismissing a Section 11 claim in *CIT Group*, the court rejected the argument "that defendants could not have actually believed that loan loss reserves were adequate because defendants decided to increase loan loss reserves just three weeks after the IPO." 349 F. Supp. 2d at 690 (citations to complaint omitted). "That defendants later decided to revise the amount of loan loss reserves…provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time." *Id.* at 690-91. See also *Denny v. Barber*, 576 F.2d 465, 467, 470 (2d Cir. 1978) (Friendly, J.) (a claim concerning, *inter alia*, "amounts reserved for loan losses" alleges "fraud by hindsight"; "plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones"); *Zirkin*, 2009 WL 185940, at *10-11 (a loss estimate was not false when made simply because it was revised upward by 15% two

months later); *Coronel*, 2009 WL 174656, at *14 (same); *Scibelli*, 2000 WL 122193, at *3 ("To *infer* that Nortel *possessed* such information [about declining revenue growth] on July 24 because Nortel *announced* such information on September 29 is not a reasonable inference, and the plaintiffs' complaint fails on this score"); *In re Starter Corp. Sec. Litig.*, 1996 WL 406624, at *3 (S.D.N.Y. July 19, 1996) (dismissing a Section 11 claim based on an inventory markdown 18 months after the registration statement because "no possible inference can be drawn from these write-downs, occurring long after the prospectus, that the questioned statements in the prospectus about inventory controls were false").

Indeed, because "retrospective analysis of awareness cannot be the basis for a claim" under Section 11, events that occurred after the date of the financial statements are irrelevant— "[u]nder…Section 11, information is required to be included only if it is available prior to the issuance of a financial statement." *In re Acceptance Ins. Sec. Litig.*, 423 F.3d 899, 903 (8th Cir. 2005) (affirming dismissal of a Section 11 claim alleging that an insurer's reserves were inadequate). Accordingly, plaintiff's allegations concerning events after the 2007 financial statements must be disregarded. See Cmplt. ¶¶ 9, 13, 15, 72, 101, 103, 107-08, 110-27, 130-37, 157, 160-63, 168-69, 183-85, 206.

The absence of allegations about Regions' loan portfolio at the end of 2007 is fatal. There are no allegations about specific loans held by Regions that were in peril at the end of 2007. Nor does the complaint provide any specifics about the impact of problems in the Florida real estate market generally on the particular loans held by Regions. In a case alleging that the defendants "exercised poor judgment in the timing of" a $5.1 billion write-down of goodwill, the court dismissed the claim because the plaintiffs "fail[ed] to allege specific facts that the valuations, and the timing of the write-offs, violated GAAP." *In re Corning Sec. Litig.*, 2004 WL 1056063, at *31 (W.D.N.Y. Apr. 9, 2004), *aff'd*, 2005 WL 714352, at *2 (2d Cir. Mar. 30,

2005).  In the absence of "specific facts," the court held that the complaint did not state a claim in "ask[ing] the reader to conclude that defendants unreasonably delayed in writing down inventories and goodwill figures because, as it developed, the downturn in the telecommunications market was more severe than analysts had predicted at the end of 2000." 2004 WL 1056063, at *32.  See also *DiLeo v. Ernst & Young*, 901 F.2d 624, 626-27 (7th Cir. 1990) (affirming dismissal of a claim against an auditor alleging that a bank "did not increase its reserves fast enough"—credit losses were allegedly understated by $4 billion—because "[t]he complaint does not…give examples of problem loans that E&W should have caught, or explain how it did or should have recognized that the provisions for reserves established by [the bank] were inaccurate").

Plaintiff cannot make up for the absence of allegations about specific Regions loans by relying instead on allegations about the Florida real estate market generally.  See Cmplt. ¶¶ 6-8, 79-83, 90-91, 93-97, 103, 136; *Landmen Partners v. Blackstone Group*, 2009 WL 3029002, at *9 (S.D.N.Y. Sept. 22, 2009) (dismissing a Section 11 claim because "generalized allegations that problems brewing in the [real estate] market at large made it 'foreseeable' that a particular set of unidentified investments would sour are insufficient to 'nudge[] [the] claims across the line from conceivable to plausible'") (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974); *Hinerfeld v. United Auto Group*, 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) (dismissing a Section 11 claim about inadequate loss reserves because "[t]here are no facts alleged to support an inference that this failure was the result of anything but inaccurate forecasting or unforeseen circumstances").  Allegations about general market conditions do not permit a "reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id*. (quoting

*Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966).

