UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

ALFRED FAIT, Individually and on Behalf of :    Civil Action No. 1:09-cv-03161-LAK
All Others Similarly Situated,                 :    (**Consolidated**)

                               :

                Plaintiff,    :    CLASS ACTION

                               :

       vs.                        :    CORRECTED FIRST AMENDED
                               :    COMPLAINT FOR VIOLATIONS OF THE

REGIONS FINANCIAL CORPORATION, et :    FEDERAL SECURITIES LAWS
al.,                               :

                               :

               Defendants.    :

                               :

—————————————————————— x

## NATURE OF THE ACTION

1.    This is a securities class action on behalf of all persons who acquired the 8.875%
Trust Preferred Securities (the "Securities") of Regions Financing Trust III ("Regions Trust III")
pursuant or traceable to a materially false and misleading registration statement and prospectus (the
"Registration Statement") issued in connection with the April 2008 offering of the Securities (the
"Offering").  This action asserts violations of the Securities Act of 1933 ("1933 Act") based on
theories of strict liability and negligence – but not fraud – against Regions Financial Corporation
("Regions" or the "Company"), certain of its subsidiaries, its senior insiders, its auditors and the
investment banks that underwrote the Offering (collectively, "defendants").

2.    The Securities at issue are hybrid securities that have characteristics of both equity
and debt.  This type of security has been especially popular with bank holding companies, such as
Regions, in recent years due to a 1996 Federal Reserve Board opinion allowing the proceeds of a
trust preferred offering to be treated as precious "Tier I" capital by the bank.[1]  Under these federal
guidelines, up to 25% of a bank's Tier I capital may be derived from funds raised through trust
preferred securities offerings such as the one at issue here.

3.    In anticipation of the Securities offering, Regions created a wholly-owned subsidiary
that was organized as a trust – Regions Trust III.  Regions issued debt to the trust and the trust in
turn issued the Securities to investors through an initial public offering.  The proceeds of the
Offering were transferred from the trust to Regions, allowing the Company to treat the proceeds as
Tier I capital on its balance sheet.  Regions consummated the Offering pursuant to the false and

---

[1]    The Tier I capital ratio measures a bank's readily available capital as a percentage of assets
that are potentially at risk of default (known as its "risk-adjusted assets").

misleading Registration Statement, selling 13.8 million shares of the Securities at $25 per share for proceeds of $345 million.

## INTRODUCTION

4.    In the Spring of 2006, Regions agreed to purchase AmSouth Corporation ("AmSouth"), a bank that was heavily invested in the real estate markets in the South, especially Florida and Georgia, through its growing issuance of residential mortgages. But Regions' timing was terrible. It ended up paying a huge premium for a company that had a recent history of large gains due to the real estate bubble – but was about to be decimated by the impending collapse in mortgage-related asset values.

5.    At the urging of management of both companies, the stock-for-stock purchase was approved by shareholders in November, 2006. Regions paid $10 billion for AmSouth, but an astounding 60% of that price, or over $6 billion, was ***not*** based on the assets of the company, and therefore had to be attributed to "goodwill." But the only way that amount of goodwill could reasonably be attributed to AmSouth was if the residential real estate markets that AmSouth was so heavily invested in continued their rapid growth for years into the future. But just the opposite, in fact was happening. Indeed, by the time the deal had closed the air was already coming out of the real estate bubble in the areas where AmSouth – and now Regions – was so heavily invested. Many of AmSouth's residential mortgages were adjustable rate mortgages ("ARMs"), including those with initial teaser rates. The combination of a declining real estate market and a large number of ARMs meant that many of these mortgages would default. This problem was amplified at AmSouth because, since 2005, AmSouth had kept a large portion of ARMs on its own books rather than selling the loans to other investors.

6.    By late 2006, the real estate markets in the areas where the vast majority of Regions' business now focused – especially Florida – began a rapid descent from its dizzying heights in 2005.

Real estate sales slowed, mortgage originations stalled, values began declining and foreclosures began accelerating. As the collapse gained momentum throughout 2007, foreclosures skyrocketed, loan originators began going bankrupt and the financial media publicly described the fallout from the lax mortgage requirements and salacious lending practices of the recent past.

7.      For instance, on April 2, 2007 New Century Financial, the nation's second largest sub-prime lender in 2006 filed for bankruptcy. On June 12, 2007 RealtyTrac announced U.S. foreclosure filings surged 90% year-over-year in May 2007, and had increased an incredible 19% month-to-month; that is, from April 2007 to May 2007. Then on August 6, 2007, American Home Mortgage, one of the largest home lenders in the country, also filed for bankruptcy due to the "weak housing market and a spike in payment defaults." And it only got worse from there.

8.      Things were especially bad in Florida. As reported in an April 17, 2007 *Sun-Sentinel* article entitled, "Residents Miss More Mortgage Payments; Foreclosure Rates Expected to Jump in South Florida":

> A deluge of South Floridians are falling behind on their monthly house payments, raising fears that many of the delinquent property owners will lose their homes to foreclosure this year and next.
>
> "Who knows how bad it's going to get," said Richard French, a manager with SunTrust Mortgage and president of the Broward County chapter of the Mortgage Bankers Association. "It's a little scary to think about."
>
> Escalating home values from 2000 to 2005 caused buyers to overextend themselves. Many took out short-term, adjustable-rate mortgages and are seeing their loan payments spike as interest rates rise. Higher property taxes and insurance premiums also are putting homeowners in peril.
>
> Broward had 1,168 property owners with late payments in March, a 331 percent increase over the 271 a year ago, according to Realestat.com, a Plantation-based firm that compiles local housing statistics. Palm Beach County's late payments climbed 288 percent, to 888, from 229 last March.
>
> Late home loan payments in both counties increased in each of the first three months of 2007. The rise 'bodes ill for actual foreclosures down the road,' said Mike Larson, an analyst with Weiss Research in Jupiter.

Marc Thomashaw, a vice president for Realestat.com, was more blunt.

"We're set for an explosion [of foreclosures] to happen between now and the next six months," he said Monday.

\*        \*        \*

What's more, South Florida's slumping real estate market is holding down prices and preventing recent buyers from selling quickly to get out of financial trouble.

"A lot of these escape valves are now shut," Weiss' Larson said. "It's not a pretty sight."

\*        \*        \*

Mark Zandi, chief economist with Moody's Economy.com, a West Chester, Pa., research firm, agrees that short-term investors and others who bought within the past few years are most at risk of losing their homes. ***Still, he said more mortgage delinquencies and foreclosures are inevitable due to a "noxious mix" of aggressive lending, falling home prices and borrowers facing large increases in their monthly payments***.

9.      By early 2008, the mortgage meltdown was wildly out of control and was bleeding into all of the financial markets. In early March 2008, the credit markets seized up, causing the near bankruptcy of Bear Stearns. In desperation, Bear Stearns had to be sold overnight to JP Morgan for $2 per share, in a deal brokered by the U.S. government in which the government agreed to make good on $30 billion of Bear Stearns losses – mostly attributable to mortgage-backed securities.

10.     Yet in spite of all of this, Regions did not write down any of the massive goodwill it carried on its balance sheet from the AmSouth merger, and it only marginally increased its loan loss reserves. In its 2007 Form 10-K, filed with the Securities and Exchange Commission ("SEC") on February 27, 2008, Regions carried $11.5 billion of "goodwill" on its balance sheet, more than $6.2 billion of which was attributable to the AmSouth merger – essentially reporting that its goodwill was not impaired. Concerning Region's "allowance for credit losses," the 10-K stated:

The provision for loan losses is used to maintain the allowance for loan losses at a level that, in management's judgment, is adequate to cover losses inherent in the

- 4 -

loan portfolio as of the balance sheet date. During 2007, the provision for loan losses from continuing operations increased to $555.0 million compared to $142.4 million in 2006. Two primary factors led to the increase. Most notably, 2006 included just two months of provision for loan losses added to the portfolio as a result of the November 2006 merger with AmSouth, while the provision recorded in 2007 reflected the results of the newly merged Regions for the full year. Additionally, the provision rose due to an increase in management's estimate of inherent losses in its residential homebuilder portfolio, as well as generally weaker conditions in the broader economy.

11. Many banks, especially those with significant mortgage related holdings such as Regions, became desperate to raise capital. One of the ways Regions did this was to issue "trust preferred securities." But the Registration Statement defendants used to issue the Securities was defective. While it provided information about the Securities themselves – how the trust worked, when interest payments would or would not be made, etc. – the Registration Statement negligently offered false and misleading information about the Company itself, and its prospects.

12. The recently filed 2007 10-K which was incorporated by reference into the Registration Statement, had vastly underestimated the Company's loan loss reserves, and the massive goodwill being carried on the balance sheet had not been written down since the AmSouth acquisition – in spite of the fact that the housing markets relied upon so heavily by AmSouth and Regions had utterly imploded. But these defects went unnoticed and unquestioned in the Offering because the underwriters performed almost no due diligence. As a result, at the time of the Offering, the Company's most recent financial statement (the 2007 10-K incorporated by reference into the Registration Statement) overstated goodwill *by more than $6 billion* and the loan loss reserves were understated *by more than $1 billion*.

13. Less than two months after the April 28, 2008 Offering, the SEC sent Regions a comment letter concerning the Company's recently filed 2007 10-K, and pointed out that at the time of the filing of the 10-K, *the Company's stock price was trading at a value below the Company's book value*, and demanding that the Company improve its disclosures to comply with Statement of

Financial Accounting Standards ("SFAS") No. 142 (relating to calculation of goodwill) – which it had not done.

14.     As its capital position deteriorated further, Regions was required to seek government help.  In October 2008 it announced it would be bailed out by taxpayers, receiving $3.5 billion of TARP money.  But with the government bailout came increased scrutiny.  So in January 2009 Regions was finally forced to write down its goodwill by $6 billion and increased its loan loss reserves by over $1 billion, all in a single day!  These charges wiped out all the earnings Regions had reported the prior three years.

15.     Needless to say, investors were furious, analysts criticized management and the stock price declined dramatically.  As a further result, the ratings agencies reduced their ratings on the Company, drastically increasing the cost of raising capital for the Company.  According to the Company's 2008 10-K, filed February 29, 2009, defendants admitted the deteriorating real estate market was the cause of these huge charges (especially in Florida and Georgia), and that it had been a problem for the Company since at least 2007.  This lawsuit follows.

## THE FALSE AND MISLEADING REGISTRATION STATEMENT

16.     On or about May 11, 2007, Regions filed with the SEC a Form S-3 Registration Statement, which stated:

> The SEC allows us to "incorporate by reference" into this prospectus the information in documents we file with the SEC, which means that we can disclose important information to you by referring you to those documents.  The information incorporated by reference is considered to be a part of this prospectus and should be read with the same care.  When we update the information contained in documents that have been incorporated by reference, by making future filings with the SEC, the information incorporated by reference in this prospectus is considered to be automatically updated and superseded.  In other words, in all cases, if you are considering whether to rely on information contained in this prospectus or information incorporated by reference into this prospectus, you should rely on the information contained in the document that was filed later.  We incorporate by reference the documents listed below and any additional documents we file with the SEC in the future under Sections 13(a), 13(c), 14, or 15(d) of the Securities

Exchange Act of 1934 until our offering is completed (other than information in such additional documents that are deemed, under SEC rules, not to have been filed):

- Annual Report on Form 10-K for the year ended December 31, 2006;

- Quarterly Report on Form 10-Q for the quarter ended March 31, 2007;

- Current Reports on Form 8-K filed on January 8, 2007, January 24, 2007, January 30, 2007, March 14, 2007, April 13, 2007 and April 20, 2007, and two Forms 8-K filed on April 30, 2007, and Form 8-K/A filed on January 12, 2007, amending the Form 8-K filed on November 6, 2006; and

- The description of our common stock set forth in our registration statement filed with the SEC pursuant to Section 12 of the Securities Exchange Act of 1934 and any amendment or report filed for the purpose of updating any such description.

17.    Approximately one year later, on or about April 28, 2008, Regions filed its Prospectus for the April 2008 Offering, which formed part of the May 11, 2007 Registration Statement.  The April 2008 Prospectus stated:

At December 31, 2007, Regions had total consolidated assets of approximately $141.0 billion, total consolidated deposits of approximately $94.8 billion and total consolidated stockholders' equity of approximately $19.8 billion.

18.    The April 2008 Prospectus also stated:

The SEC allows us to "incorporate by reference" into this prospectus supplement the information we file with it, which means that we can disclose important information to you by referring you to those documents.  The information incorporated by reference is an important part of this prospectus supplement and information that we subsequently file with the SEC will automatically update and supersede information in this prospectus supplement and in our other filings with the SEC.  We incorporate by reference the documents listed below, which we have already filed with the SEC, and any future filings we make with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, or "Exchange Act," until we sell all the securities offered by this prospectus supplement (in each case, other than information that is deemed, under SEC rules, not to have been filed):

- Annual Report on Form 10-K for the year ended December 31, 2007; and

- Current Reports on Form 8-K filed on January 24, 2008, February 20, 2008, February 27, 2008, February 29, 2008, and April 22, 2008.

19.     The Form 10-K for the year 2007, incorporated by reference into the Registration Statement, reported provisions for loan losses of $555 million, net income of $1.251 billion, assets of $141 billion and stockholders' equity of $20 billion.  Regarding provisions for loan losses, the 2007 10-K stated:

> The provision for loan losses is used to maintain the allowance for loan losses at a level that, in management's judgment, is adequate to cover losses inherent in the loan portfolio as of the balance sheet date.  During 2007, the provision for loan losses from continuing operations increased to $555.0 million compared to $142.4 million in 2006.  Two primary factors led to the increase.  Most notably, 2006 included just two months of provision for loan losses added to the portfolio as a result of the November 2006 merger with AmSouth, while the provision recorded in 2007 reflected the results of the newly merged Regions for the full year.  Additionally, the provision rose due to an increase in management's estimate of inherent losses in its residential homebuilder portfolio, as well as generally weaker conditions in the broader economy.
>
> As a result of the general economic environment and the deteriorating credit conditions described above, which accelerated late in 2007, Regions increased its allowance for credit losses through a loan loss provision from continuing operations of $555.0 million and a provision for unfunded commitments of $6.4 million, $358.0 million and $2.4 million of which, respectively, were expensed in the fourth quarter. These provisions drove the allowance for credit losses up to 1.45 percent of total loans, net of unearned income, at December 31, 2007, as compared to 1.17 percent at December 31, 2006.

20.     The Form 10-K also disclosed that ***Regions' goodwill balance for the fiscal year ending December 31, 2007 was $11.5 billion, effectively reporting that its goodwill was not impaired***.  In fact the 10-K stated that "[e]xcess purchase price at December 31, 2007 totaled $11.5 billion as compared to $11.2 billion at December 31, 2006, with the increase driven by finalizing the purchase price adjustments related to the AmSouth merger."  Concerning Regions' "Critical Accounting Policies," the 2007 10-K expressly stated that:

> ***Regions' excess purchase price is tested for impairment annually, or more often if events or circumstances indicate impairment may exist***.  Adverse changes in the economic environment, declining operations of business unit, or other factors could result in a decline in implied fair value of excess purchase price.  ***If the implied fair value is less than the carrying amount, a loss would be recognized to reduce the carrying amount to implied fair value***.

21.    Concerning Regions' "Allowance for Credit Losses," the 2007 10-K stated that:

*The allowance for credit losses represents management's estimate of credit losses inherent in the portfolio as of year end*.  The allowance for credit losses consists of two components: the allowance for loan losses and the reserve for unfunded credit commitments.  Management's assessment of the adequacy of the allowance for credit losses is based on the combination of both of these components. . . .

*At December 31, 2007, the allowance for credit losses totaled $1.4 billion or 1.45 percent of total loans, net of unearned income compared to $1.1 billion or 1.17 percent at year end 2006*.  The increase in the allowance for credit loss ratio reflects management's estimate of the level of inherent losses in the portfolio, which management believes increased significantly during the fourth quarter of 2007 due to a slowing economy and a weakening housing market.  The increase in non-performing assets was a key determining factor in the assessment of inherent losses and, as a result, was an important factor in determining the allowance level.  Non-performing assets increased from $379.1 million at December 31, 2006 to $864.1 million at December 31, 2007, with $275.7 million of the increase occurring during the fourth quarter of 2007. . . .

*Factors considered by management in determining the adequacy of the allowance for credit losses include, but are not limited to: (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the level of the allowance for credit losses in relation to total loans and to historical loss levels; (4) levels and trends in non-performing and past due loans; (5) collateral values of properties securing loans; (6) the composition of the loan portfolio, including unfunded credit commitments; and (7) management's analysis of economic conditions*.

Various departments, including Credit Review, Commercial and Consumer Credit Risk Management, and Special Assets, are involved in the credit risk management process to assess the accuracy of risk ratings, the quality of the portfolio and the estimation of inherent credit losses in the loan portfolio.  *This comprehensive process also assists in the prompt identification of problem credits.*

For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools sharing common risk characteristics.  Loans that share common risk characteristics are assigned a portion of the allowance for credit losses based on the assessment process described above.  Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on several factors, including current and historical loss experience for each pool and management's judgment of current economic conditions and their expected impact on credit performance.

*Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status.  All loans that management has*

- 9 -

*identified as impaired, and that are greater than $2.5 million, are evaluated individually for purposes of determining appropriate allowances for credit losses. . . .*

*Management considers the current level of allowance for credit losses adequate to absorb losses inherent in the loan portfolio and unfunded commitments.*

22.     The 2007 10-K also contained the following false and misleading Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") certifications, signed by defendant C. Dowd Ritter ("Ritter")  and Alton "Al" E. Yother ("Yother"):

1.  I have reviewed this annual report on Form 10-K of Regions Financial Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

23. The 2007 10-K also contained the following false and misleading statement by Regions' auditor, Ernst & Young, LLP ("E&Y"):

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

THE BOARD OF DIRECTORS AND SHAREHOLDERS OF REGIONS FINANCIAL CORPORATION

We have audited Regions Financial Corporation's internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Regions Financial Corporation's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Report of Management on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

- 11 -

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

\*    \*    \*

In our opinion, Regions Financial Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Regions Financial Corporation and subsidiaries as of December 31, 2007 and 2006, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2007 of Regions Financial Corporation and our report dated February 26, 2008, expressed an unqualified opinion thereon.

Ernst & Young LLP
Birmingham, Alabama
February 26, 2008

24.    The 2007 10-K also contained the following false and misleading statement by E&Y:

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

THE BOARD OF DIRECTORS AND SHAREHOLDERS OF REGIONS FINANCIAL CORPORATION

We have audited the accompanying consolidated balance sheets of Regions Financial Corporation and subsidiaries as of December 31, 2007 and 2006, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2007. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

\*    \*    \*

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Regions Financial Corporation and subsidiaries at December 31, 2007 and 2006, and the consolidated

results of their operations and their cash flows for each of the three years in the period ended December 31, 2007, in conformity with U.S. generally accepted accounting principles.

\*        \*        \*

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Regions Financial Corporation's internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 26, 2008, expressed an unqualified opinion thereon.

Ernst & Young LLP
Birmingham, Alabama
February 26, 2008

25.     Pursuant to the Registration Statement, on or about April 28, 2008, Regions sold 13.8 million shares of the April 2008 Securities to the public at $25.00 per share, raising $345 million from investors.

26.     The Registration Statement contained untrue statements of material fact or omitted to state other facts necessary to make the statements made therein not misleading, and was not prepared in accordance with applicable SEC rules and regulations.

27.     As more fully described herein, the true facts that were negligently omitted from the Registration Statement were as follows:

(a)     Regions failed to adequately reserve for mortgage-related exposure (losses), causing its balance sheet and financial results to be grossly inflated;

(b)     The $6 billion in "goodwill" Regions carried on its books from the inception of the AmSouth acquisition on November 4, 2006 was grossly impaired and overstated;

(c)     Regions had failed to properly test for and write down the impaired goodwill post-acquisition, causing the Company's balance sheet and financial results to be artificially inflated;

- 13 -

(d)    Regions had failed to accurately and timely increase its loan loss provision by at least $1 billion during the relevant period or to raise its allowance for credit losses as prudent accounting required; and

(e)    Regions was operating with woefully deficient internal controls, resulting in inaccurate and misleading financial disclosures by the Company, including improperly reporting its loan loss reserves and goodwill.

28.    As a result of the Company's subsequent corrective disclosures, the price of the Securities dropped significantly throughout the latter half of 2008 and early 2009, as can be seen in the following chart.  On the date this lawsuit was filed, the April 2008 Securities closed at a price of $16.21 per share, or $8.79 per share less than the $25 per share offering price.



- 14 -

## JURISDICTION AND VENUE

29.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.   In connection with the acts complained of, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

31.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because the Underwriter Defendants (defined below) conduct business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

## PARTIES

32.     Plaintiff Howard M. Rensin, Trustee for the Howard M. Rensin IRA, acquired the 2008 Securities pursuant or traceable to the Offering as set forth in the certification previously filed with this Court and has been damaged thereby.  He was appointed Lead Plaintiff by Order dated June 29, 2009.

33.     Defendant Regions is a Delaware Corporation which operates throughout the South, Midwest and Texas.   Regions provides consumer and commercial banking, trust, securities brokerage, mortgage and insurance products and services.  Regions provides traditional commercial, retail and mortgage banking services, as well as other financial services in the fields of investment banking, asset management, trust, mutual funds, securities brokerage, insurance and other specialty financing.   On December 31, 2008, Regions reportedly had total consolidated assets of approximately $146.2 billion, total consolidated deposits of approximately $90.9 billion and total

consolidated stockholders' equity of approximately $16.8 billion. Regions' principal executive offices are located at 1900 Fifth Avenue North, Birmingham, Alabama.

34.     Defendant Regions Trust III is a Delaware statutory trust formed by Regions for the sole purpose of issuing the Securities and other common securities. Regions Trust III used the proceeds from the April 2008 Offering to buy Junior Subordinated Notes from Regions, thereby transferring the proceeds raised from the Offering directly to Regions.

35.     Defendant Ritter was, at all relevant times, President, Chief Executive Officer ("CEO") and a director of Regions. Ritter has also served as Regions' Chairman of the Board of Directors since Jackson W. Moore ("Moore") resigned the chairmanship in January 2008. Prior to the AmSouth acquisition, Ritter had served as President and CEO of AmSouth and AmSouth Bank and Chairman of the Board of AmSouth Bank since 1996. Ritter had served as chairman of the AmSouth board from September 1996 to October 1999 and from January 2001 through the acquisition. Defendant Ritter signed the false and misleading Registration Statement, the FY 2007 Form 10-K, all 2007 and 2008 interim financial reports and the Sarbanes-Oxley certifications that accompanied those financial statements.

36.     Defendant Samuel W. Bartholomew ("Bartholomew") was, at all relevant times, a director of Regions. Bartholomew has also been a member of Regions' Risk Committee since 2007. Bartholomew signed the false and misleading Registration Statement and the FY 2007 Form 10-K.

37.     Defendant George W. Bryan ("Bryan") was, at all relevant times, a director of Regions. Bryan signed the false and misleading Registration Statement and the FY 2007 Form 10-K.

38.      Defendant David J. Cooper ("Cooper") was, at all relevant times, a director of Regions.  Cooper signed the false and misleading Registration Statement and the FY 2007 Form 10-K.

39.      Defendant Earnest W. Deavenport, Jr. ("Deavenport") was, at all relevant times, a director of Regions.  Deavenport signed the false and misleading Registration Statement and the FY 2007 Form 10-K.

40.      Defendant Don DeFosset ("DeFosset") was, at all relevant times, a director of Regions.  DeFosset currently serves on the Audit Committee.  DeFosset signed the false and misleading Registration Statement and the FY 2007 Form 10-K.

41.      Defendant James R. Malone ("Malone") was, at all relevant times, a director of Regions.  Malone currently serves on the Risk Committee.  Malone signed the false and misleading Registration Statement and the FY 2007 Form 10-K.

42.      Defendant Susan W. Matlock ("Matlock") was, at all relevant times, a director of Regions.  Matlock signed the false and misleading Registration Statement and the FY 2007 Form 10-K.

43.      Defendant Charles D. McCrary ("McCrary") was, at all relevant times, a director of Regions.  McCrary currently serves on the Audit Committee.  McCrary signed the false and misleading Registration Statement and the FY 2007 Form 10-K.

44.      Defendant Claude B. Nielsen ("Nielsen") was, at all relevant times, a director of Regions.  Nielsen signed the false and misleading Registration Statement and the FY 2007 Form 10-K.

45.     Defendant Jorge M. Perez ("Perez") was, at all relevant times, a director of Regions. Perez was also a member of Regions' Risk Committee in 2006. Perez signed the false and misleading Registration Statement and the FY 2007 Form 10-K.

46.     Defendant John R. Roberts ("Roberts") was, at all relevant times, a director of Regions. Roberts has been a member of Regions' Audit Committee since at least 2006. Roberts was also a member of Regions' Risk Committee in 2006. Roberts signed the false and misleading Registration Statement and the FY 2007 Form 10-K.

47.     Defendant Lee J. Styslinger, III ("Styslinger") was, at all relevant times, a director of Regions. Styslinger has also been a member of Regions' Audit Committee since at least 2006. Styslinger signed the false and misleading Registration Statement and the FY 2007 Form 10-K.

48.     Defendant Spence L. Wilson ("Wilson") was, at all relevant times, a director of Regions. Wilson has also been a member of Regions' Risk Committee since at least 2006, when he served as Chairman. Wilson signed the false and misleading Registration Statement and the FY 2007 Form 10-K.

49.     The defendants named above in ¶¶35-48 are referred to herein as the "Individual Defendants."

50.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") provides capital markets services, investment banking and advisory services, wealth management, asset management, insurance, banking and related products and services on a global basis. Merrill Lynch acted as an underwriter in connection with the Offering. Merrill Lynch also acted as a financial advisor to Regions in connection with the AmSouth acquisition.

51.     Defendant UBS Securities LLC ("UBS") is the U.S. investment banking and securities arm of UBS Investment Bank.  UBS Investment Bank provides a range of financial products and services worldwide.  UBS acted as an underwriter in connection with the Offering.

52.     Defendant Morgan Keegan & Company, Inc. ("Morgan Keegan") provides brokerage, investment banking, trust and other financial services to individuals and institutions. Morgan Keegan acted as an underwriter in connection with the Offering.  Morgan Keegan has been a subsidiary of Regions since 2001.

53.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a large integrated financial services institution that through subsidiaries and divisions provides commercial and investment banking services, commercial loans to corporate entities and acts as underwriter in the sale of corporate securities.  Citigroup acted as an underwriter in connection with the Offering.

54.     Defendant Wachovia Capital Markets, LLC ("Wachovia Capital") is the corporate and investment banking side of brokerage firm Wachovia Securities (both companies are subsidiaries of banking giant Wachovia).  Wachovia Capital provides financial and corporate advisory services, private capital, debt private placement, mergers and acquisitions advice, underwriting and equity investing.  It also offers real estate financing, risk management services and structured products such as asset-backed and mortgage-backed securities.  Wachovia Capital acted as an underwriter in connection with the Offering.

55.     Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services to customers, including corporations, governments, financial institutions and individuals.  Morgan Stanley assists public and private corporations in raising funds in the capital markets (both equity and debt), as well as in providing strategic advisory services for mergers, acquisitions and other

types of financial transactions.  Morgan Stanley acted as an underwriter in connection with the Offering.

56.     The defendants referenced in ¶¶50-55 above are referred to herein as the "Underwriter Defendants."

57.     Defendant E&Y is an audit, tax and advisory firm that served as the Company's auditor during the relevant period and, with its consent, was named as having certified a portion of the Registration Statement, as well as the financial statements in Regions' 2007 SEC Form 10-K.

58.     E&Y consented to the use of its prior unqualified audit reports of Regions in the Registration Statement.  E&Y also issued unqualified audit reports throughout the relevant period, certifying that Regions' post-acquisition financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP") for fiscal 2006 and 2007, and the first three interim financial periods for FY 2008, and that E&Y's audits of such financial statements had been performed in accordance with Generally Accepted Auditing Standards ("GAAS").

## SUBSTANTIVE ALLEGATIONS

59.     In November 2005, rumors began to surface in the banking community of a possible merger between Regions and AmSouth.

60.     At the time, Regions was a full-service provider of retail and commercial banking, trust, securities brokerage, mortgage and insurance products and services.  Regions reported $86.1 billion in assets as of June 30, 2006, making it one of the nation's top 15 banks.  Regions' banking subsidiary, Regions Bank, operated some 1,300 offices and a 1,600-ATM network across a 16-state geographic footprint in the South, Midwest and Texas.  Its investment and securities brokerage, trust and asset management division, Morgan Keegan, provided services from over 300 offices.  Regions was a member of both Forbes and Fortune 500.

61.    AmSouth was a regional bank holding company and a financial holding company with $53.9 billion in reported assets as of June 30, 2006, more than 680 branch banking offices and 1,200 ATMs.  AmSouth operated in Florida, Tennessee, Alabama, Mississippi, Louisiana and Georgia.  AmSouth was a leader among regional banks in the Southeast in several key business segments, including consumer and commercial banking, small business banking, mortgage lending, equipment leasing and trust and investment management services.

62.    The value the market was attributing to AmSouth's real estate lending business in August 2006 – and thus to its stock price – was materially overstated.  In particular, despite seeing several red flags in real estate lending activity and curtailing its operations in the over-heated lending markets, AmSouth ramped up its business in the Southeast.  In 2004, AmSouth pledged to "double" its presence in the rapidly-growing Florida real estate lending market.  Moreover, according to its 2005 annual report, AmSouth said it had "experienced a shift in customer preference toward variable-rate products" and decided "to retain a greater proportion of adjustable-rate residential mortgages on the balance sheet."  Previously, AmSouth would have sold those loans into the secondary market.  To fund the increased adjustable-rate lending, AmSouth sold its $550 million credit card portfolio in the fourth quarter of 2004.  As a result of these changes, according to the Management's Discussion and Analysis ("MD&A") section of AmSouth's FY 2005 financial report, during FY 2005 AmSouth's "commercial loans secured by real estate increased $455.3 million or 20 percent due to increased construction activity and further penetration into AmSouth's Florida markets."

63.    Meanwhile, as the following Year-Over-Year change in home prices chart (compiled for Miami (Southern Florida's biggest city) by Standard & Poor's/Case-Shiller (and published by *The New York Times*)) would demonstrate in vivid detail, by the end of FY 2005 Florida's housing

prices had dramatically increased by more than 150% of their level at the end of FY 2003, and were

exceeding Case-Shiller's 20-city average by almost that amount at the end of FY 2005:



64.     Certainly, by this time south Florida real estate was in bubble territory.  Nonetheless,

the MD&A section in AmSouth's 2005 annual report indicated that AmSouth had ***lowered*** its "loan

and lease loss provision [for FY 2005], ***primarily due to improved credit quality***," resulting in

"increased earnings in 2005." The MD&A to AmSouth's FY 2005 annual financial report also

claimed that "[c]redit quality showed further improvement during 2005 ***as evidenced by the***

***reduction in net charge-offs***," that the "improvement in credit performance reflects . . . ***the benefit***

***of tighter underwriting of home equity and indirect loans***," that "[e]fforts associated with

AmSouth's strategic initiative ***to grow Commercial Banking with improved credit quality*** were the

primary driver of commercial and commercial real estate loan growth" and that the "credit quality of

home equity originations during 2005 remained high."  Finally, the MD&A to the FY 2005 annual

report expressly stated that "regular reports [were] made to Senior Management, the Board of

Directors and the Risk Committee of the Board regarding the credit quality of the loan portfolio ***as***

***well as trends in the portfolio***."

- 22 -

65.     Crucially, AmSouth's FY 2005 annual report omitted that, in its quest to dramatically increase its presence in Florida's booming real estate market, AmSouth, which had little experience servicing large loan portfolios, much less large portfolios of ARMs, had significantly *lowered* its underwriting standards while chasing growth markets and attracting the loans that other banks were avoiding.  Despite strong market indicators demonstrating that the Florida real estate market was overbuilt and over-saturated, AmSouth failed to pull back and instead pushed on, continuing its rapid expansion into Florida.

**Regions' Acquisition of AmSouth**

66.     By February 2006, Moore and Ritter – Regions' and AmSouth's Chairmen and CEO, respectively – who had known each other for several years, began seriously discussing a strategic merger of the two companies.  In May 2006, after consulting with the Regions Board, Moore retained Merrill Lynch as Regions' outside financial advisor concerning a proposed combination with AmSouth.  On May 17, 2006, Regions and AmSouth entered into a confidentiality agreement and commenced mutual "due diligence."  Within five days, Moore and Ritter had agreed in principle to an all-stock transaction in which AmSouth would merge into Regions, with Regions being the surviving corporation, and having a fixed exchange ratio of 0.7974 shares of Regions common stock for each share of AmSouth common stock.

67.     Immediately upon deciding that Regions would acquire AmSouth, Moore and Ritter quickly rushed approval of the acquisition through the Regions and AmSouth boards in May 2006. As a result, Merrill Lynch – Regions' financial advisor in the acquisition and an underwriter in the subsequent Offering – only had five days to conduct due diligence in order to form an opinion as to the fairness of the exchange to Regions' shareholders.  Consequently, neither the Regions Board nor Merrill Lynch had the time to, nor conducted, an appropriate analysis of the merger or market check on the price being paid, performed meaningful due diligence or conducted reliable checks on the

- 23 -

credit quality and lending standards AmSouth had employed to grow its risky loan portfolio so quickly. This was critical because AmSouth had just pledged in 2004 to "double" its presence in the rapidly-growing Florida real estate lending market and had just started experimenting with adjustable mortgages, many of which it was keeping on its books rather than repackaging and selling as had been AmSouth's practice.

68.    AmSouth and Regions announced their plan to "merge" on May 25, 2006. In reality, Regions, a valuable and well-established Birmingham bank charted in 1970 as Alabama's first multi-bank company, would be acquiring the grossly inflated assets of AmSouth. Under the agreement announced, each share of AmSouth would be exchanged for 0.7974 share of Regions common stock. Based on the closing prices of Regions' and AmSouth's stock, the companies estimated the market capitalization of the combined entity would be approximately $26 billion. The deal valued AmSouth shares at $28.33 each, putting the overall value of the deal at approximately $10 billion.

69.    The Merger Proxy filed with the SEC and sent to Regions' and AmSouth's shareholders advised that the transaction was an "acquisition" of AmSouth by Regions and that most of the purchase price could not be directly attributed to a tangible asset – *an astounding $6 billion of the approximately $10 billion being paid (or over 60% of the total purchase price)* – would be recorded as "goodwill," or "excess purchase price," on new Regions' balance sheet following the acquisition:

### Accounting Treatment

The merger will be accounted for as a "purchase" by Regions of AmSouth, as that term is used under U.S. Generally Accepted Accounting Principles, which we refer to as GAAP, for accounting and financial reporting purposes. As a result, the historical financial statements of Regions will continue to be the historical financial statements of Regions following the completion of the merger. The assets (including identifiable intangible assets) and liabilities (including executory contracts and other commitments) of AmSouth as of the effective time of the merger will be recorded at their respective fair values and added to those of Regions. *Any excess of purchase*

***price over the net fair values of AmSouth assets and liabilities is recorded as
goodwill (excess purchase price)***.

70.     Without knowledge of the impending financial catastrophe, Regions' shareholders

overwhelmingly approved the acquisition on October 3, 2006 – causing a massive "brain drain" as

Regions' senior executives moved onto other endeavors and left the operations of Regions' franchise

in the hands of Ritter and his AmSouth executives.