Finally, "[f]or any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off. No matter when a bank does this, someone may say that it should have acted sooner." *DiLeo*, 901 F.2d at 627. Thus, when "all that is involved is a dispute about the timing of the writeoff," the allegations amount to a claim of poor business judgment, which is not actionable. *Id*. (citing *Santa Fe Industries v. Green*, 430 U.S. 462, 97 S. Ct. 1292 (1977)). See also *Ciresi v. Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991) ("the claim that the defendants did not plan their loan reserves properly is essentially a claim that defendants mismanaged the company," which is "not actionable"), *aff'd*, 956 F.2d 1161 (2d Cir. 1992) (table); *Hinerfeld*, 1998 WL 397852, at *7 ("The failure to anticipate the extent of necessary reserves, even if it amounts to mismanagement, is not actionable under federal securities laws"); *CIT Group*, 349 F. Supp. 2d at 689 (same); *Naye v. Boyd*, 1986 WL 198, at *4 (W.D. Wash. Oct. 20, 1986) (dismissing a claim against an auditor that a bank's financial statements were false and misleading as to the bank's loan loss reserves because inquiry into "the adequacy of the loan loss would require the court to evaluate [the bank's] business judgment to determine whether [the bank] did indeed engage in imprudent banking practices. This sort of inquiry…is precisely what the ruling in *Santa Fe* sought to avoid").

\*    \*    \*

The allegations here simply do not "plausibly give rise to an entitlement to relief" against E&Y. *Iqbal*, 129 S. Ct. at 1950. They are based on pure hindsight and provide no basis from which to conclude that E&Y knew at the end of 2007 that the economy, by the next fall, would be on the brink of a financial disaster, which would wreak havoc on Regions' business. It was only after *that* near-meltdown of the economy that Regions increased its loan loss reserves by $1 billion and decreased its goodwill by $6 billion. The complaint's allegations provide no basis

from which to infer that E&Y knew, at year-end 2007, that the adjustments later made in January 2009 were already warranted and that Regions was grossly mistaken in assessing the value of its goodwill and the amounts needed for loan loss reserves (which Regions increased by 400% over 2006). Because it cannot be inferred from the complaint's allegations that such a claim has "facial plausibility," the Section 11 claim against E&Y must be dismissed. *Iqbal*, 129 S. Ct. at 1949.

### B.    The Bespeaks Caution Doctrine Bars The Claim Against E&Y.

There is another reason why the claim against E&Y is facially implausible: plaintiff's allegations ignore the explicit warnings contained in Regions' 2007 10-K. Under the common law bespeaks caution doctrine, "'alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.'" *Rombach*, 355 F.3d at 173 (quoting *Halperin v. eBanker USA.com*, 295 F.3d 352, 357 (2d Cir. 2002)). The doctrine "is aimed at warning investors that bad things may come to pass—in dealing with the contingent or unforeseen future." *P. Stolz Family Partnership v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004). The defendant will not be liable if the cautionary language "warns of the specific contingency that lies at the heart of the alleged misrepresentation." *Id*. A two-step analysis is involved. The court must first "identify the allegedly undisclosed risk." *Halperin*, 295 F.3d at 359. Next, "analyz[ing] the allegedly fraudulent materials in their entirety"—including the cautionary language—the court "determine[s] if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist." *Id*. at 357, 359.

Viewing events in hindsight, plaintiff contends that the offering documents did not disclose that loan loss reserves might be increased as much as they ultimately were, and that goodwill from the AmSouth acquisition might be reduced, due to losses in a real estate loan

portfolio that was concentrated in the Southeast, especially Florida, where the real estate market was in the process of crashing.

Warnings of this risk were made repeatedly in the offering materials. Regions' 2007 10-K, which was incorporated by reference in the registration statement, was filled with warnings that losses on real estate loans could worsen due to continued weakness in the housing market, increasing unemployment, and a heightened risk of a recession. The 10-K also specifically warned investors that those losses could negatively impact loan loss reserves and goodwill. The 2007 10-K explicitly cautioned:

- "[T]he weakness in the homebuilder portfolio is expected to continue well into 2008. Accordingly, it is anticipated that our non-performing asset and charge-off levels will continue to increase in 2008." 2007 10-K at 15.