71.     For instance, Regions' investors were told that in connection with the acquisition,

Moore would continue on as the combined entity's Chairman and that he had entered into a

sweetened four-year employment agreement commencing upon completion of the acquisition –

described in the merger agreement as follows:

> On completion of the merger, all equity-based compensation awards will vest and
> options will remain exercisable in accordance with their terms.  Following
> completion of the merger, Mr. Moore will be paid his accrued SERP benefit, the
> balance of his deferred stock account and the change-in-control benefits under his
> existing employment agreement.  In addition, Regions will honor the existing terms
> of the trust agreement pertaining to the payment of premiums on Mr. Moore's life
> insurance policy.  In the event that, during the term, Mr. Moore's employment is
> terminated by Regions without "cause" or by Mr. Moore for "good reason," Mr.
> Moore will be paid a lump sum cash payment equal to the sum of (1) a pro rata bonus
> for the year of termination and (2) Mr. Moore's annual base salary and average
> annual bonus as Chairman (or if no such bonus has been paid, his last bonus as chief
> executive officer) for the remainder of the term.  In addition, upon such a termination
> all equity compensation awards will vest and remain exercisable for their full term.

72.     In reality, Moore would leave within a year, leaving Ritter to assume the reins as the

combined entity's Chairman and CEO.  In fact, by June 2008, at least seven Regions executives had

left to start their own competing banks in the Southeast, taking teams of colleagues and scores of

formerly established Regions banking customers with them, something American Banker

characterized as a "'mass exodus of talent.'"  Despite the mortgage crisis already spiraling out of

control, former Regions executives told American Banker that it was a good time to open a bank

because the organizers would start with a clean slate: "'***You're going to beat the heck out of the guy***

*down the street who has loan problems and can't really do anything . . . He's boxed himself in and you're going to be able to pick off his customers*.'"

73.    The AmSouth acquisition was rushed through and accomplished in haste. The impression made on investors was that Regions was acquiring the seemingly rapid growth attributed to AmSouth's burgeoning Florida mortgage assets. These assets were supposed to achieve significant net income and earnings per share ("EPS") growth, consequently allowing the Company's stock price to trade at a higher price/earnings ratio. On November 4, 2006, Regions announced that it had completed the transaction. In connection with the acquisition, Regions issued and delivered over 277 million shares of its common stock – valued at approximately $10 billion – in exchange for AmSouth's assets.

**Regions Ignored Signs of the Impending Collapse in Mortgage Related Asset Values**

74.    When housing prices began to stall and interest rates began to rise in mid-2005, homeowners who over-extended themselves by buying homes with no money down, or relying on teaser loans (which gave the mortgagee an artificially low interest rate for an introductory period of time) and those with poor credit and unstable income, began to default on their loans. These default rates began to rise dramatically in 2006, leading to a cascading effect on the credit markets due to the correlation of the rising rate of default for subprime and Alt-A mortgages with the decline in value of the securities backed by these mortgages.

75.    Banks and mortgage industry insiders became increasingly concerned about financial institutions' exposure to mortgages and mortgage-backed securities. Specifically, the most egregious lending practices drew alarm, including "Hybrid ARMs" loans, "Stated Income" or "No Doc" loans, and "Option ARMs" mortgages. Industry executives recognized that a "'reset problem'" would lead to "forced home sales which would diminish collateral values, which, in turn, would foster yet more delinquencies and forced sales."

76.    These problems grew worse in 2006, as borrowers continued to default in record numbers.  In May 2006, Ameriquest Mortgage, one of the largest wholesale subprime lenders in the U.S., announced the closing of each of its 229 retail offices and a reduction of 3,800 employees.

77.    A Standard & Poors report for the third quarter of 2006 noted that mortgage lenders were experiencing rising delinquencies and early payment defaults.  An October 23, 2006 *Bloomberg* article reported that "'[d]elinquency trends and home prices' show a weakening real estate market."

78.    As illustrated in the chart below, by late-2006, and accelerating into 2007, the domestic housing market collapsed.  For a financial institution like Regions, with substantial exposure to troubled geographic housing markets, high loan-to-value loans and ARMs, this collapse immediately resulted in rising delinquency rates and impaired loans.



OFHEO HOUSE PRICE INDEX HISTORY FOR USA
Seasonally-Adjusted Price Change Measured in Purchase-Only Index

79.    On December 14, 2006, the Mortgage Bankers Association ("MBA") reported in its quarterly National Delinquency Survey that late payments and new foreclosures on U.S. homes rose in the third quarter and were likely to grow as a massive wave of ARMs reset at higher interest rates. MBA also reported that delinquencies rose for all home loans, but most notably for adjustable loans

to subprime borrowers who were already stretched before mortgage rates climbed and predicted that between $1.1 trillion and $1.5 trillion of mortgages face rate resets in 2007.

80.     On December 22, 2006, the Center for Responsible Lending ("CRL") issued a study that revealed that 2.2 million American households are likely to lose their homes, resulting in as much as $164 billion in foreclosures.  CRL's research reported that risky lending practices have triggered the worst foreclosure crisis in the modern mortgage market, projecting that one out of five (19.4%) subprime loans issued during 2005-2006 will fail.

81.     On December 28, 2006, Ownit Mortgage Solutions ("Ownit"), the 11th largest U.S. issuer of subprime mortgages, filed for bankruptcy.  Earlier in the month, Ownit abruptly shut its doors and told its 800 workers not to return.

82.     In 2007, the real estate markets in which Regions was now so heavily invested got much worse, and a host of competing mortgage lenders continued to suffer from the enormous surge in loan defaults. In February 2007, two more prominent lenders filed for bankruptcy – ResMae Mortgage and Mortgage Lenders Network USA Inc.  Both companies specialized in originating and servicing non-conforming residential mortgages.

83.     Things were especially bad in Florida.  As reported in an April 17, 2007 *Sun-Sentinel* article entitled, "Residents Miss More Mortgage Payments; Foreclosure Rates Expected to Jump in South Florida":

> A deluge of South Floridians are falling behind on their monthly house payments, raising fears that many of the delinquent property owners will lose their homes to foreclosure this year and next.
>
> "Who knows how bad it's going to get," said Richard French, a manager with SunTrust Mortgage and president of the Broward County chapter of the Mortgage Bankers Association.  "It's a little scary to think about."
>
> Escalating home values from 2000 to 2005 caused buyers to overextend themselves. Many took out short-term, adjustable-rate mortgages and are seeing their

loan payments spike as interest rates rise.  Higher property taxes and insurance premiums also are putting homeowners in peril.

Broward had 1,168 property owners with late payments in March, a 331 percent increase over the 271 a year ago, according to Realestat.com, a Plantation-based firm that compiles local housing statistics.  Palm Beach County's late payments climbed 288 percent, to 888, from 229 last March.

Late home loan payments in both counties increased in each of the first three months of 2007.  The rise 'bodes ill for actual foreclosures down the road,' said Mike Larson, an analyst with Weiss Research in Jupiter.

Marc Thomashaw, a vice president for Realestat.com, was more blunt.

"We're set for an explosion [of foreclosures] to happen between now and the next six months," he said Monday.

\*        \*        \*

What's more, South Florida's slumping real estate market is holding down prices and preventing recent buyers from selling quickly to get out of financial trouble.

"A lot of these escape valves are now shut," Weiss' Larson said. "It's not a pretty sight."

\*        \*        \*

Mark Zandi, chief economist with Moody's Economy.com, a West Chester, Pa., research firm, agrees that short-term investors and others who bought within the past few years are most at risk of losing their homes.  ***Still, he said more mortgage delinquencies and foreclosures are inevitable due to a "noxious mix" of aggressive lending, falling home prices and borrowers facing large increases in their monthly payments***.

84.    On March 1, 2007, Regions filed its Form 10-K for its fiscal year ending December 31, 2006, the first financial report following the acquisition which included the AmSouth assets.  The Form 10-K stated that Regions' goodwill balance for the fiscal year ending December 31, 2006 was $11.2 billion, essentially reporting that its goodwill was not impaired.  Concerning Regions' "Critical Accounting Policies," the 2006 10-K stated that:

Regions' excess purchase price ***is tested for impairment annually, or more often if events or circumstances indicate impairment may exist***.  Adverse changes in the economic environment, declining operations of acquired business units, or other

factors could result in a decline in implied fair value of excess purchase price. ***If the implied fair value is less than the carrying amount, a loss would be recognized to reduce the carrying amount to implied fair value.***

85.     As to Regions' "Allowance for Credit Losses," the 2006 10-K stated that:

>    ***The allowance for credit losses represents management's estimate of credit losses inherent in the portfolio as of year-end***. The allowance for credit losses consists of two components, the allowance for loan losses and the reserve for unfunded credit commitments. Management's assessment of the adequacy of the allowance for credit losses is based on the combination of both of these components. . . .

>    ***At December 31, 2006, the allowance for credit losses totaled $1.1 billion or 1.17 percent of total loans, net of unearned income compared to $783.5 million or 1.34 percent at year-end 2005. The increase in the allowance is primarily related to the acquisition of AmSouth, which added $335.8 million to the overall allowance. The decrease in the allowance for credit losses to total loans ratio was primarily due to the acquisition of AmSouth, which had a ratio lower than that of Regions. AmSouth's lower allowance for credit loss ratio reflected a product mix higher in residential mortgage secured credits, which inherently have lower loss content***. . . . Management expects the allowance for credit loss ratio to vary over time due to changes in economic conditions, loan mix, changes in collateral values or variations in other factors that may affect inherent losses.

>    ***Factors considered by management in determining the adequacy of the allowance for credit losses include but are not limited to: (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the level of the allowance for credit losses in relation to total loans and to historical loss levels; (4) levels and trends in non-performing and past due loans; (5) collateral values of properties securing loans; (6) the composition of the loan portfolio, including unfunded credit commitments, and (7) management's analysis of economic conditions.***

>    Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and Special Assets are involved in the credit risk management process to assess the accuracy of risk ratings, quality of the portfolio and the estimation of inherent credit losses in the loan portfolio. ***This comprehensive process also assists in the prompt identification of problem credits***.

>    ***For the majority of the loan portfolio, management uses information from its ongoing review processes*** to stratify the loan portfolio into pools sharing common risk characteristics. Loans which share common risk characteristics are assigned a portion of the allowance based on the assessment process described above. Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on several factors, including current and historical loss experience for each

pool and management's judgment of current economic conditions and their expected impact on credit performance.

*Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status. All loans which management has identified as impaired, and which are greater than $2.5 million ($1.0 million in 2005), are evaluated individually for purposes of determining appropriate allowances for credit losses. . . . If current valuations are lower than the current book balance of the credit, the negative differences are reviewed for possible charge- off*.

\*        \*        \*

*Management considers the current level of allowance for credit losses adequate to absorb probable losses inherent in the loan portfolio and unfunded commitments*.

86.     Then on April 2, 2007, New Century Financial, the second largest subprime lender in 2006, filed for bankruptcy. Shortly thereafter on April 24, 2007, the National Association of Realtors announced that sales of existing homes fell by 8.4% in March from February, the sharpest month-to-month drop in 18 years. The number of unsold homes left on the market reached a record total of 4.2 million.

87.     On April 13, 2007, defendants announced that Chief Financial Officer ("CFO") Bryan Jordan had resigned and that its controller Yother had been named CFO. Yother had been AmSouth's CFO at the time of the acquisition.

88.     In spite of numerous red flags of an impending collapse in U.S. real estate markets and mortgage-backed securities, Regions continued reporting record financial growth for the interim quarters during fiscal 2007, and continued reporting that the goodwill attributable to the AmSouth acquisition was not impaired.

89.     On May 11, 2007, Regions filed with the SEC the operative false and misleading Shelf Registration Statement on SEC Form S-3. The S-3 expressly incorporated by reference the Company's FY 2006 10-K, including (with E&Y's consent) E&Y's clean audit opinion, and the

interim financial report for the Company's 1Q 07. Once declared effective, the registration statement would permit Regions to conduct "shelf offerings" of its securities via a prospectus which would incorporate by reference all financial reports filed with the SEC between the time the registration statement was declared effective and the date of the securities offering.

90.     But the mortgage and other credit markets continued their swift decline. For example, on June 12, 2007, RealtyTrac announced U.S. foreclosure filings had surged 90% year-over-year in May 2007. Foreclosure filings were also up 19% month-to-month – April to May 2007. At this time, there was no sign this trend would slow down. In fact, industry experts were predicting the devastating foreclosure trend could only get worse.

91.     On July 18, 2007, the U.S. Commerce Department announced housing starts were down 19.4% year-over-year for June 2007. The Commerce Department also announced a 7.5% plunge in permits to build new homes, the largest monthly decline since January 1995. Permits were 25.2% below their level from the previous year, reflecting continued pessimism among builders over the near-term outlook for new homebuilding.

92.     On August 3, 2007, Regions filed its interim financial report for the 2Q 07 with the SEC. The Form 10-Q still reflected Regions' goodwill balance for the quarter ending June 30, 2007 as $11+ billion, reporting that its goodwill was not impaired. As to Regions' "Allowance for Credit Losses," the 2Q 07 10-Q stated that:

> ***The allowance for credit losses ("allowance") represents management's estimate of probable credit losses inherent in the portfolio as of June 30, 2007***. The allowance consists of two components: the allowance for loan losses, which is recorded as a contra-asset to loans, and the reserve for unfunded credit commitments, which is recorded in other liabilities. The assessment of the adequacy of the allowance is based on the combination of both of these components. . . .
>
> ***At June 30, 2007 and December 31, 2006, the allowance totaled approximately $1.1 billion***. The allowance as a percentage of net loans was 1.19% at June 30, 2007 compared to 1.17% at year-end 2006. Net loan losses as a

- 32 -

percentage of average loans (annualized) were 0.21% in the first six months of both 2007 and 2006. . . .

*Management's determination of the adequacy of the allowance is an ongoing, quarterly process and is based on an evaluation of the loan portfolio, including but not limited to: (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the level of the allowance in relation to total loans and to historical loss levels; (4) levels and trends in non-performing and past due loans; (5) collateral values of properties securing loans; (6) the composition of the loan portfolio, including unfunded credit commitments; and (7) management's judgment of current economic conditions and their impact on credit performance.*

Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and Special Assets are involved in the credit risk management process to assess the accuracy of risk ratings, the quality of the credit portfolio and the estimation of inherent credit losses in the loan portfolio. *This comprehensive process also assists in the prompt identification of problem credits.*

For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools sharing common risk characteristics. Loans which share common risk characteristics are assigned a portion of the allowance based on the assessment process described above. Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on the processes described above.

*Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status. Impaired loans totaled approximately $439.4 million at June 30, 2007, compared to $237.5 million at December 31, 2006*. . . . Within total impaired loans, $83.4 million of these loans had specific reserves of approximately $17.1 million at June 30, 2007. This compares to $70.1 million of impaired loans having specific reserves of approximately $17.6 million at December 31, 2006. While impaired loans increased, they are well-secured by real estate collateral.

93.    On August 6, 2007, American Home Mortgage, one of the largest home lenders in the U.S., filed for bankruptcy. According to the *New York Times* on August 7, 2007, the company's collapse resulted from "[a] weak housing market and a spike in payment defaults [which] scared investors from mortgage debt, including bonds and other securities backed by home loans."

94.    Shortly thereafter on August 13, 2007, Aegis Mortgage Corp., another large U.S. mortgage lender, also filed for bankruptcy protection.

- 33 -

95.    And the rate of foreclosures continued to skyrocket. On August 22, 2007, RealtyTrac announced that foreclosures were up 93% year-over-year for July 2007. The national foreclosure rate in July was one filing for every 693 households.

96.    Despite the Company's repeated optimistic disclosures, analysts were becoming skeptical of Regions' loan portfolio. In an August 29, 2007 Punk Ziegel & Company report, respected analyst Richard X. Bove stated the following:

- The only problem that I see, and it is a big one, is that an economic recession may be on the horizon. Some believe that Florida is already in recession and Alabama and Tennessee are industrial states. This might result is [sic] a loan quality problem in the short run and this prevents me from recommending [Regions'] stock.

97.    On September 18, 2007, the mortgage crisis intensified as mega-lender Impac Mortgage Holdings Inc. stated it would suspend most lending activities indefinitely, while another large mortgage lender, Accredited Home Lenders Holding Co. posted a major quarterly loss and said its survival remained in doubt.

98.    On November 6, 2007, almost one year to the day after the AmSouth acquisition, Regions announced Moore would be retiring effective December 31, 2007, with Ritter replacing him as Chairman of the Board. The Company's release that day stated that "[u]pon retirement from the company, Moore will be paid the remaining benefits under his employment agreement." Then on November 15, 2007, Regions announced that Allen B. Morgan, Jr., Chairman of Morgan Keegan and a director and the Vice Chairman of the Regions Board was also retiring from all three positions, effective December 31, 2007.

99.    On January 3, 2008, the Company announced plans to moderately increase its loan loss provision. The release issued that day stated in relevant part that:

Regions Financial Corporation today announced it plans to increase its loan loss provision to approximately $360 million in the fourth quarter of 2007, an increase of approximately $270 million from the third quarter of 2007. Regions' decision was

prompted by weakening credit quality, primarily in its residential builder loan portfolio. Fourth quarter 2007 net loan charge-offs and non-performing assets are expected to rise to approximately an annualized 46 basis points of average loans and 91 basis points of period-end loans and foreclosed properties, respectively. The total allowance for credit losses is expected to be strengthened to about 1.45 percent of net loans at December 31, 2007, from the prior period's 1.19 percent.