- "Management anticipates that the housing industry will remain weak throughout 2008." *Id*. at 63.

- Noting that its "residential homebuilder portfolio is geographically concentrated" in Florida and Atlanta, Regions stated that it "expects that losses" on "loans to real estate developers and investors," loans for "single-family residences," and "real estate construction loans" will "continue to rise" during 2008. *Id*. at 45, 64.

- "[T]he risk of recession is significantly increasing due to the negative impact housing is having on the overall economy"; and "there has been a decrease in job creation and increases in unemployment in states within our footprint." *Id*. at 63.

- Because of an "increased loss rate," Regions increased its loan loss reserves in 2007 by about 400% (to $555 million compared to $142 million in 2006); the increase stemmed in part from "an increase in management's estimate of inherent losses in its residential homebuilder portfolio, as well as generally weaker conditions in the broader economy." *Id*. at 25.

- "[I]f our assumptions or judgments are wrong, our allowance for credit losses may not be sufficient to cover our actual credit losses"; "[w]e may have to increase our allowance in the future…to adjust for changing conditions and assumptions, or as a result of any deterioration in the quality of our loan portfolio." *Id*. at 15.

- "[T]he effects of recent mortgage market challenges, combined with the ongoing decrease in residential real estate market prices and demand, could result in further price reductions in home values, adversely affecting the value of collateral

securing the…loans." *Id*. at 15.

- "Adverse changes in the economic conditions" of the markets in which Regions operated—including Florida—"could negatively impact the financial results of Regions' banking operations and have a negative effect on its profitability." *Id.*

- With respect to Regions' principal intangible asset, goodwill, the 10-K warned that "[a]dverse changes in the economic environment, declining operations of the business unit, or other factors could result in a decline in implied fair value of excess purchase price," in which case "a loss would be recognized." *Id*. at 30; accord *id*. at 87.

- Regions' ability to achieve "the benefits of the merger with AmSouth" depended on several factors, including "the continued growth of the markets that the acquired entities serve, consistent with recent historical experience." *Id*. at 15.

Any reasonable investor reading these warnings would have realized that Regions could suffer significant losses—which could result in increased loan loss reserves and a lower amount for goodwill—if the economy worsened and housing markets continued to decline. In *CIT Group*, 349 F. Supp. 2d at 691, the court dismissed a Section 11 claim because cautionary language in the offering documents explained that the chosen level of loan loss reserves "was the product of 'estimates and significant judgment.'" Regions' 10-K is similar; it noted that loan loss reserves were based on an "estimate of inherent losses" and that the allowance for credit losses may have to be increased if "our assumptions or judgments are wrong." 2007 10-K at 15, 25. See also *Hinerfeld*, 1998 WL 397852, at *6-7 (dismissing a Section 11 claim based on inadequate loss reserves because the prospectus warned that "'general economic conditions'" could "'worsen and lead to higher rates of delinquency and default'").

The risks disclosed in the 2007 10-K are precisely the risks that came to pass. "The cautionary language addresses the relevant risk directly." *Halperin*, 295 F.3d at 360. The warnings about the housing market and the economy were "specific enough to warrant a reasonable investor's attention." *Olkey*, 98 F.3d at 9. To be sure, at the time no one knew just how bad things would get. But the failure to anticipate that a recession—a risk explicitly noted

(2007 10-K at 63)—would turn into the Great Recession is not a basis for imposing liability under the securities laws. "'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future.'" *Rombach*, 355 F.3d at 174 (quoting *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1129-30 (2d Cir. 1994)). "The Registration Statement need not predict all of the details of the contingency that came to pass"; it is sufficient if it "warn[s] of th[e] risk at a higher level of generality." *In re Novagold Resources Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 294 (S.D.N.Y. 2009).

The 2007 10-K more than adequately warns prospective investors of the risk that Regions might incur considerable losses in its real estate loans due to both weakness in the real estate market and a slumping economy, and cautions that this could adversely affect loan loss reserves and goodwill. In light of that cautionary language, no reasonable investor would consider the allegedly false statements set forth in the complaint to be material. As a result, the claim against E&Y must be dismissed.

### C. The Complaint Does Not Allege Any Facts Indicating A Plausible Claim Based On Purported GAAS Violations And Internal Control Weaknesses.