*     *     *

*Despite more challenging residential real estate market conditions, loans within Regions' residential first mortgage and home equity portfolios generally continue to perform well.*

*Regions believes its strong capital position and core earnings power will position the company for continued long-term success despite the current credit cycle.*

100.    While conceding that several of Regions' residential developments had "zero activity today" during a conference call later on the evening of January 3rd, the Company attempted to soothe investors by stating that loans to home builders only made up approximately 8%, or $7.5 billion, of Regions' loan portfolio of $95 billion, with Regions' Chief Risk Officer William Wells stating that the rest of Regions' loan portfolio was performing "relatively well." And as the real estate and credit markets continued to soften in the first half of 2008, Regions repeatedly reassured the investment community that the Company had taken the appropriate steps to decrease its exposure to troubled mortgages.

101.    On January 15, 2008, the U.S. Federal Reserve – working to combat the effects of a serious credit crisis – announced that it auctioned $30 billion to commercial banks at an interest rate of 3.95%. This marked the third in a series of innovative auctions the U.S. Federal Reserve began in December 2007 as a way to provide cash-strapped banks with the reserves they needed. The hope was that the increase in resources would keep banks lending to consumers and businesses and prevent further credit turmoil. Unfortunately, this was not enough capital to keep certain banks

- 35 -

afloat and financial institutions were forced to explore alternative ways to raise capital in the private

markets.

102.    On January 22, 2008, Regions issued a release announcing its FY 2007 and 4Q 07

financial results, stating:

> **Fourth quarter EPS of 24 cents, excluding merger-related charges**
>
> \*          \*          \*
>
>       "**Despite an increasingly challenging operating environment, Regions is well positioned for 2008 and beyond,**" *said Dowd Ritter, chairman, president and chief executive officer*.
>
> \*          \*          \*
>
> **Annualized net charge-offs of 45 basis points of average loans, non-performing assets at 90 basis points of loans and other real estate**
>
>       Net loan charge-offs increased to $107.5 million, or an annualized 0.45 percent of average net loans, in the fourth quarter of 2007 compared to $63.1 million, or an annualized 0.27 percent of average net loans in the prior quarter. The linked-quarter increase was partially related to deterioration in the residential homebuilder loan portfolio, a result of the housing down cycle in some of the Company's markets, including Florida and Atlanta. **Loans within Regions' residential first mortgage and home equity portfolios continue to perform relatively well**.
>
>       As previously reported, residential homebuilder loans represent approximately 8 percent, or $7.2 billion, of Regions' total portfolio of $95.4 billion. **In addition to increasing the loan loss provision, the Company is implementing several measures to support the management of this portion of its portfolio, including reassignment of highly experienced, key relationship managers to focus on work-out strategies for distressed borrowers**. Approximately $850 million of loans have been identified to be managed by Regions' special assets department.
>
>       Indicative of the more challenging credit environment, the fourth quarter's loan loss provision totaled $358.0 million, or $250.5 million above actual fourth quarter net loan charge-offs. The total reserve for credit losses was 1.45 percent of net loans at December 31, 2007, a significant increase over the prior quarter's 1.19 percent.
>
>       Total non-performing assets at December 31, 2007, were $864.1 million, or 0.90 percent of loans and other real estate, compared to $588.3 million, or 0.62 percent at September 30, 2007. Stress on the residential builder portfolio largely drove the quarterly increase. Non-performing assets and net charge-off levels are

expected to continue upward in 2008 as the depressed housing market further evolves.

*    *    *

***Capital position remains strong***

     ***At December 31, 2007, Regions' capital position, as measured by the tangible stockholders' equity-to-tangible assets ratio, was a strong 5.88 percent. This compared to 6.02 percent at September 30, 2007***.

103.    On January 24, 2008, The National Association of Realtors announced that 2007 had the largest drop in existing home sales in 25 years, and "the first price decline in many, many years and possibly going back to the Great Depression."

104.    On February 27, 2008, Regions filed its negligently false and misleading annual financial report for FY 2007 with the SEC, which included substantially the same financial results previously reported on January 22, 2007. ***The Form 10-K further reflected Regions' goodwill balance for the fiscal year ending December 31, 2007 as $11.5 billion, reporting that its goodwill was not impaired***. In fact the 10-K stated that "[e]xcess purchase price at December 31, 2007 totaled $11.5 billion as compared to $11.2 billion at December 31, 2006, with the increase driven by finalizing the purchase price adjustments related to the AmSouth merger." Regions' "Critical Accounting Policies," the 2007 10-K expressly stated that:

    ***Regions' excess purchase price is tested for impairment annually, or more often if events or circumstances indicate impairment may exist***. Adverse changes in the economic environment, declining operations of the business unit, or other factors could result in a decline in implied fair value of excess purchase price. ***If the implied fair value is less than the carrying amount, a loss would be recognized to reduce the carrying amount to implied fair value***.

105.    Concerning Regions' "Allowance for Credit Losses," the 2007 10-K stated that:

    ***The allowance for credit losses represents management's estimate of credit losses inherent in the portfolio as of year end***. The allowance for credit losses consists of two components: the allowance for loan losses and the reserve for unfunded credit commitments. Management's assessment of the adequacy of the

- 37 -

allowance for credit losses is based on the combination of both of these components. . . .

*At December 31, 2007, the allowance for credit losses totaled $1.4 billion or 1.45 percent of total loans, net of unearned income compared to $1.1 billion or 1.17 percent at year end 2006.*  The increase in the allowance for credit loss ratio reflects management's estimate of the level of inherent losses in the portfolio, which management believes increased significantly during the fourth quarter of 2007 due to a slowing economy and a weakening housing market.  The increase in non-performing assets was a key determining factor in the assessment of inherent losses and, as a result, was an important factor in determining the allowance level.  *Non-performing assets increased from $379.1 million at December 31, 2006 to $864.1 million at December 31, 2007, with $275.7 million of the increase occurring during the fourth quarter of 2007.* . . .

*Factors considered by management in determining the adequacy of the allowance for credit losses include, but are not limited to: (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the level of the allowance for credit losses in relation to total loans and to historical loss levels; (4) levels and trends in non-performing and past due loans; (5) collateral values of properties securing loans; (6) the composition of the loan portfolio, including unfunded credit commitments; and (7) management's analysis of economic conditions.*

Various departments, including Credit Review, Commercial and Consumer Credit Risk Management, and Special Assets, are involved in the credit risk management process to assess the accuracy of risk ratings, the quality of the portfolio and the estimation of inherent credit losses in the loan portfolio.  *This comprehensive process also assists in the prompt identification of problem credits.*

For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools sharing common risk characteristics.  Loans that share common risk characteristics are assigned a portion of the allowance for credit losses based on the assessment process described above.  Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on several factors, including current and historical loss experience for each pool and management's judgment of current economic conditions and their expected impact on credit performance.

*Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status.  All loans that management has identified as impaired, and that are greater than $2.5 million, are evaluated individually for purposes of determining appropriate allowances for credit losses.* . . .

- 38 -

> *Management considers the current level of allowance for credit losses*
> *adequate to absorb losses inherent in the loan portfolio and unfunded*
> *commitments.*

106.     The 2007 10-K also contained false and misleading Sarbanes-Oxley certifications, signed by defendant Ritter and Yother, quoted above in ¶22.

107.     On February 13, 2008, Regions announced CFO Yother was stepping down and would be replaced by Irene Esteves ("Esteves") effective April 1, 2008. Then on February 27, 2008, Regions announced that Doug Edwards, Morgan Keegan's President and CEO, was also stepping down in April 2008.

108.     In March, the collapsing real estate and credit markets led to the destruction of one of this country's oldest investment banks. On March 16, 2008, Bear Stearns announced it would be acquired for $2 a share by J.P. Morgan (later increased to $10 per share) in a fire sale to avoid bankruptcy. The deal had to be brokered by the Federal Reserve, which provided up to $30 billion to cover potential Bear Stearns losses – mostly resulting from mortgage-backed securities.

109.     In an effort to shore up its capital base, on or about April 28, 2008, Regions filed the negligently false and misleading prospectus for the April 2008 Offering with the SEC, which stated Regions had $141 billion in assets and $19.8 billion in shareholders' equity – including more than $6 billion in goodwill attributable to the AmSouth acquisition. The Registration Statement also expressly incorporated by reference Regions' FY 2007 Form 10-K, including (with E&Y's consent) E&Y's clean audit opinion, and certain other disclosures filed with SEC subsequent to the filing of the Shelf Registration Statement in May 2007. Pursuant to this Registration Statement, on or about April 28, 2008, Regions issued 13.8 million shares of the April 2008 Securities to the public at $25 each, receiving gross proceeds of $345 million. The Registration Statement contained material misstatements concerning the value of the Company's real estate loan portfolio, its loan loss reserves and its goodwill.

110.    On May 7, 2008, Regions filed its negligently false and misleading interim financial report for the 1Q 08 with the SEC. *The Form 10-Q still reflected Regions' goodwill balance for the quarter ending March 31, 2008 as $11.5 billion, incredibly reporting that its goodwill was not impaired*. As to Regions' "Allowance for Credit Losses," the 1Q 08 10-Q stated that:

> *The allowance for credit losses ("allowance") represents management's estimate of credit losses inherent in the portfolio as of March 31, 2008*. The allowance consists of two components: the allowance for loan losses and the reserve for unfunded credit commitments. Management's assessment of the adequacy of the allowance is based on the combination of both of these components. . . .
>
> *At March 31, 2008 and December 31, 2007, the allowance totaled approximately $1.4 billion. The allowance as a percentage of net loans was 1.49% at March 31, 2008 compared to 1.45% at year-end 2007. Net loan losses as a percentage of average loans (annualized) were 0.53% and 0.20% in the first three months of 2008 and 2007, respectively*. The increase in the allowance was primarily driven by deterioration in the residential homebuilder portfolio and losses within the home equity portfolio, both of which are tied directly to the housing market slowdown. . . .
>
> *Factors considered by management in determining the adequacy of the allowance include, but are not limited to: (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the level of the allowance in relation to total loans and to historical loss levels; (4) levels and trends in non-performing and past due loans; (5) collateral values of properties securing loans; (6) the composition of the loan portfolio, including unfunded credit commitments; and (7) management's analysis of economic conditions.*
>
> Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and Special Assets are involved in the credit risk management process to assess the accuracy of risk ratings, the quality of the portfolio and the estimation of inherent credit losses in the loan portfolio. *This comprehensive process also assists in the prompt identification of problem credits.*
>
> For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools sharing common risk characteristics. Loans that share common risk characteristics are assigned a portion of the allowance based on the assessment process described above. Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on the processes described above.
>
> *Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status. Impaired loans totaled approximately*

- 40 -

*$899.5 million at March 31, 2008, compared to $660.4 million at December 31, 2007*. . . . All loans that management has identified as impaired, and that are greater than $2.5 million, are evaluated individually for purposes of determining appropriate allowances for credit losses. For these loans, Regions measures the level of impairment based on the present value of the estimated cash flows, the estimated value of the collateral or, if available, observable market prices. . . . *While impaired loans increased, they are generally well-secured by real estate collateral*.

111.    On June 17, 2008, the SEC sent a comment letter to Regions regarding its 10-K for FY 2007. In the comment letter, the SEC questioned Regions determination that its goodwill balance was not impaired, *especially in light of the fact that Regions stock had been trading at a market value below the Company's book value by the date of the filing of the 10-K. The SEC further noted Regions failure to comply with the disclosure requirements of SFAS No. 142 and demanded that the Company begin providing information related to its goodwill on a reportable segment basis*.

112.    On July 11, 2008, Indymac Bank, a subsidiary of Independent National Mortgage Corporation ("Indymac"), was placed into the receivership of the Federal Deposit Insurance Corporation ("FDIC") by the Office of Thrift Supervision. Indymac was the fourth-largest bank failure in United States history, and the second-largest failure of a regulated thrift. Before its failure, Indymac was the largest savings and loan association in the Los Angeles area and the seventh-largest mortgage originator in the United States.

113.    On July 22, 2008, Regions issued a release announcing Regions' 2Q 08 financial results and disclosing *that Regions' quarterly cash dividend would be cut by approximately 75% from $0.38 to $0.10 per share "to further strengthen its capital position*." For the 2Q 08, the release disclosed earnings from continuing operations of $0.30 per diluted share, disclosed "[h]igher net loan charge-offs, at an annualized 0.86 percent of average loans, primarily due to home equity and residential homebuilder credit deterioration," announced "[a]llowance for credit losses increases to 1.56 percent of loans" and reported a "[f]urther rise in non-performing assets to 1.65 percent of

period end loans and other real estate," but provided for an "[i]ncrease in average loan growth to 6

percent annualized, driven by prudent support of Regions' best commercial customers through the

current cycle."  The release also stated in relevant part that:

> Net loan charge-offs increased to $209.0 million, or an annualized 0.86 percent of average net loans, in the second quarter of 2008 compared to $125.8 million, or an annualized 0.53 percent of average net loans, in the prior quarter. ***The linked-quarter increase was primarily driven by continuing deterioration of the Company's home equity portfolio, particularly lines in a second lien position in Florida, and its residential homebuilder portfolio, both of which are closely tied to declining residential property values.***

> Home equity credits accounted for over half of the increase in net-charge-offs, rising to an annualized 1.94 percent of outstanding loans and lines. ***The increase was mostly due to Florida-based credits, where property valuations in certain markets have experienced significant and rapid deterioration***. While these loans and lines represent approximately $5.4 billion or one-third of Regions' total home equity portfolio, they accounted for just under two-thirds of total company home equity losses in the second quarter. ***As further evidence of the acute stress in Florida's housing market, second quarter home equity losses amounted to an annualized 3.55 percent of loans and lines in that state versus 1.08 percent across the remainder of Regions' footprint***. A number of actions have been taken to mitigate future losses in the home equity portfolio. These include a strong Customer Assistance program that educates customers about workout options and initiates early contact with customers to discuss workout solutions ***when a loan first becomes delinquent.***

> Second quarter losses within the residential homebuilder portfolio were also higher, in line with expectations. This portfolio now stands at $5.8 billion, a $473 million reduction versus first quarter.

> Reflecting continuing challenges in the credit environment, the second quarter's loan loss provision totaled $309.0 million, or $100.1 million above net loan charge-offs. The total allowance for credit losses was 1.56 percent of net loans at June 30, 2008, an increase over the prior quarter's 1.49 percent.

> Total non-performing assets at June 30, 2008, were $1.6 billion, or 1.65 percent of loans and other real estate, compared to $1.2 billion, or 1.25 percent at March 31, 2008. ***Residential homebuilder and condominium loans were the primary drivers of the linked-quarter increase***. Proactive management of these portfolios continued during the second quarter, as Regions disposed of approximately $147 million of properties, the majority of which had been classified as non-performing assets; additional dispositions are expected to be executed on an opportunistic basis.

114.    On August 7, 2008, Regions filed its negligently false and misleading interim financial report for the 2Q 08 with the SEC, which included substantially the same financial results previously reported on July 22, 2008. *The Form 10-Q still reflected Regions' goodwill balance for the quarter ending June 30, 2008 as $11.5 billion, reporting that its goodwill was not impaired.* As to Regions' "Allowance for Credit Losses," the 2Q 08 10-Q stated that:

> *The allowance for credit losses ("allowance") represents management's estimate of credit losses inherent in the portfolio as of June 30, 2008.* The allowance consists of two components: the allowance for loan losses and the reserve for unfunded credit commitments. Management's assessment of the adequacy of the allowance is based on the combination of both of these components. . . .

> *At June 30, 2008 and December 31, 2007, the allowance totaled approximately $1.5 billion and $1.4 billion, respectively.* The allowance as a percentage of net loans was 1.56% at June 30, 2008 compared to 1.45% at year-end 2007. Net charge-offs as a percentage of average loans (annualized) were 0.70% and 0.21% in the first six months of 2008 and 2007, respectively. *The increase in the allowance was primarily driven by deterioration in the residential homebuilder and condominium portfolios and losses within the home equity portfolio, all of which are tied directly to the housing market slowdown.* . . .

> *Home equity credits accounted for over half of the increase in net charge-offs, rising to an annualized 1.94% of outstanding loans and lines during the second quarter of 2008. The increase was mostly due to Florida-based credits, where property valuations in certain markets have experienced significant and rapid deterioration.* These loans and lines represent approximately $5.4 billion of Regions' total home equity portfolio. Of that balance, approximately $1.9 billion represent first liens; second liens, which total $3.5 billion, are the main source of losses. Florida second lien losses were 4.74% during the second quarter of 2008. *Second quarter home equity losses amounted to an annualized 3.55% of loans and lines in Florida versus 1.08% across the remainder of Regions' footprint.*

> The remainder of the increase in net charge-offs during the second quarter of 2008 relates primarily to the residential homebuilder portfolio, which is discussed earlier in this report. Specifically, charge-offs in the residential homebuilder portfolio totaled $34.2 million in the second quarter of 2008.

> *Factors considered by management in determining the adequacy of the allowance include, but are not limited to: (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the Company's policies relating to delinquent loans and charge-offs; (4) the level of the allowance in relation to total loans and to historical loss levels; (5) levels and trends in non-performing and past due*

- 43 -

*loans; (6) collateral values of properties securing loans; (7) the composition of the loan portfolio, including unfunded credit commitments; and (8) management's analysis of current economic conditions.*

Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and Special Assets are involved in the credit risk management process to assess the accuracy of risk ratings, the quality of the portfolio and the estimation of inherent *credit losses in the loan portfolio. This comprehensive process also assists in the prompt identification of problem credits. The Company has taken a number of measures to aggressively manage the portfolios and mitigate future losses, particularly in the more problematic portfolios. Specific to the residential homebuilder portfolio, $1.8 billion of relationships have been identified as problem loans and are being aggressively managed to mitigate risk. Significant action in the management of the home equity portfolio has also been taken. A portfolio evaluation was completed during the quarter, which will provide detailed property level information to assist in workout strategies. Also, a strong Customer Assistance Program is in place which educates customers about options and initiates early contact with customers to discuss solutions when a loan first becomes delinquent*.