Finally, the complaint is deficient because while it contains conclusory allegations that E&Y did not follow GAAS in performing its audit (Cmplt. ¶¶ 192, 209, 212, 214), it does not contain any factual allegations to back up those assertions. Just what should E&Y have done in auditing the 2007 financial statements that it did not do? The complaint does not say. The Supreme Court has emphasized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65. A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966). But "naked assertions" are all that plaintiffs have alleged with respect to

purported GAAS violations. That is not enough to survive a motion to dismiss. "Rule 8… does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S. Ct. at 1950.

For example, the complaint contains many paragraphs concerning E&Y's alleged responsibility under AU § 711 (Grewell Decl., Ex. 8) to update certain financial information between December 31, 2007 (the date on the 2007 financial statements) and April 28, 2008 (the date of the registration statement). See Cmplt. ¶¶ 193-204. Failure to satisfy § 711 is not actionable under the securities laws in any event, *Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1125-26 (7th Cir. 1990), but beyond that the complaint *does not allege any facts* showing that E&Y failed to follow the procedures suggested in § 711. Plaintiff alleges only that "E&Y's reports and approval of the financial results were false and misleading due to its negligent failure to comply with GAAS and specifically AU § 711 because Regions' financial statements were not prepared in conformity with GAAP." Cmplt. ¶ 209. This is no more than a "'naked assertion[]' devoid of 'further factual enhancement,'" which is insufficient to state a claim. *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966).

Equally conclusory are the assertions that E&Y violated GAAS because it "failed to obtain sufficient, competent evidential matter to support Regions' assertions regarding its accounting for its goodwill and its loan loss reserves" (Cmplt. ¶ 212) and "ignor[ed] red flags …including unreasonable assumptions regarding Regions' accounting for its goodwill and its loan loss reserves" (*id*. ¶ 214). What "evidential matter" did E&Y obtain during its audit and why was it purportedly insufficient? The complaint provides no details at all. What "red flags" did E&Y supposedly know about during its audit, but ignore? Again, the complaint gives not a clue.

The allegations concerning Regions' internal controls are also flawed. First, "[n]either

27

applicable professional standards, nor any legal authority…treat deficiencies in internal controls of a company as material to the audit report itself." *Monroe v. Hughes*, 31 F.3d 772, 775 (9th Cir. 1994). Second, the handful of internal controls allegations do not even appear to be a separate basis for a claim because they are linked to the allegations concerning loan loss reserves and goodwill. See Cmplt. ¶¶ 129, 139(f). Third, if the internal control allegations are intended to be a separate basis for a claim, they are entirely conclusory. The complaint alleges only that E&Y "negligently represented that in its opinion the Company had maintained effective internal controls, when it had not." *Id.* ¶ 218; see also *id*. ¶ 192 ("E&Y incorrectly represented that Regions maintained…effective internal control over financial reporting"). Why was E&Y supposedly negligent in making its statement about internal controls? What was negligent about its audit as to this issue? The complaint is utterly silent on the matter.

Plaintiff's failure to allege any facts supporting its conclusory assertions of GAAS violations and internal control problems is especially problematic because plaintiff is required to allege subjective falsity: that E&Y *knew* that its audit did not comply with GAAS and *knew* that Regions' internal controls were deficient. See pp. 9-15, *supra*. Yet the complaint has *no* allegations that E&Y subjectively believed that its opinions on GAAS and internal controls were false, much less "sufficient factual matter" that would make such a claim "'plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). Accordingly, the claims that E&Y's audits violated GAAS and that E&Y misrepresented the effectiveness of Regions' internal controls must be dismissed.

## CONCLUSION

For the reasons set forth, the claim against E&Y should be dismissed with prejudice.

October 27, 2009

Mauricio A. España
MAYER BROWN LLP
1675 Broadway
New York, New York 10019-5820
(212) 506-2500

Respectfully submitted,

<u>s/ Stanley J. Parzen</u>
Stanley J. Parzen
John J. Tharp, Jr.
James C. Schroeder
J. Bishop Grewell
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, IL 60606
(312) 782-0600

Email:
sparzen@mayerbrown.com
jtharp@mayerbrown.com
jschroeder@mayerbrown.com
jgrewell@mayerbrown.com
mespana@mayerbrown.com

*Attorneys for Defendant Ernst & Young LLP*

29

**CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2009, I electronically filed the foregoing Memorandum in Support of Ernst & Young LLP's Motion to Dismiss with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to counsel of record.


<u>s/ Mauricio A. España</u>
MAURICIO A. ESPAÑA