For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools sharing common risk characteristics. Loans that share common risk characteristics are assigned a portion of the allowance based on the assessment process described above. Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on the processes described above.

*Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status. Impaired loans totaled approximately $1,246.3 million at June 30, 2008, compared to $660.4 million at December 31, 2007. . . . While impaired loans increased, they are generally secured by real estate collateral.*

115.   On September 7, 2008, the U.S. government rescued Fannie Mae ("Fannie") and Freddie Mac ("Freddie") from bankruptcy, effectively nationalizing them. At the time, Fannie and Freddie owned or guaranteed about half of the U.S.'s $12 trillion mortgage market. Fannie and Freddie's insolvency caused extreme distress in the financial markets because almost every home mortgage lender and Wall Street bank relied on them to facilitate the mortgage market, and investors worldwide owned $5.2 trillion of debt securities backed by them.

116.    Shortly thereafter on September 14, 2008, Merrill Lynch was sold overnight to Bank of America amidst fears of a liquidity crisis.  The next day, Lehman Brothers, one the oldest investment banks on Wall Street, filed for bankruptcy protection.

117.    Another large U.S. bank, Washington Mutual, was seized by the FDIC on September 25, 2008, and its banking assets were quickly sold to J.P. Morgan for $1.9 billion.

118.    On September 30, 2008, *The Birmingham News* issued an article entitled "Regions stock plummets 41 percent; CEO Dowd Ritter says business is strong," which stated in part:

> Birmingham-based Regions Financial Corp.'s stock plummeted 41 percent on Monday, but CEO Dowd Ritter expressed confidence in the strength of his company's Main Street business amid turmoil on Wall Street.
>
> *            *            *
>
> **But Ritter noted that while other banks are writing off billions every quarter, Regions has so far made about a half-billion in profit this year.**
>
> "There's a pretty simple reason," he said.  "We always have taken a very conservative approach to our business.  At times, we may not be doing what is in vogue, but that plain vanilla banking plays very well in times like this."
>
> Ritter said Regions is well-capitalized by regulatory standards, as evidenced by its recent takeover of the failed Georgia-based Integrity Bank last month, at the request of the Federal Deposit Insurance Corp.
>
> "We are a safe harbor, if you will, for deposits," he said.
>
> He also noted that Regions is not burdened with exotic securities and risky mortgages that have prompted the demise of other institutions.  Regions has few subprime mortgages in its entire portfolio, he said.
>
> **"All that said, it doesn't matter whether we're lucky or smart, we've avoided the real troubled areas that are plaguing many in this industry," he said.**

119.    On October 21, 2008, Regions issued a release announcing its 3Q 08 financial results, disclosing reporting of $0.11 per diluted share for the quarter ended September 30, 2008, disclosing it was "[a]ggressively managing well-defined credit issues, with $430 million in nonperforming assets either sold or transferred to held for sale," with "[n]et charge-offs and other real estate expense

- 45 -

related to these dispositions total[ing] approximately $186 million," stating "[n]on-performing assets, excluding assets held for sale, ***steadied*** at 1.66 percent of period end loans and other real estate," disclosing "[n]et loan charge-offs an annualized 1.68 percent of average loans, driven by accelerated problem asset disposition," such that "[e]xcluding impact of sales and transfers to held for sale, net loan charge-offs an annualized 1.03 percent of average loans," but highlighting its "Tier 1 capital ratio at an estimated 7.47%, $1.7 billion above well-capitalized level."

120.    The October 21, 2008 release also disclosed that Regions had been invited to participate in the U.S. government's TARP bailout program and that defendants intended to cause Regions to accept TARP funds:

> Regions has been notified that it is eligible and ***does intend to participate in the capital purchase program announced by the Treasury Department on October 13, 2008***. The capital is in the form of senior perpetual preferred stock (together with warrants to purchase common stock) and qualifies as Tier 1 capital for regulatory purposes. It is being offered at an attractive coupon of 5 percent for the first five years. Qualified institutions can obtain between 1 percent and 3 percent of their total risk-weighted assets as of September 30, 2008, as defined by banking regulations. For Regions, this would approximate between $1.17 billion and $3.51 billion of capital, providing a significant strengthening of our overall capital base.

121.    With its announced receipt of TARP funds, the investment community began scrutinizing Regions' financial statements. On October 23, 2008, *Bloomberg* issued an article entitled "***Regions Financial Must Think We're All Stoned***," which stated in relevant part:

> You have to wonder who the people running Regions Financial Corp. think they're kidding.
>
> So far this year, the Birmingham, Alabama-based regional bank says it has earned $622.5 million, including $79.5 million of net income last quarter. In reality, Regions probably has lost billions. The bosses just won't admit it.
>
> ***It all comes down to that pneumatic, intangible asset known as goodwill, which is about as valuable as the air in a paper sack. As of Sept. 30, according to Regions, the bank's goodwill was worth $11.5 billion, slightly more than the quarter before. That's about 59 percent of Regions' book value, and $4.1 billion more than what the stock market says the entire company is worth***.

- 46 -

Case 1:09-cv-03161-LAK    Document 44    Filed 11/02/2009    Page 48 of 91

There is one scenario I can envision in which that goodwill figure would be justified. That would be if another big bank is offering right now to buy Regions for a huge premium. There's no reason for us to think that's happening, notwithstanding the Treasury Department's recent jawboning, encouraging U.S. banks to merge their way out of their problems.

Barring an undisclosed deal in the works, Regions executives would have to be nuts to believe that goodwill number. Maybe they think the rest of us are just stoned. A Regions spokesman, Tim Deighton, declined to comment. The bank's chief financial officer, Irene Esteves, didn't respond to my e-mails.

It's become standard fare for banks to insult the public's intelligence by publishing asset values that defy logic. Saying Regions' goodwill is worth $11.5 billion would be like a hen bragging that her unlaid egg weighs more than she does.

Matter of Trust

There's a bigger problem here, though. By sticking to that goodwill valuation, Regions executives might as well be telling us we can't trust a single number on their financial statements.

*        *        *

While goodwill isn't completely unsaleable, it can't be sold by itself. It's just the bookkeeping entry a company records when it pays a premium to buy another. Specifically, it's the difference between the purchase price and the fair value of the acquired company's net assets.

Most of Regions' goodwill dates to the company's November 2006 acquisition of Birmingham-based AmSouth Bancorp., the month after Wachovia bought Golden West. Regions allocated $6.6 billion of the $9.9 billion purchase price to goodwill. Regions' chief executive, C. Dowd Ritter, joined the company from AmSouth.

Regions shares closed yesterday at $10.73, down 55 percent this year. It now trades for 38 percent of the company's official book value. Irrational goodwill isn't the only thing weird about Regions' accounting, either.

As of Sept. 30, Regions had a $1.5 billion loan-loss allowance, equivalent to just 83 percent of its nonperforming assets, which were $1.8 billion. A year earlier, Regions' allowance was at 175 percent of nonperforming assets. A year before that, it was at 249 percent.

Keeping Up

***Common sense tells you a bank's loan-loss allowance, in an economic decline, should be rising as a percentage of nonperforming assets. It's the reserve***

- 47 -

*a lender sets up on its balance sheet in anticipation of bad loans. At Regions, the allowance hasn't kept up*.

122.    Despite *Bloomberg's* and other members of the financial and investment community's criticism, Regions continued reporting a grossly inflated value of the goodwill attributable to the AmSouth acquisition, with its balance sheet materially overstating assets, shareholder equity and, as a result of not taking the impairment charge on the goodwill attributable to the AmSouth acquisition, overstating Regions' income.

123.    On October 24, 2008, Regions announced that it had determined to accept $3.5 billion in TARP funds, with the Company's release stating in relevant part that the cash infusion would "*increase Regions' Tier 1 capital to approximately 10.5 percent*" and "*enable [it] to expand lending and step up acquisitions*."

124.    On October 30, 2008, Regions filed its negligently false and misleading interim financial report for the 3Q 08, which included substantially the same financial results previously reported on October 21, 2008.  The Form 10-Q still reflected Regions' goodwill balance for the quarter ending September 30, 2008 as $11.5 billion, reporting that its goodwill was not impaired.  As to Regions' "Allowance for Credit Losses," the 3Q 08 10-Q stated that:

> *The allowance for credit losses ("allowance") represents management's estimate of credit losses inherent in the portfolio as of September 30, 2008*.  The allowance consists of two components: the allowance for loan losses and the reserve for unfunded credit commitments. . . .
>
> *At September 30, 2008 and December 31, 2007, the allowance totaled approximately $1.5 billion and $1.4 billion, respectively*.  The allowance as a percentage of net loans was 1.57% at September 30, 2008 compared to 1.56% at June 30, 2008 and 1.45% at year-end 2007.  Net charge-offs as a percentage of average loans (annualized) were 1.03% and 0.23% in the first nine months of 2008 and 2007, respectively. *The increase in the allowance was primarily driven by deterioration in the residential homebuilder, condominium and home equity portfolios, all of which are tied directly to the housing market slowdown*. . . .
>
> For the third quarter of 2008, net charge-offs on home equity credits were an annualized 1.59% of home equity loans compared to an annualized 0.31% for the

third quarter of 2007. However, net charge-offs on home equity credits decreased on a linked-quarter basis from an annualized 1.94% of outstanding loans and lines during the second quarter of 2008. *Losses in Florida-based credits remained at elevated levels, as property valuations in certain markets have continued to experience ongoing deterioration*. These loans and lines represent approximately $5.6 billion of Regions' total home equity portfolio at September 30, 2008. Of that balance, approximately $2.0 billion represent first liens; second liens, which total $3.6 billion, are the main source of losses. *Florida second lien losses were 4.28% annualized during the third quarter of 2008 as compared to 4.74% during the second quarter of 2008. Third quarter home equity losses in Florida amounted to an annualized 3.28% of loans and lines versus 0.69% across the remainder of Regions' footprint. This compares to second quarter 2008 losses of 3.55% and 1.08%, respectively*.

The remainder of the increase in net charge-offs during the third quarter of 2008 relates primarily to the residential homebuilder portfolio, which is discussed earlier in this report, and the disposition of non-accrual loans. During the third quarter of 2008, a total of $327 million in non-accrual loans were sold or designated as held for sale with associated charge-offs of approximately $163 million.

*Factors considered by management in determining the adequacy of the allowance include, but are not limited to: (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the Company's policies relating to delinquent loans and charge-offs; (4) the level of the allowance in relation to total loans and to historical loss levels; (5) levels and trends in non-performing and past due loans; (6) collateral values of properties securing loans; (7) the composition of the loan portfolio, including unfunded credit commitments; and (8) management's analysis of current economic conditions.*

Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and Special Assets are involved in the credit risk management process to assess the accuracy of risk ratings, the quality of the portfolio and the estimation of inherent credit losses in the loan portfolio. *This comprehensive process also assists in the prompt identification of problem credits. The Company has taken a number of measures to aggressively manage the portfolios and mitigate losses, particularly in the more problematic portfolios*. Specific to the residential homebuilder portfolio, $2.2 billion of relationships are being aggressively managed to mitigate risk. *Significant action in the management of the home equity portfolio has also been taken*. A portfolio evaluation was completed during the quarter, which provided detailed property level information to assist in workout strategies. *Also, a strong Customer Assistance Program is in place which educates customers about options and initiates early contact with customers to discuss solutions when a loan first becomes delinquent*.

For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools sharing common

risk characteristics. Loans that share common risk characteristics are assigned a portion of the allowance based on the assessment process described above. Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on the processes described above.

Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status. Impaired loans totaled approximately $1,268.7 million at September 30, 2008, compared to $660.4 million at December 31, 2007. The increase in impaired loans is consistent with the increase in non-performing loans, which is discussed in the "Non-Performing Assets" section of this report. All loans that management has identified as impaired, and that are greater than $2.5 million, are evaluated individually for purposes of determining appropriate allowances for loan losses. For these loans, Regions measures the level of impairment based on the present value of the estimated cash flows, the estimated value of the collateral or, if available, observable market prices. Specifically reviewed impaired loans totaled $768.8 million, and the allowance allocated to these loans totaled $132.6 million at September 30, 2008. This compared to $337.2 million of specifically reviewed impaired loans with allowance allocated to these loans of $58.7 million at December 31, 2007.

125.    On November 7, 2008, the *Birmingham Business Journal* issued an article entitled

"Loan charge-offs mount at Birmingham banks," which stated in relevant part that:

Net charge-offs – the gross amount of loans charged off as bad debt, minus money recovered on collateral of earlier charge-offs – are on the rise as the financial crisis deepens at local banks.

*If a bank has a high level of charge-offs, it likely means they delved into hazardous lending practices, banking experts say*.

*"You are what you eat – and charge-offs are an indication of risky loans that have been made," said Bankrate.com senior financial analyst Greg McBride.*

Specifically referencing Regions, the story warned:

Richard Bove, banking analyst with New York-based Landenburg Thalmann & Co. Inc., said in a research note that *despite the company's "high level of charge-offs," its "nonperforming assets keep rising*."

According to Bove's calculations, all types of Region's non-performing loans, including foreclosures and loans more than 90 days past due, climbed to $2.4 billion in the quarter, a more than 9 percent increase.

*Bove said Regions was itching to get into the Florida market for years, and it was one of the reasons behind its $10 billion acquisition of AmSouth Bancorp. Now that the Sunshine State has been hammered by the housing slump, "it*

*appears the company has reversed course and is moving out of Florida assets as quickly as it can," he said*.

*Region's hike in charge-offs indicate "the bank should probably have been writing off loans at a faster rate," he said.  "The fact that it did not do so indicates that the future write-offs and reserve builds will be sizable.  This will meaningfully penalize earnings*."

126.     Suddenly, on January 20, 2009, before the market opened, Regions reported *a net loss of $5.6 billion for the 4Q 08*, stating the loss "was largely driven by a *$6 billion non-cash charge for impairment of goodwill*." Regions' January 20th release also disclosed:

-- *Accelerated disposition of problem assets*, with approximately $1 billion in non-performing assets sold or transferred to held for sale, resulting in approximately $479 million of losses

-- *Net loan charge-offs rose to an annualized 3.19 percent of average loans*

-- *Increased loan loss provision to $1.150 billion*, $354 million above net charge-offs; raised allowance for credit losses to 1.95 percent of loans . . . .

127.     If defendants' disclosure were to be believed, the "results of goodwill impairment testing at the end of the fourth quarter [*suddenly*] indicated that the estimated fair value of Regions' banking reporting unit was less than its book value, *requiring a $6 billion non-cash charge*." But $6 billion impairments do not happen overnight, and Regions had falsely stated quarter after quarter that its goodwill was not impaired, and Regions' CEO and CFO falsely certified each quarter those financial filings were accurate and that Regions' internal controls were solid.

128.     Individual Defendants and E&Y also reviewed and acquiesced in the Company's financial reports filed with the SEC and earnings releases, yet never required Regions to properly test the enormous amount of goodwill being carried on its books following the AmSouth acquisition. As set forth above, the Individual Defendants also signed the Company's false and misleading annual reports and the Registration Statement filed in connection with the Offering.

129.    Yet defendants' statements that the value of goodwill on Regions' balance sheet attributable to the AmSouth acquisition was not impaired were not accurate.  In reality, the Company's goodwill and earnings had been overstated since at least 2007 due to: (i) Regions' overvaluing of AmSouth's loan portfolio; (ii) an inadequate level of loan loss reserves largely related to the outsized growth of the Company's Florida loan portfolio; and (iii) a lack of adequate internal accounting controls.

130.    On January 20, 2009, *Bloomberg.com* issued an article entitled "Regions Plunges to 23-Year Low on $6.24 Billion Loss," which stated in relevant part:

> Regions fell $1.47 to $4.60 at 4 p.m., the lowest price since March 13, 1985. ***The bank has lost more than three-quarters of its market value in the past 12 months***.
>
> ***The lender almost tripled its reserves to cover bad debt to $1.15 billion in the fourth quarter from $358 million in the same period a year earlier.  It had $1.7 billion in loans no longer collecting interest in the quarter***.

131.    On January 20, 2009, *TheStreet.com* issued an article entitled "Regions Dividend at Risk After Posting Loss," which stated in relevant part:

> The noncash goodwill impairment charge represented premiums paid for acquisitions over the years, which most large banks are continually assessing in the current troubled environment.
>
> Excluding the charge, Regions Financial's net loss would have been 35 cents a share, but even that exceeded the Thomson Reuters consensus estimate of an 8 cent-per-share loss for the fourth quarter.
>
> *                *                *
>
> At first glance, it may appear that Regions Financial's asset quality improved during the fourth quarter, since the nonperforming assets ratios dropped to 1.26% from 1.45% the previous quarter.  ***But the main reason for the drop in nonperformers was a large increase in net loan charge-offs, with home builder and condominium loans comprising the bulk of the fourth-quarter loan losses***.
>
> *. . . **This means that if the pace of charge-offs continues at this level for the next few quarters, the company needs to continue its elevated levels of loan loss provisions, leading to more net losses***.

132.    On January 23, 2009, the *Birmingham Business Journal* issued an article entitled "Regions Financial's $6 billion write-down may start trend," noting that Regions had lost considerable credibility in the investment community:

> *In an in-depth report on Regions released earlier this month, Audit Integrity said the company's accounting practices are considered "aggressive" and the company is at high risk of restating its quarterly earnings reports to account for losses it might not be disclosing in the present*.

> The firm's rating system *found at least 10 red flags against Regions based on third quarter 2008 data and surmised that the company might be overvaluing its assets because of its large goodwill*, assuming lower than usual liability risks on its pension compensation and for its high noninterest income compared to noninterest expenses.

> \*        \*        \*

> "*Whether this (recent) write-down indicated that Regions has fully disclosed its risky or overstated assets is another question*," *Zwingli said.*

> "*Until we see the quality and transparency of their disclosures improve, we would continue to anticipate further write-downs and unrealized losses in the quarters ahead.*"

133.    Rating agencies began slashing the Company's ratings.  On February 2, 2009, the *Birmingham Business Journal* issued an article entitled "Regions shares drop after Moody's downgrade," which stated in part:

> Regions Financial Corp.'s share prices tumbled 15 percent in late afternoon trading Monday after Moody's Investor Service downgraded its ratings.

> Regions Bank, the Birmingham-based titan's primary subsidiary, *was knocked down to a C+ from a B- and its long-term deposits dwindled to A2 from A1.*

> \*        \*        \*

> *The credit rating agency said the company had a "negative outlook," because of its deteriorating loan portfolios in the troubled Florida market*.

> "*Net charge-offs for the fourth quarter of 2008 were nearly double that of the prior quarter and reflect a pace of asset quality deterioration beyond Moody's prior expectations*," Moody said in a research note.

134.    On February 2, 2009, *Bloomberg* published an article entitled "Regions Declines After Moody's Downgrade on Defaults," which stated:

> Regions Financial Corp., Alabama's biggest bank, fell 16 percent in New York trading after Moody's Investors Service downgraded the lender on the prospects of more borrower defaults in Florida.
>
> "Regions has seen nearly a doubling of nonperforming assets over the past year, largely in the residential homebuilder and home-equity portfolios," Moody's said in a statement today on the Birmingham-based bank.
>
> The bank dropped 54 cents to $2.92 at 4 p.m. in New York Stock Exchange composite trading and has plunged almost 90 percent in the past 12 months.
>
> The debt rating was cut to A3 from A2 and may be dropped further, Moody's said.

135.    The Company's annual financial report on Form 10-K filed with the SEC on February 25, 2009 further disclosed that as a result of the massive increase in loan loss reserves and goodwill impairment, Regions' corporate debt ratings were being slashed –significantly increasing the Company's cost of borrowing on a going-forward basis:

> In February 2009, Regions Financial Corporation's senior notes, subordinated notes, and junior subordinated notes were downgraded to A3, Baal, and Baal, respectively, by Moody's, reflecting the Company's concentration in residential homebuilder and home equity lending, particularly in Florida.  Also, Moody's downgraded Regions Bank's long-term bank deposits, long-term debt, and subordinated debt to A2, A2, and A3, respectively.

136.    The Company's Form 10-K finally admitted how much damage the Florida loan portfolio was causing, ***and that it had been occurring since at least 2007***:

> As of December 31, 2008, residential homebuilder loans, home equity loans secured by second liens in Florida and condominium loans represented approximately 9.3% of our total loan portfolio.  ***These portions of our loan portfolio have been under stress for over a year and, due to weakening credit quality, we increased our loan loss provision and our total allowance for credit losses***.  In addition, we have implemented several measures to support the management of these portions of the loan portfolio, including reassignment of experienced, key relationship managers to focus on work-out strategies for distressed borrowers.

*    *    *

Net charge-offs totaled $1.5 billion, or 1.59 percent of average loans in 2008 compared to $270.5 million, or 0.29 percent of average loans in 2007. The increased loss rate resulted from deteriorating economic conditions during 2008, especially related to the housing sector. More specifically, approximately $639.0 million of 2008 net charges-offs were related to non-performing loan dispositions or transfers to held for sale as compared to none in 2007. Non-performing assets increased $853.9 million between December 31, 2007 and December 31, 2008 to $1.7 billion, primarily due to continued weakness in the Company's residential homebuilder portfolio, which began experiencing significant pressure toward the end of 2007. *This pressure was due to a combination of declining residential real estate demand and resulting price and collateral value declines in certain of the Company's markets, particularly areas of Florida and Atlanta, Georgia. Condominium loans, mainly in Florida, were also a driver of the increase in non-performing assets*. Regions aggressively managed its exposure to its most stressed assets by selling or transferring to held for sale approximately $1.3 billion of non-performing loans during 2008. Non-performing assets held for sale totaled $423.3 million at December 31, 2008.

\*　　\*　　\*

The majority of Regions' home equity lending balances was originated through its branch network and the Company has not purchased broker-originated or other third-party production. However, home equity losses still increased significantly in 2008, impacted by the unprecedented drop in real estate values coupled with a deteriorating economy. *The main source of stress has been in Florida, where home values declined precipitously in 2007 and 2008. Further, losses on relationships in Florida where Regions is in a second lien position have been especially high; much higher, in fact, than the remaining areas of Regions geographic footprint*.

\*　　\*　　\*

Housing continued to weaken considerably throughout 2008 and the risk of a deepening recession is significantly increasing due to the negative impact housing is having on the overall economy. *Within the Regions footprint, the housing slowdown has been modest in some areas and severe in Florida and selected other geographical areas, including Atlanta, Georgia. Florida has experienced above-average price increases and construction activity in recent years*. The slowdown is evident in many areas, including steeply declining sales and prices, and high levels of excess unsold inventory on the market. Management anticipates that the housing industry will remain weak throughout 2009. *Housing-related issues have been exacerbated by a sharp increase in unemployment across Regions' footprint, particularly in Florida*.

\*　　\*　　\*

- 55 -

*Residential First Mortgage* – The residential first mortgage portfolio contains one-to-four family residential properties, which are secured principally by single-family residences. Loans of this type are generally smaller in size and are geographically dispersed throughout Regions' market areas, with some guaranteed by government agencies or private mortgage insurers. Losses on the residential loan portfolio depend, to a large degree, on the level of interest rates, the unemployment rate, economic conditions and collateral values. During 2008, losses on single-family residences totaled 0.50 percent, 38 basis points higher than in the previous year, primarily driven by declining property values and other influential economic factors, such as the unemployment rate, which deteriorated substantially as the year progressed. ***Deterioration of the Company's residential first mortgage portfolio was most apparent in Florida, where property valuations declined significantly and unemployment rose at a rapid pace. Regions expects losses on loans of this type to continue to increase during 2009, further driven by continued rising unemployment and the continued housing slowdown throughout the U.S., including areas within Regions' operating footprint.***

*Home Equity* – This portfolio contains home equity loans and lines of credit totaling $16.1 billion as of year-end 2008. Substantially all of this portfolio was originated through Regions' branch network. As a percentage of outstanding home equity loans and lines, losses increased in 2008 to 1.46 percent from 0.27 percent in 2007. ***The deteriorating economic environment as described above, particularly with respect to housing, caused the significant increase in loss rate. Florida real estate markets have been particularly affected. Slightly more than one-third of Regions' home equity portfolio is located in Florida and has suffered losses reflective of the falling property values and demand in that geography.***

\*      \*      \*

Net charge-offs on home equity credits were also a driver of the increase, rising to 1.46 percent in 2008 versus 0.27 percent in 2007. ***Losses from Florida-based credits were particularly high, as property valuations in certain markets continued to experience ongoing deterioration. These loans and lines represent approximately $5.8 billion of Regions' total home equity portfolio at December 31, 2008. Of that balance, approximately $2.1 billion represents first liens; second liens, which total $3.7 billion, were the main source of losses. Florida second lien losses were 3.67 percent in 2008. Total home equity losses in Florida amounted to 2.83 percent of loans and lines versus 0.73 percent across the remainder of Regions' footprint.***

\*      \*      \*

Loans past due 90 days or more and still accruing totaled $554.4 million as of year-end 2008, an increase of $197.7 million from year-end 2007 levels, and reflected weaker economic conditions and general market deterioration. ***The increase was primarily due to increases in home equity and residential first***

*mortgages, particularly in Florida, as well as commercial real estate loans being managed by the Special Assets Department and in the process of collection.*

\*        \*        \*

At December 31, 2007, non-performing assets totaled $864.1 million, or 0.90 percent of ending loans, compared to $379.1 million, or 0.40 percent of loans, at December 31, 2006. *The increase in non-performing assets was largely influenced by growth in non-performing loans in the fourth quarter of 2007 due to weakness in the residential homebuilder portfolio. This pressure was due to a combination of declining residential demand and resulting price and collateral value declines in certain of the Company's markets, particularly areas of Florida and Atlanta, Georgia.*

137.    Finally, on May 19, 2009, the *Memphis Business Journal* reported that the Company would have to conduct a very dilutive stock offering and sell assets to bring the Company's capital up to the levels being required by the U.S. government:

Regions Financial Corp. plans to raise $1.25 billion in a stock offering to help meet the U.S. government's demands to raise more capital if the economy worsens.

The Birmingham banking giant plans to pony up $1 billion via a common stock offering and another $250 million in new mandatory convertible preferred shares. If raised, the money would account for only half of the $2.5 billion company needs to bolster its capital reserves, a requirement set by the federal government after results of its "stress tests" predicted the bank could suffer from $9.2 billion in loan losses given the worst-case scenario.

Regions also plans to sell certain businesses, exchange equity for Regions Bank's $4.25 billion of outstanding subordinated debt and $345 million of additional trust preferred securities to come up with the rest of the money, the bank said in a written statement.

138.    Throughout the relevant period, the Individual Defendants subjected Regions to improper loan review processes, over-valued its loan portfolio and failed to maintain adequate loan loss reserves which inflated Regions' operating results and goodwill. By failing to report the true facts concerning the Company's grossly inflated loan portfolio and goodwill, the Registration Statement and publicly incorporated financial reports defendants caused and/or permitted Regions to issue and file with the SEC failed to provide investors with the basic information necessary to

understand Regions' financial results and omitted material information, rendering them materially false and misleading.

139.    The true facts that were negligently omitted from the Registration Statement were as follows:

(a)    AmSouth's decision to "double" its presence in the over-stimulated Florida real estate lending market between 2004 and 2006, coupled with AmSouth's lack of experience in lending and servicing ARMs and the fact that it was keeping these loans on its own books rather than repackaging them and selling them to other investors, significantly increased the risk associated with the AmSouth assets and diminished AmSouth's (and then Regions') ability to accurately calculate adequate loan loss reserves;

(b)    As the mortgage markets imploded in 2006 and 2007, Regions failed to adequately reserve for mortgage-related exposure, causing its balance sheet and financial results to be grossly inflated;

(c)    The $6 billion in "goodwill" Regions carried on its books from the inception of the AmSouth acquisition on November 4, 2006 was grossly impaired and overstated;

(d)    Regions failed to properly test for and write down impaired goodwill post-acquisition, causing the Company's balance sheet and financial results to be grossly inflated;

(e)    Regions failed to accurately and timely increase its loan loss provision by at least $1 billion during the relevant period or to raise its allowance for credit losses as prudent accounting would have required; and

(f)    Regions was operating with woefully deficient internal controls, resulting in the Company improperly reporting its loan loss reserves and goodwill.

## DEFENDANTS' FALSE FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP AND SEC REGULATIONS

**Regions' Recorded Materially Overstated Goodwill in Violation of Applicable Accounting Principles**

140.     Defendants caused the Company to falsely report its financial results for those periods incorporated into the Registration Statement by failing to timely write-off its impaired goodwill and increase its loan loss reserves, thereby overstating the Company's assets and net income.

141.     Region's financial results were included in a Form 10-K and Form 10-Qs filed with the SEC.  *See* ¶¶19-21, 104-105, 110, 114, 124.  Defendants' SEC filings claimed that the financial information presented therein was a fair statement of Regions' financial results and that the results were prepared in accordance with GAAP.

142.     Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Regions' financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

143.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

**Regions' Goodwill Accounting**

144.    Regions' acquisition of AmSouth dramatically increased the size of Regions' reported goodwill or excess purchase price[2], one of the important assets on the Company's balance sheet, in addition to increasing the size of Regions' loan portfolio.  Given the precarious lending practices which had generated much of AmSouth's portfolio, Regions' reported goodwill vastly overstated the future benefit AmSouth would provide.  This became increasingly true as the real estate market plummeted and the most tenuous loans from the over-heated Florida market began defaulting in higher amounts.  However, defendants failed to timely record impairment to Regions' goodwill.

145.    Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination.  Companies account for their business combinations using the purchase method of accounting as set forth in Financial Accounting Standards Board ("FASB") SFAS No. 141, *Business Combinations*.  Under the purchase method of accounting, the assets acquired and liabilities assumed are initially recorded at their respective fair market value as of the date of the acquisition.  The assigned amounts may be adjusted for a period of up to one year after the date of the acquisition if new information becomes available as to the actual fair value amounts of the assets or liabilities as of the date of the acquisition.  The excess of the purchase price over the fair value of the net assets acquired is recognized as an asset called goodwill.

146.    An asset is an item which provides economic value to an entity.  FASB Statement of Concepts ("FASCON") No. 2, ¶25.  Goodwill is considered to be an asset because future economic benefits are expected from it in combination with the future benefits of the other assets acquired in

---

[2]    Regions refers to its goodwill mostly as "excess purchase price" in its SEC filings through 1Q 08.  Thereafter, it uses the term goodwill exclusively.

the acquisition. Goodwill is intended to reflect the going concern value of the business acquired and its expected contribution to future earnings growth. SFAS No. 141, ¶¶B101-114.

147.    Following an acquisition, companies are required to account for their goodwill in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets*. SFAS No. 142 requires that a company review its goodwill to determine if the asset is impaired. ***Goodwill must be tested at least annually for impairment, and more often when events or circumstances arise that indicate the goodwill could be impaired***. SFAS No. 142, ¶¶18-29.

> Goodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount. Examples of such events or circumstances include:
>
> a.    A significant adverse change in legal factors or in the business climate
>
> b.    An adverse action or assessment by a regulator
>
> c.    Unanticipated competition
>
> d.    A loss of key personnel
>
> e.    A more-likely-than-not exception that a reporting unit or a significant portion of a reporting unit will be sold or otherwise disposed of
>
> f.    The testing for recoverability under Statement 144 of a significant asset group within a reporting unit
>
> g.    Recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit.

SFAS No. 142, ¶28.

148.    Testing for goodwill impairment is a two-step process. The first step in the process is used to identify potential goodwill impairment while the second step is used to measure the amount of the impairment. A company performs goodwill testing at a reporting unit level. In the first step, a company will compare the fair value of a reporting unit to its carrying value. If the fair value of the unit exceeds its carrying amount, then goodwill is deemed to not be impaired and no further testing

is required.  However, if the carrying value of the unit exceeds its fair value, then a second step is

performed to measure the amount of the impairment.  SFAS No. 142, ¶¶17-22.

149.    SFAS No. 142, ¶35 requires that a company make certain disclosures concerning its

goodwill:

> The following information shall be disclosed in the financial statements or the
> notes to the financial statements for each period for which a statement of financial
> position is presented:
>
> *        *        *
>
> c.        The changes in the carrying amount of goodwill during the period including:
>
>> (1)        The aggregate amount of goodwill acquired
>>
>> (2)        The aggregate amount of impairment losses recognized
>>
>> (3)        The amount of goodwill included in the gain or loss on disposal of all
>> or a portion of a reporting unit.
>
> Entities that report segment information in accordance with Statement 131
> shall provide the above information about goodwill in total and for each reportable
> segment and shall disclose any significant changes in the allocation of goodwill by
> reportable segment.  If any portion of goodwill has not yet been allocated to a
> reporting unit at the date the financial statements are issued, that unallocated amount
> and the reasons for not allocating that amount shall be disclosed.

SFAS No. 142, ¶45.

150.    Regions operates in three business segments: General Banking/Treasury, Investment

Banking/Brokerage/Trust and Insurance.  It considers reporting units for goodwill impairment

purposes to be its operating segments.  The General Banking/Treasury is the Company's primary

segment which provides commercial, retail and mortgage banking services.  Regions allocated

substantially all of its acquired AmSouth operations, including its toxic Florida loan portfolio to the

General Banking reporting unit.

151.    Regions' acquisition of AmSouth in late 2006 occurred at a time when the housing

market had already begun to show signs of slowing.  As set forth above, the AmSouth acquisition

was a risky acquisition.  AmSouth engaged in aggressive lending practices concentrated in high-risk markets.  Despite the size and risk associated with AmSouth's loan portfolio and the slowing in the real estate market, Regions failed to perform adequate due diligence on AmSouth.  In a rush to close the deal, Regions perfunctorily performed its formal due diligence in a matter of days.

152.    The acquisition was completed on November 4, 2006 in an all stock transaction valued at $9.9 billion.  Regions paid a premium for AmSouth over the fair value of its assets and liabilities and initially recorded $6.2 billion as goodwill.  This acquisition caused a sharp increase in Regions' goodwill.  The Company's overall goodwill balance jumped from $5 billion at year end 2005 to $11.2 billion at year end 2006.

153.    *At the time of the acquisition, over 71% of AmSouth's reported fair value of its assets belonged to its loan portfolio*.  AmSouth's loan portfolio was grossly overstated due to its gross understatement of its loan loss reserves.  *As of November 4, 2006, AmSouth reported a total loan portfolio of $34.8 billion while only recording an allowance for loan losses of $336 million or less than one percent*.

154.    Regions failed to adjust the amount of goodwill it recorded from its acquisition of AmSouth downward in the year following the acquisition as it was required to do under GAAP.  *In fact, Regions not only failed to decrease its goodwill balance but actually increased the balance by a net $337 million, increasing the goodwill associated with the AmSouth acquisition to $6.6 billion for year end 2007*.  It did so despite growing evidence indicating that serious problems existed at the time of the acquisition with AmSouth's loan portfolio.

155.    The significant market disruption in the credit markets not only persisted but worsened throughout 2007.  This turmoil constituted an event or change in circumstance which indicated Regions' goodwill balance might be impaired within the meaning of SFAS No. 142, ¶28,

- 63 -

and therefore required Regions to test the goodwill for impairment. Despite clear indications that impairment testing was necessary, Regions failed to conduct impairment tests in the first three quarters of FY 2007 and failed to properly record impairment charges during this period. Regions also failed to provide meaningful disclosures concerning its goodwill balance.

156.    At year end 2007, when Regions' annual impairment test was scheduled, the Company performed a test but utilized assumptions so unreasonable that it resulted in no impairment charge related to its AmSouth operations. According to Regions, the Company's impairment evaluation for FY 2007 purportedly indicated that none of its goodwill was impaired.

157.    Even the SEC questioned the validity of Regions' goodwill balance related to the AmSouth acquisition not being impaired at the end of fiscal year 2007. On June 17, 2008 the SEC provided a comment letter to Regions after the agency reviewed the Company's Form 10-K filed on February 26, 2008. The comment letter included a question asking Regions to explain how it determined its goodwill balance was not impaired at the end of 2007. The SEC specifically asked Regions how the goodwill balance could not be impaired at the end of 2007 *given the fact that the Company was trading at a market value that was below its book value*.

158.    Given the deterioration of the banking sector by the end of 2007 and the fact that Regions was trading at a market value that was below its book value as of the end of 2007, it defies logic that the goodwill balance would not be impaired as this time. Accordingly, the incorporation of the Company's 2007 Form 10-K in the Offering led to a materially false and misleading Registration Statement because the goodwill balance was overstated by at least $6 billion at the end of 2007.

159.    In its FY 2007 10-K, Regions also failed to comply with the disclosure requirements of SFAS No. 142, ¶45, by failing to disclose whether or not it tested for goodwill at a reporting unit

level and by failing to provide information about its goodwill on a reportable segment basis. It was not until Regions' filing of its 2Q 08 Form 10-Q, after the Offering and after the SEC had sent its comment letter to Regions, that Regions made its goodwill disclosure more transparent.

160.    Despite the continued decline in Regions' stock price, the continued downward spiral in the real estate market and the collapse of Bear Stearns, Regions again failed to conduct an impairment test and failed to properly record an impairment charge for 1Q 08.

161.    On October 23, 2008, *Bloomberg* columnist Jonathon Weil ("Weil") further questioned Regions' goodwill assessment in his commentary entitled "Regions Financial Must Think We're All Stoned," which provided in pertinent part:

> So far this year, the Birmingham, Alabama-based regional bank says it has earned $622.5 million, including $79.5 million of net income last quarter. In reality, Regions probably has lost billions. The bosses just won't admit it.
>
> ***It all comes down to that pneumatic, intangible asset known as goodwill, which is about as valuable as the air in a paper sack. As of Sept. 30, according to Regions, the bank's goodwill was worth $11.5 billion, slightly more than the quarter before. That's about 59 percent of Regions' book value, and $4.1 billion more than what the stock market says the entire company is worth***.
>
> There is one scenario I can envision in which that goodwill figure would be justified. That would be if another big bank is offering right now to buy Regions for a huge premium. There's no reason for us to think that's happening, notwithstanding the Treasury Department's recent jawboning, encouraging U.S. banks to merge their way out of their problems.
>
> Barring an undisclosed deal in the works, Regions executives would have to be nuts to believe that goodwill number. Maybe they think the rest of us are just stoned. A Regions spokesman, Tim Deighton, declined to comment. The bank's chief financial officer, Irene Esteves, didn't respond to my e- mails.
>
> It's become standard fare for banks to insult the public's intelligence by publishing asset values that defy logic. Saying Regions' goodwill is worth $11.5 billion would be like a hen bragging that her unlaid egg weighs more than she does.

162.    Ultimately, in the fourth quarter of 2008, Regions reported a $6.2 billion loss for the quarter.  The massive loss was due in substantial part to a $6 billion goodwill charge attributable to the Company's AmSouth operations.

163.    Had Regions properly written off the impaired goodwill associated with the AmSouth acquisition at year end 2007 – as it should have –or even in any of its first three quarters in 2008, the Company's reported net income and diluted EPS would have been dramatically lower, as illustrated below:

| Regions Bank | | | | |
|---|---|---|---|---|
| (In Millions of $ Except EPS) | **FY 2007** | **Q1 2008** | **Q2 2008** | **Q3 2008** |
| Net Income as Reported | $  1,251 | $    337 | $    206 | $      79 |
| Diluted EPS as Reported | $  1.76 | $  0.48 | $  0.30 | $  0.11 |
| Goodwill Write-Off Defendants Should Have Taken to Reflect Impairments | $  (6,000) | $  (6,000) | $  (6,000) | $  (6,000) |
| Net Income Reflecting Goodwill Write-Off | $  (4,749) | $  (5,663) | $  (5,794) | $  (5,921) |
| Actual Diluted EPS Reflecting Goodwill Write-Off | $  (6.66) | $  (8.14) | $  (8.32) | $  (8.50) |

**Regions Recorded Materially Understated Loan Loss Reserves in Violation of Applicable Accounting Principles**

164.    The American Institute of Certified Public Accountants ("AICPA") Audit and Accounting Guide states:

> *Finance receivables normally are the most significant portion of a finance company's total assets*. . . .   A finance company should maintain a reasonable *allowance for credit losses*. . . .  *The allowance for loan losses reduces the carrying amount of loans receivable to the amount that is estimated to be collectible*.

165.    During a November 2000 speech at the AICPA National Conference for Banks and Savings Institutions, the Deputy Chief Accountant of the SEC stated the following:

> In plain English, the allowance for loan losses must reflect, on a timely basis, the changes in the credit quality of an institution's loan portfolio.  *As credit quality deteriorates, the allowance should be adjusted upward in a timely fashion to reflect the additional losses that have been incurred*.

166.    Under GAAP, Regions was required to have adequate reserves for: (1) estimated credit losses for loans specifically identified as being impaired; (2) estimated credit losses for loans or groups of loans with specific characteristics that indicate probable losses; and (3) estimated credit losses inherent in the remainder of the portfolio based on current economic events and circumstances.

167.    The SEC also provides explicit guidance on the proper accounting for loan losses that defendants were required to follow, but did not.  Staff Accounting Bulletin ("SAB") No. 102 states in pertinent part:

> It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a ***disciplined and consistently applied process***. . . .   A registrant's loan loss allowance methodology generally should . . . ***[c]onsider all known relevant internal and external factors that may affect loan collectability . . . [and] [b]e based on current and reliable data*** . . . .

SAB No. 102 also provides:

> Factors that should be considered in developing loss measurements includ[ing] . . . [l]evels of and trends in delinquencies and impaired loans . . . [and] [e]ffects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices . . . .

The SEC further states that:

> For many entities engaged in lending activities, the allowance and provision for loan losses are significant elements of the financial statements.  Therefore, the staff believes it is appropriate for an entity's management to review, on a periodic basis, its methodology for determining its allowance for loan losses.

168.    Regions' loan loss reserves from the first quarter of 2007 through the first three quarters of 2008 were materially inadequate and did not reflect the high risk of loss inherent in its mortgage loan portfolio, which included AmSouth's ARMs from the over-stimulated Florida real estate lending market between 2004 and 2006.  The Company's reserves therefore violated GAAP and SEC rules.  Further, the Company's understated reserves resulted in overstatements of net

income, retained earnings, total assets and total shareholders equity, as set forth on Regions' consolidated balance sheets and income statements. Because those overstated balance sheet and income statement items were components of the Company's Tier 1 capital ratio, those capital ratios were also overstated from the first quarter of 2007 through the first three quarters of 2008 for this reason alone, and others described herein.

### Defendants Concealed Impairments on Certain High-Risk Loans It Acquired from AmSouth

169.    From the first quarter of 2007 through the first three quarters of 2008 Regions failed to take adequate specific reserves related to the impairment of its residential homebuilder portfolio, which included a significant concentration of loans in the troubled Florida housing market obtained from its acquisition of AmSouth in 2006.  SFAS No. 114, *Accounting by Creditors for Impairment of a Loan* and Emerging Issues Task Force ("EITF") Topic No. D-80, *Application of FASB Statements No. 5 and No. 114 to a Loan Portfolio* clearly describe that an evaluation of loan impairment must be made in context of current information and events.  For example, SFAS No. 114, ¶8 states:

> *A loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement*.  As used in this Statement and in Statement 5, as amended, all amounts due according to the contractual terms means that both the contractual interest payments and the contractual principal payments of a loan will be collected as scheduled in the loan agreement.

170.    SFAS No. 114, ¶10 states:

> The conditions for accrual . . . are not inconsistent with the accounting concept of conservatism. *Those conditions are not intended to be so rigid that they require virtual certainty before a loss is accrued*. . . .  They require only that it be *probable* that an asset has been impaired or a liability has been incurred and that the amount of loss be *reasonably* estimable.

171.    As of the 1Q 07, it was probable that a significantly greater portion of the loan portfolio containing the Florida (and Georgia) real estate loans acquired from the AmSouth

acquisition were impaired and as a result, defendants were required, under GAAP, to estimate the loss exposure and set up appropriate reserves (in the form of a valuation allowance) at that time.

SFAS No. 114, ¶13 states:

> [If] the present value of expected future cash flows . . . is less than the recorded investment in the loan (including accrued interest, net deferred loan fees or costs, and unamortized premium or discount), ***a creditor shall recognize an impairment by creating a valuation allowance with a corresponding charge to bad-debt expense***.

172.    To calculate the Company's loss exposure, Regions was required under GAAP, to evaluate the likelihood of future cash flows (in the form of repayments of principle and interest).

SFAS No. 114, ¶13 states:

> When a loan is impaired . . . ***a creditor shall measure impairment based on the present value of expected future cash flows*** discounted at the loan's effective interest rate . . . .

173.    Regions' decision to purchase AmSouth in 2006 significantly increased its presence in the over-stimulated Florida real estate lending market.  This factor, along with AmSouth's lack of experience in lending and servicing ARMs required Regions to record and expense over $1 billion more in impaired loans by the end of 2007.  By failing to accrue properly for over $1 billion in additional impaired loans, defendants' reported financial results incorporated into its Registration Statement for the Offering were materially false and misleading violating GAAP and SEC rules.

**Regions Failed to Reserve Adequately for Groups of Loans with Characteristics that Indicated Probable Losses**

174.    Even where loans were not delinquent and impaired under GAAP, defendants were required to set reserves to reflect the risks associated with loans with similar characteristics to those that were impaired.  EITF Topic No. D-80 states:

- ***Simply because a portion of the allowance is designated as "unallocated," it is not thereby inconsistent with GAAP***.  The important consideration is whether the allowance reflects an estimate of probable losses, determined in accordance with GAAP, and is appropriately supported.

- 69 -

\*      \*      \*

- ... [S]ome loans that are specifically identified for evaluation may be individually impaired, while other loans, that are not impaired individually pursuant to FAS 114, may have ***specific characteristics that indicate that there would be probable loss in a group of loans with those characteristics***. Loans in the first category must be accounted for under FAS 114 and ***loans in the second category should be accounted for under FAS 5***. Under FAS 5, ***a loss is accrued if characteristics of a loan indicate that it is probable that a group of similar loans includes some losses even though the loss could not be identified with a specific loan***. [fn] Moreover, current GAAP . . . emphasize that ***the loss does not have to be virtually certain in order to be recognized***.

175.    Similarly, SFAS No. 5, *Accounting for Contingencies*, ¶22 states that "***accrual shall be made even though the particular receivables that are uncollectible may not be identifiable***."

176.    Regions violated GAAP by ignoring the probable loss characteristics in groups of very high risk mortgage loans on the distressed Florida and Georgia markets that were increasingly suffering from delinquencies. It was not until year end 2008, well after the housing market had already collapsed, that Regions significantly increased its write-offs and provision for loan losses. At the time of the Offering, the Company had taken much smaller write-offs and reserves for these mortgage loans with high risk characteristics, ignoring red flags and experience that these types of loans were suffering high delinquency and default rates. As a result, Regions' financial results incorporated into its Registration Statement understated the loan loss reserves by more than $1 billion.

**Defendants Also Violated GAAP and SEC Disclosure Requirements**

177.    Regions' financial statements also violated GAAP as a result of defendants' failure to adequately disclose the material loss contingencies and significant concentrations of risk related to the loans acquired from the AmSouth acquisition that had imploded due to the housing downturns in the Florida and Georgia real estate markets.

- 70 -

178.    Under GAAP, a loss contingency is an existing condition, situation or set of circumstances involving uncertainty as to possible loss. *See* SFAS No. 5, ¶1. The collectability of mortgage loans is an example of a loss contingency. GAAP requires that an estimated loss from a loss contingency "be accrued by a charge to income if both of the following conditions are met: (a) ***[i]nformation available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statement***"; and "***(b) [t]he amount of loss can be reasonably estimated***." *See* SFAS No. 5, ¶8.

179.    Even if no accrual is made for a loss contingency because one or both of the above conditions of SFAS No. 5 are not met, or if an exposure to loss exists in excess of the amount accrued, defendants were still required to disclose the contingency when there is at least a "***reasonable possibility***" that a loss or an additional loss may have been incurred.[3] SFAS No. 5, ¶10. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made. *See* SFAS No. 5, ¶10.

180.    SFAS No. 107, *Disclosures about Fair Value of Financial Instruments*, required Regions to disclose "all significant concentrations of credit risk from all financial instruments, whether from an individual counterparty or groups of counterparties." Group concentrations of credit risk exist if a number of counterparties have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions. As alleged herein, Regions' mortgage loans from the afflicted Florida and Georgia markets clearly represented a significant concentration of credit risk.

---

[3]    GAAP defines "[r]easonably possible" as "[t]he chance of the future event or events occurring is ***more than remote but less than likely***." SFAS No. 5, ¶3.

181.    If a significant concentration of risk represents a material contingency, the risk must be disclosed in the Company's interim financial statements in accordance with Accounting Principles Board Opinion (APB") No. 28, *Interim Financial Reporting*.  The purpose behind these GAAP provisions is to warn investors about  concentrations  of risk that ***may*** result in losses under changed conditions – not to wait until those losses become substantial (which they already were by the end of 2007) – and then disclose the concentration of risk ***after*** the losses have already harmed investors.

182.    Similarly, AICPA Statement of Position ("SOP") No. 94-6, *Disclosure of Certain Risks and Uncertaintie*s, requires disclosures to be made in financial statements regarding any vulnerabilities arising due to the fact that the business is exposed to certain risks and uncertainties that might have a "severe impact" on future operations.  SOP 94-6 defines a "severe impact" as a "significant financially disruptive effect on the normal functioning of the company."  For Regions, the Florida and Georgia mortgage loans acquired from the AmSouth acquisition presented a group concentration of credit risk that threatened to, and ultimately did, severely impact the Company's financial position.

**Defendants' Provision for Loan Losses and Net Charge-Offs of Loans Were Understated Until Year End 2008**

183.    Ultimately, at year end 2008, Regions finally announced dramatic increases in its write-offs and in its provision for loan losses.  For FY 2008, Regions' net charge-offs totaled $1.5 billion or 1.59% of average loans in 2008 versus $270.5 million or 0.29% of average loans in 2007. Regions' provision for loan losses increased to $2.1 billion in 2008 versus $555 million in 2007.

184.    *Bloomberg* columnist Weil questioned Regions accounting for its loan loss reserves in his commentary on October 23, 2008:

Irrational goodwill isn't the only thing weird about Regions' accounting, either.

As of Sept. 30, Regions had a $1.5 billion loan-loss allowance, equivalent to just 83 percent of its nonperforming assets, which were $1.8 billion. A year earlier, Regions' allowance was at 175 percent of nonperforming assets. A year before that, it was at 249 percent.

Keeping Up

Common sense tells you a bank's loan-loss allowance, in an economic decline, should be rising as a percentage of nonperforming assets. It's the reserve a lender sets up on its balance sheet in anticipation of bad loans. At Regions, the allowance hasn't kept up.

185.    The illustrations below demonstrate how Regions' provision for loan losses and net charge-offs of loans failed to "keep up" and timely reflect the high risk of loss inherent in the Company's mortgage loan portfolio.    Even though Regions' total loan balance increased significantly (over $30 billion) after the AmSouth acquisition, the Company's corresponding provision for loan losses and net charge-offs combined did not cover even 1% of the total loan balance at the end of 2007.    It wasn't until the fourth quarter of 2008 that Regions belatedly increased its provision for loan losses and net charge-offs well after the housing market had already collapsed.

| Regions Bank | | | | |
|---|---|---|---|---|
| (Dollars in Thousands) | **Q1 2007** | **Q2 2007** | **Q3 2007** | **Q4 2007** |
| Provision for Loan Losses | $47,000 | $60,000 | $90,000 | $358,000 |
| Net Charge-Offs of Loans | $46,022 | $53,907 | $63,121 | $107,472 |
| Total Loan Balance | $94,168,000 | $94,014,000 | $94,374,000 | $95,379,000 |

| Regions Bank | | | | |
|---|---|---|---|---|
| | **Q1 2008** | **Q2 2008** | **Q3 2008** | **Q4 2008** |
| Provision for Loan Losses | $181,000 | $309,000 | $417,000 | $1,150,000 |
| Net Charge-Offs of Loans | $125,758 | $208,951 | $416,384 | $795,992 |
| Total Loan Balance | $96,385,000 | $98,267,000 | $98,712,000 | $97,419,000 |





**Regions' Failure to Maintain Adequate Controls Over Its Financial Reporting and Disclosures Violated Applicable Accounting Principles and SEC Regulations**

186.     The SEC defines "disclosure controls and procedures" as follows, in relevant part,

controls and procedures . . . of an issuer that are designed to ensure that *information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms*.

17 C.F.R. §240.13a-15(e) (emphasis added).

187.     "Internal control over financial reporting" is defined by the SEC:

[A] process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and *the preparation of financial statements for external purposes in accordance with generally accepted accounting principles* and includes those policies and procedures that:

- 74 -

(1)    Pertain to the maintenance of records that, in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(2)    Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

17 C.F.R. §240.13a-15(f) (emphasis added).

188.    Securities Exchange Act of 1934 ("1934 Act") Rule 13a-15 requires the Company's principal executive officer and principal financial officer to annually certify the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's disclosure controls and procedures, and provide management's assessment of the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's internal controls over financial reporting, as of the end of each fiscal year.  17 C.F.R. §240.13a-15(b)(1) and (c).

189.    In the Company's 2007 Form 10-K, defendants misled investors regarding the effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting, insofar as they negligently misrepresented that the Company's disclosure controls and procedures, and internal controls over financial reporting were effective when they were not, for the reasons set forth above.

190.    In addition, the Company's 2007 Form 10-K contained the Sarbanes-Oxley certifications, signed by defendant Ritter and Yother.  As alleged in detail above, the statements made in the certification were each materially false and/or misleading when the certifications were signed on February 26, 2008.

## E&Y'S PARTICIPATION IN THE ISSUANCE OF FALSE FINANCIALS

191.    E&Y, a firm of certified public accountants, was engaged by Regions to provide independent auditing and accounting services at all times relevant to this action.  Regions, who is the largest client of E&Y's Birmingham office, has retained E&Y as its outside auditor since 1971. E&Y was engaged to examine and report on Regions' financial statements for FY 2006-FY 2008 and to perform review services on Regions' interim results for FY 2007 and FY 2008.  E&Y further provided Regions with other services including accounting consultations, internal control reviews and tax related services.  For FY 2006-FY 2008, Regions paid E&Y nearly $20 million for its services.  As a result of the duration and far-reaching scope of services provided by E&Y, E&Y personnel should have been intimately familiar with Regions' business, including Regions' accounting for its goodwill and its loan loss reserves.

**E&Y's Erroneous Statements as to Regions' FY 2007 Financial Statements**

192.    E&Y incorrectly represented that Regions' financial results for FY 2007 were presented in accordance with GAAP and that E&Y's audits and reviews for 2007 of Regions' financial statements had been performed in accordance with GAAS.  Furthermore, E&Y incorrectly represented that Regions maintained, in all material respects, effective internal control over financial reporting, based on the COSO criteria.  E&Y consented to the incorporation of its negligently false reports on Regions' financial statements and effective internal controls in Regions' Form 10-K for FY 2007, which was filed with the SEC.  E&Y also consented to the incorporation of this same report into Regions' Registration Statement.

193.    In the context of an offering such as this one, the independent auditor serves a gatekeeping function.  A company that sells new securities to the public is required to file a registration statement with the SEC, and the 1933 Act requires that the registration statement contain financial statements audited by an independent auditor.  Section 11 of the 1933 Act imposes

significant responsibilities on every auditor who has with his or her consent been named as having

certified any part of the registration statement.  Because of the significance of these responsibilities

and their difference from the auditor's responsibilities in ordinary circumstances, professional

standards contain (*i.e.* GAAS) a separate discussion of these additional responsibilities in AU §711,

*Filings Under Federal Securities Statutes*.

194.    GAAS, as approved and adopted by the AICPA, relates to the conduct of individual

audit engagements.  Statements on Auditing Standards (codified and referred to as AU §___) are

recognized by the AICPA as the interpretation of GAAS.

195.    When an independent auditor's report is included in a registration statement, the

nature and extent of this responsibility are specified in some detail in the federal securities statutes

and in the related rules and regulations.  AU §711.02 states that §11(a) imposes responsibility for

false or misleading statements in an effective registration statement, or for omissions that render

statements made in such a document misleading ***on every auditor who consents to be named as***

***having certified any part of the registration statement, or as having prepared any report used in***

***connection with the registration statement, with respect to the statement or reporting in the***

***registration statement that purports to have been prepared or certified by him***.

196.    AU §711.03 explains that §11(b) states, in part, that no person whose report is

included in the registration statement on his authority as an expert shall be liable as provided therein

if that person sustains the burden of proof that, as regards the part of the registration statement

purporting to be made on his authority as an expert, or purporting to be a copy from a report of

himself as an expert, "'he had, after reasonable investigation, reasonable ground to believe and did

believe, at the time such part of the registration statement became effective, that the statements

therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"

197.    AU §711.03 also states:

Section 11 further provides that, in determining what constitutes reasonable investigation and reasonable ground to believe, "the standard of reasonableness shall be that required of a prudent man in the management of his own property."

Thus, this reasonableness requirement goes beyond the requirement of due professional care imposed by the auditing standards.

198.    One of the unique responsibilities related to the auditor's consent to the inclusion of an audit report in a registration statement is that the decision to consent should be made in light of the circumstances at the effective date.  AU §711.05 states:

Because a registration statement under the Securities Act of 1933 speaks as of its effective date, the independent accountant whose report is included in such a registration statement has a statutory responsibility that is determined in light of the circumstances on that date.  This aspect of responsibility is peculiar to reports used for this purpose (see paragraphs .10 through .12).

199.    This means that the auditor should view the continuing validity of the opinion expressed at an earlier date from the perspective of the circumstances known at the effective date.

200.    AU §711.10 describes the auditor's responsibility to keep informed of relevant circumstances through the effective date as follows:

To sustain the burden of proof that he has made a "reasonable investigation" (see paragraph .03) as required under the Securities Act of 1933, an auditor should extend his procedures with respect to subsequent events from the date of his audit report up to the effective date or as close thereto as is reasonable and practical in the circumstances.

201.    AU §711.10 describes the procedures that should be applied as including the normal subsequent events review procedures as described in AU §560, *Subsequent Events*, plus reading the entire prospectus and other pertinent portions of the registration statement and inquiring of and obtaining written representations from management responsible for financial and accounting matters.

Naturally, the auditor is also responsible for any knowledge he or she has obtained in providing professional services to the company since the audit through the effective date.

202.    AU §711.12 describes the auditor's responsibilities if the auditor discovers or becomes aware of information that affects the audited financial statements included in the registration statement or the audit report thereon as follows:

> If, subsequent to the date of his report on audited financial statements, the auditor . . . (a) discovers, in performing the procedures described in paragraphs .10 and .11 above, subsequent events that require adjustment or disclosure in the financial statements, or (b) becomes aware that facts may have existed at the date of his report that might have affected his report had he then been aware of those facts, he should follow the guidance in sections 560 and 561.

AU §§560 and 561 relate to seeing that the proper adjustments or disclosures are made or withdrawing a previously issued audit report.

203.    AU §711.13 imposes a similar responsibility for any unaudited financial statements or unaudited interim financial information presented or incorporated by reference in a registration statement that are not in conformity with GAAP.

204.    Under both AU §§711.12 and .13 if the financial statements or financial information is not appropriately revised, the auditor should modify his or her audit report for the GAAP departure and consider withholding the consent to the use of his or her report on the audited financial statements in the registration statement.

205.    E&Y consented to the inclusion of its audit report for the 2007 Form 10-K in the April 2008 Prospectus.  E&Y should not have consented to the inclusion of its audit report in Regions' April 2008 Prospectus and Registration Statement because of the Company's improper accounting for its goodwill balance and loan loss reserves.  *See* ¶¶144-185.

206.    E&Y should have evaluated whether to reissue its audit report on Regions FY 2007 financial statements in light of the circumstances (*i.e.* overstatement of goodwill, net income and EPS) that existed on April 28, 2008.

207.    If E&Y had reasonably considered these matters, E&Y would not have consented to the inclusion of its audit report on the FY 2007 financial statements in the Prospectus.

208.    Thus, E&Y violated professional standards by consenting to the inclusion of its audit report for the fiscal year ended December 31, 2007, in the Prospectus on April 28, 2008.  By including its consent in the Prospectus, E&Y was required to make a "reasonable investigation" with respect to events at Regions subsequent to the date of the audit report up to the date of the Prospectus.  AU §711.10.  E&Y was responsible for any knowledge it obtained in providing professional services through the date of the Prospectus, in addition to reading the entire Prospectus and other pertinent portions of the Registration Statement.

209.    E&Y's reports and approval of the financial results were false and misleading due to its negligent failure to comply with GAAS and specifically AU §711 because Regions' financial statements were not prepared in conformity with GAAP so that issuing the reports or approving Regions' financial results was in violation of GAAS and SEC rules.  E&Y knew its reports and approval of the financial statements would be relied upon by the Company as well as by present and potential investors in Regions' securities.

**E&Y Ignored the Audit Evidence It Gathered**

210.    GAAS, as set forth in AU §326, *Evidential Matter*, requires auditors to obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit:

> In evaluating evidential matter, the auditor considers whether specific audit objectives have been achieved.  The independent auditor should be thorough in his or her search for evidential matter and unbiased in its evaluation.  In designing audit

procedures to obtain competent evidential matter, he or she should recognize the possibility that the financial statements may not be fairly presented in conformity with generally accepted accounting principles or a comprehensive basis of accounting other than generally accepted accounting principles. In developing his or her opinion, the auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements. To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion.

AU §326.25 (footnotes omitted).

211.    E&Y's duty, as Regions' independent auditor, was to obtain "sufficient appropriate audit evidence . . . to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." AU §§110.01, 150.02.

212.    In violation of GAAS, and contrary to the representations in its report on Regions' financial statements, E&Y negligently failed to obtain sufficient, competent evidential matter to support Regions' assertions regarding its accounting for its goodwill and its loan loss reserves.

**E&Y Failed to Design Its Audit to Identify the Alleged Improprieties**

213.    As one of the largest audit firms in the world, E&Y was well aware of the strategies, methods and procedures required by GAAS to conduct a proper audit. Also, E&Y knew or should have known of the audit risks inherent at Regions and in the industries in which Regions operated because of the comprehensive services it provided to Regions and its experience with many other clients. In connection with Regions' operations, E&Y had virtually limitless access to information concerning the Company's true operations as:

- E&Y had been Regions' auditor since 1971;

- E&Y representatives were present at Regions' headquarters and divisions frequently;

- E&Y had frequent conversations with Regions management and employees about the Company's operations and financial statements;

- E&Y audited and reviewed Regions' financial statements at all relevant times and knew or should have known that Regions' financial statements were not accurate or prepared in compliance with GAAP or GAAS; and

- E&Y provided Regions with accounting consultations, internal review controls and tax services.

214.    E&Y failed in its role as independent auditor by ignoring red flags of improper accounting, including unreasonable assumptions regarding Regions' accounting for its goodwill and its loan loss reserves. E&Y reasonably should have but did not insist upon adjustments to Regions' audited financial statements. Pursuant to GAAS, E&Y reasonably should have but did not issue a qualified or adverse report, or it should have insisted that Regions comply with GAAP. Furthermore, E&Y reasonably should have refused to approve Regions' quarterly financial results for 2007.

**E&Y Failed to Identify Material Weaknesses in Internal Controls**

215.    E&Y, as Regions' auditors, were obligated to assess Regions' internal disclosure, financial and accounting controls and whether such controls had been placed in operation, were effective and complied with Sarbanes-Oxley, including controls to provide assurance about the safeguarding of assets, financial reporting, operations and compliance with regulations. E&Y was required to evaluate whether poor controls might lead to or contribute to false and misleading financial disclosures.

216.    Internal controls are essential to a company's financial reporting, as adequately designed internal controls provide a company with reasonable assurance on the reliability of financial reporting, the effectiveness and efficiency of operations and compliance with applicable laws and regulations. AU §319.06. Under AU §319.02:

In all audits, the auditor should obtain an understanding of internal control sufficient to plan the audit by performing procedures to understand the design of

controls relevant to an audit of financial statements and determining whether they have been placed in operation.

217.   If an auditor identifies any material weaknesses in a company's internal controls during an audit, then the auditor must communicate these weaknesses to the company's audit committee.  AU §325.  Further, the auditor should identify any limitations related to the internal control weaknesses in his or her audit opinion in accordance with the procedures proscribed by the professional standards.

218.   With respect to Regions' internal controls for FY 2007, E&Y negligently represented that in its opinion the Company had maintained effective internal controls, when it had not.

219.   Despite E&Y's "clean" audit reports for FY 2007 and its assessment as to the effectiveness of Regions' internal controls, Regions announced significant charges related to its goodwill, its loan loss reserves and an SEC inquiry into its accounting subsequent to the issuance of E&Y's audit opinion in February 2008.

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

220.   The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.

221.   First, none of the statements complained of herein was a forward-looking statement. Rather they were historical statements or statements of purportedly current facts and conditions at the time the statements were made. Second, the statutory safe harbor does not apply to statements included in financial statements which purport to have been prepared in accordance with GAAP.

222.   To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in

the statements. As set forth above in detail, then-existing facts contradicted defendants' statements regarding the Company's business and financial condition and its purported compliance with GAAP.

## CLASS ACTION ALLEGATIONS

223.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired the Securities pursuant or traceable to the Company's false and misleading Registration Statement issued in connection with the Company's Offering and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

224.    The members of the Class are so numerous that joinder of all members is impracticable.  The Securities were traded on the New York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds if not thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Regions or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

225.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

226.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

227.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are: whether the 1933 Act was violated by defendants' acts as alleged herein; whether statements made by defendants to the investing public in the Registration Statement misrepresented material facts about the business, operations and management of Regions; and to what extent the members of the Class have sustained damages and the proper measure of damages.

228.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of §11 of the 1933 Act
### Against All Defendants

229.    Plaintiff repeats and realleges each and every allegation contained above.

230.    This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.  Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on theories of strict liability and negligence under the 1933 Act.

231.    The Registration Statement and April 2008 Prospectus were false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

232.    Regions was the registrant for the Offering, and created Regions Trust III for the sole purpose of issuing the Securities and obtaining the proceeds there from.  As issuer of the Securities,

Regions and Regions Trust III are strictly liable to plaintiff and the Class for the misstatements and omissions.

233.    The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.  Each of the Individual Defendants signed or authorized the signing of the Registration Statement and/or the documents incorporated by reference therein.

234.    The Underwriter Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

235.    E&Y acted as Regions' auditor and was named by consent as having certified a part of the Registration Statement.

236.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

237.    By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

238.    Plaintiff acquired the Securities pursuant and/or traceable to the Registration Statement.

239.    Plaintiff and the Class have sustained damages.  At the time of their purchases of the Securities, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that plaintiff filed this Complaint.  Less than three years elapsed between the time that the Securities upon which this Count is brought were offered to the public and the time plaintiff filed this Complaint.

## COUNT II

### Violations of §12(a)(2) of the 1933 Act
### Against Defendants Regions, Regions Trust III and the Underwriter Defendants

240.    Plaintiff repeats and realleges each and every allegation contained above.

241.    Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on theories of strict liability and negligence under the 1933 Act.

242.    By means of the defective April 2008 Prospectus, the defendants named herein sold and/or assisted in the sale of the Securities to plaintiff and other members of the Class.

243.    The April 2008 Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  The defendants named in this Count owed plaintiff and the other members of the Class who purchased the Securities pursuant to the April 2008 Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the April 2008 Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the April 2008 Prospectus as set forth above.

244.    Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the April 2008 Prospectus at the time plaintiff acquired the Securities.

245.    By reason of the conduct alleged herein, these defendants violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased the Securities pursuant to the April 2008 Prospectus sustained substantial damages in connection with their purchases of the Securities.  Accordingly, plaintiff and the other

members of the Class who hold such Securities have the right to rescind and recover the consideration paid for their Securities, and hereby tender their Securities to the defendants sued herein.  Class members who have sold their Securities seek damages to the extent permitted by law.

## COUNT III

### Violations of §15 of the 1933 Act
### Against the Individual Defendants and Regions

246.    Plaintiff repeats and realleges each and every allegation contained above.

247.    This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants and Regions.  Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

248.    Each of the Individual Defendants was a control person of Regions and Regions Trust III, by virtue of his or her position as a director, senior officer and/or major shareholders of Regions which allowed each of these defendants to exercise control over Regions and its operations.  Regions was a controlling owner of Regions Trust III by virtue of its ownership of the subsidiary and its ability to appoint directors.

249.    Each of the Individual Defendants and Regions was a culpable participant in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Offering to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying plaintiff as a Class representative;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members

against all defendants, jointly and severally, for all damages sustained as a result of defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Such equitable/injunctive or other relief as deemed appropriate by the Court.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  November 2, 2009            COUGHLIN STOIA GELLER
                                      RUDMAN & ROBBINS LLP
                                    SAMUEL H. RUDMAN
                                    DAVID A. ROSENFELD


                                            /s/ David A. Rosenfeld
                                    _____
                                        DAVID A. ROSENFELD

                                    58 South Service Road, Suite 200
                                    Melville, NY  11747
                                    Telephone:  631/367-7100
                                    631/367-1173 (fax)

                                    COUGHLIN STOIA GELLER
                                      RUDMAN & ROBBINS LLP
                                    ANDREW J. BROWN
                                    ERIC I. NIEHAUS
                                    LUCAS F. OLTS
                                    655 West Broadway, Suite 1900
                                    San Diego, CA  92101
                                    Telephone:  619/231-1058
                                    619/231-7423 (fax)

                                    Lead Counsel for Plaintiffs