UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

ALFRED FAIT, Individually and on Behalf of
All Others Similarly Situated,

                          Plaintiffs,

        vs.

REGIONS FINANCIAL CORPORATION, et
al.,

                        Defendants.

———————————————————————— x

: Civil Action No. 1:09-cv-03161-LAK
: (**Consolidated**)
:
: CLASS ACTION
:
: PLAINTIFFS' CONSOLIDATED
: OPPOSITION TO DEFENDANTS'
: MOTIONS TO DISMISS
:
:
:
:
:

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................1

II.   FACTUAL BACKGROUND .................................................................................6

III.  ARGUMENT .......................................................................................................11

   A.   Defendants' Extraneous Materials in Support of Their Motion to Dismiss
        Should Be Disregarded ...........................................................................11

   B.   Legal Standards Applicable to Defendants' Motion to Dismiss............................13

   C.   The Complaint Alleges False and Misleading Statements and Omissions in
        the Registration Statement and Prospectus ............................................................14

        1.   The Complaint Alleges False and Misleading Statements and
             Omissions Regarding Regions' Goodwill ...................................................15

             a.   Regions' False and Misleading 2007 Form 10-K Goodwill
                  Assessment..................................................................................15

             b.   Regions Admittedly Failed to Test for Goodwill
                  Impairment Prior to the Offering ...................................................19

        2.   The Complaint Alleges False and Misleading Statements and
             Omissions Regarding Regions' Loan Loss Reserves ...............................22

        3.   The Complaint Alleges False and Misleading Statements and
             Omissions Regarding Regions' Internal Controls .....................................25

   D.   Defendants' False and Misleading Statements Are Actionable Whether
        They Are Statements of "Fact," "Opinion," "Judgment," or "Belief"..................26

   E.   The False and Misleading Statements Are Material ...............................................30

   F.   The Complaint Alleges Regions' 2007 Financial Statements Certified by
        E&Y and E&Y's Audit Opinion Were False.........................................................32

        1.   E&Y Claimed Its Audit Complied with Generally Accepted
             Auditing Standards When It Did Not.........................................................33

        2.   E&Y's Certification of Regions' Internal Controls Was False and
             Misleading.................................................................................................34

        3.   Plaintiffs Need Not Allege E&Y Subjectively Knew Its Statements
             Were False and Misleading.......................................................................35

**Page**

G.     The Bespeaks Caution Doctrine Is Inapplicable ......................................................41

H.     The Complaint Alleges a Violation of §15 Against Regions and the
Individual Defendants ...........................................................................................45

IV.     CONCLUSION ...................................................................................................................45

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Adam v. Silicon Valley Bancshares*,
    884 F. Supp. 1398 (N.D. Cal. 1995) ..............................................................35

*Ashcroft v. Iqbal*,
    __ U.S. __, 129 S.Ct. 1937 (2009) ...............................................................13

*Atlas v. Accredited Home Lenders Holding Co.*,
    556 F. Supp. 2d 1142 (S.D. Cal. 2008) ...............................................11, 13, 25

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ...................................................................11, 13

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ............................................................................30

*Bay Harbour Mgmt. LLC v. Carothers*,
    282 Fed. App'x 71 (2d Cir. 2008) ..............................................................20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................13, 25

*Chris-Craft Indus. v. Piper Aircraft Corp.*,
    480 F.2d 341 (2d Cir. 1973) ....................................................................29

*Ciresi v. Citicorp*,
    782 F. Supp. 819 (S.D.N.Y. 1991)
    *aff'd without op.*, 956 F.2d 1161 (2d Cir. 1992) ..............................................34

*Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*,
    No. 99 CIV 12046 WHP, 2001 WL 300733
    (S.D.N.Y. Mar. 28, 2001) ..................................................................14, 42

*Darquea v. Jarden Corp.*,
    No. 06 CV 0722 (CLB), 2007 U.S. Dist. LEXIS 40247
    (S.D.N.Y. May 31, 2007) ......................................................................27

*Deephaven Private Placement Trading Ltd. v. Grant Thornton & Co.*,
    454 F.3d 1168 (10th Cir. 2006) .................................................................39

*DiLeo v. Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) ...............................................................20, 34

**Page**

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009).................................................................30, 31

*Eisenberg v. Gagnon*,
   766 F.2d 770 (3d Cir. 1985)........................................................................29

*EP Medsystems, Inc. v. Echocath, Inc.*,
   235 F.3d 865 (3d Cir. 2000)........................................................................42

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976)............................................................................14, 33

*Faulkner v. Beer*,
   463 F.3d 130 (2d Cir. 2006)........................................................................41

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
   270 F.3d 645 (8th Cir. 2001) .....................................................................18

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000)....................................................................4, 30

*Goldstein v. MCI Worldcom*,
   340 F.3d 238 (5th Cir. 2003) .....................................................................20

*Halperin v. eBanker USA.COM, Inc.*,
   295 F.3d 352 (2d Cir. 2002)...................................................................41, 44

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)......................................................................14, 33, 36

*Hinerfeld v. United Auto Group*,
   No. 97 CIV. 3533(RPP), 1998 WL 397852
   (S.D.N.Y. July 15, 1998) ............................................................................34

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
   159 F.3d 723 (2d Cir. 1998)........................................................................42

*In re Adams Golf, Inc. Sec. Litig.*,
   381 F.3d 267 (3d Cir. 2004)........................................................................33

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
   No. 03 MD 1529 (LMM), 2007 WL 2615928
   (S.D.N.Y. Sept. 10, 2007)...........................................................................45

**Page**

*In re Alstom SA Sec. Litig.*,
  253 F.R.D. 266 (S.D.N.Y. 2008) ...................................................................31

*In re AOL Time Warner Sec. & "ERISA" Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) .................................................5, 36, 37

*In re BellSouth Corp. Sec. Litig.*,
  355 F. Supp. 2d 1350 (N.D. Ga. 2005) ..........................................................21

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ...........................................................18, 31, 37

*In re Cendant Corp. Litig.*,
  60 F. Supp. 2d 354 (D.N.J. 1999) ............................................................33, 36

*In re CIT Group, Inc.*,
  349 F. Supp. 2d 685 (S.D.N.Y. 2004) .......................................................34, 37

*In re Complete Mgmt. Sec. Litig.*,
  153 F. Supp. 2d 314 (S.D.N.Y. 2001) ............................................................42

*In re Constar Int'l Inc. Sec. Litig.*,
  585 F.3d 774, 2009 U.S. App. LEXIS 23844
  (3d Cir. 2009) .........................................................................................5, 31, 32

*In re Converium Holding AG Sec. Litig.*,
  No. 04 CIV. 7897 (DLC), 2007 WL 2684069
  (S.D.N.Y. Sept. 14, 2007) ..............................................................................25

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) .........................................................12

*In re Direct Gen. Corp. Sec. Litig.*,
  398 F. Supp. 2d 888 (M.D. Tenn. 2005) ........................................................36

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  618 F. Supp. 2d 311 (S.D.N.Y. 2009) ............................................................42

*In re Friedman's, Inc. Sec. Litig.*,
  385 F. Supp. 2d 1345 (N.D. Ga. 2005) ..........................................................34

*In re Giant Interactive Group, Inc. Sec. Litig.*,
  643 F. Supp. 2d 562 (S.D.N.Y. 2009) ............................................................44

**Page**

*In re Global Crossing, Ltd. Sec. Litig.*,
    313 F. Supp. 2d 189 (S.D.N.Y. 2003)..........................................................37, 41

*In re Globalstar Sec. Litig.*,
    No. 01 CIV. 1748 (SHS), 2003 WL 22953163
    (S.D.N.Y. Dec. 15, 2003)...................................................................................43

*In re Harmonic, Inc. Sec. Litig.*,
    No. C 00 2287 PJH, 2006 WL 3591148
    (N.D. Cal. Dec. 11, 2006) *aff'd in part, rev'd in part*,
    2002 WL 31974384 (N.D. Cal. 2002) ...............................................................37

*In re IBM Corporate Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998)...........................................................................4, 27

*In re Initial Pub. Offering Sec. Litig.*,
    358 F. Supp. 2d (S.D.N.Y. 2004) ......................................................................13

*In re Merck & Co. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005)...............................................................................31

*In re Metro. Sec. Litig.*,
    532 F. Supp. 2d 1260 (E.D. Wash. 2007) .........................................................35

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ........................................................13, 25

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) .......................................................................37

*In re Philip Servs. Corp. Sec. Litig.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004).................................................................32

*In re PMA Capital Corp. Sec. Litig.*,
    No. 03-6121, 2005 U.S. Dist. LEXIS 15696
    (E.D. Pa. July 27, 2005).....................................................................................26

*In re ProQuest Sec. Litig.*,
    527 F. Supp. 2d 728 (E.D. Mich. 2007)..............................................................25

*In re Prudential Sec. Ltd. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) ......................................................................43

**Page**

*In re RAIT Fin. Trust Sec. Litig.*,
No. 2:07-cv-03148-LDD, 2008 U.S. Dist. LEXIS 103549
(E.D. Pa. Dec. 22, 2008) ...................................................................................18, 19, 25, 37

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007)....................................................................18, 20

*In re S. Pac. Funding Corp. Sec. Litig.*,
83 F. Supp. 2d 1172 (D. Or. 1999) .................................................................................26

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001).............................................................................................25

*In re Scottish Re Group Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007).............................................................................14

*In re StockerYale Sec. Litig.*,
453 F. Supp. 2d 345 (D.N.H. 2006)...........................................................................12, 13

*In re Stone & Webster, Inc., Sec. Litig.*,
414 F.3d 187 (1st Cir. 2005)...........................................................................................37

*In re Sunterra Corp. Sec. Litig.*,
199 F. Supp. 2d 1308 (M.D. Fla. 2002)..........................................................................37

*In re Time Warner Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993)................................................................................................27

*In re Twinlab Corp. Sec. Litig.*,
103 F. Supp. 2d 193 (E.D.N.Y. 2000) .............................................................................14

*In re Unicapital Corp. Sec. Litig.*,
149 F. Supp. 2d 1353 (S.D. Fla. 2001) ...........................................................................21

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ............................................................................21

*In re Veeco Instruments, Inc., Sec. Litig.*,
235 F.R.D. 220 (S.D.N.Y. 2006) ....................................................................................42

*In re Vivendi Universal, S.A. Sec. Litig.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003).............................................................................21

**Page**

*In re Wash. Mut.*,
   259 F.R.D. 490 (W.D. Wash. 2009) .........................................................................24, 32

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
   No. 2:08-MD-1919 MJP, 2009 WL 3517630
   (W.D. Wash. Oct. 27, 2009) .................................................................................36, 40

*In re Wells Fargo Sec. Litig.*,
   12 F.3d 922 (9th Cir. 1993) ........................................................................................24

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003)...........................................................................14

*In re WorldCom, Inc. Sec. Litig.*,
   352 F. Supp. 2d 472 (S.D.N.Y. 2005)................................................................30, 33, 36

*In re WorldSpace Sec. Litig.*,
   No. 07 Civ. 2252 (RMB), 2008 U.S. Dist. LEXIS 56224
   (S.D.N.Y. July 21, 2008) .............................................................................................13

*Kassner v. 2nd Ave. Delicatessen, Inc.*,
   496 F.3d 229 (2d Cir. 2007).........................................................................................13

*Lapin v. Goldman Sachs Group, Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006)...........................................................................27

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) .......................................................................................44

*Miller v. Lazard, Ltd.*,
   473 F. Supp. 2d 571 (S.D.N.Y. 2007)...........................................................................42

*Monroe v. Hughes*,
   31 F.3d 772 (9th Cir. 1994) ...................................................................................35, 36

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000).........................................................................................20

*Olkey v. Hyperion 1999 Term Trust*,
   98 F.3d 2 (2d Cir. 1996)...............................................................................................42

*Oneida Indian Nation v. New York*,
   691 F.2d 1070 (2d Cir. 1982).......................................................................................12

**Page**

*P. Stolz Family P'ship L.P. v. Daum,*
   355 F.3d 92 (2d Cir. 2004)..........................................................................41, 42

*Ponce v. SEC,*
   345 F.3d 722 (9th Cir. 2003) ...................................................................33

*Rombach v. Chang,*
   355 F.3d 164 (2d Cir. 2004)................................................................ *passim*

*SEC. v. DCI Telecomms.,*
   122 F. Supp. 2d 495 (S.D.N.Y. 2000)......................................................31

*SEC v. Okin,*
   137 F.2d 862 (2d Cir. 1943)......................................................................38

*Shapiro v. UJB Fin. Corp.,*
   964 F.2d 272 (3d Cir. 1992)......................................................................25

*Staehr v. Hartford Fin. Servs. Group,*
   547 F.3d 406 (2d Cir. 2008)......................................................................12

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,*
   552 U.S. 148 (2008)..................................................................................44

*Stumpf v. Garvey,*
   No. 02-MDL-1335-PB, 2005 WL 2127674
   (D.N.H. Sept. 2, 2005) ............................................................................37

*United States SEC v. Power,*
   525 F. Supp. 2d 415 (S.D.N.Y. 2007)......................................................11

*United States v. Bilzerian,*
   926 F.2d 1285 (2d Cir. 1991)....................................................................31

*Virginia Bankshares, Inc. v. Sandberg,*
   501 U.S. 1083 (1991).......................................................................4, 29, 38

*White v. Heartland High-Yield Mun. Bond Fund,*
   237 F. Supp. 2d 982 (E.D. Wis. 2002)......................................................36

## STATUTES, RULES AND REGULATIONS

15 U.S.C.

§77k ............................................................................................................. *passim*
§77k(a)(4) ...............................................................................................32, 35
§77k(b)(3) ........................................................................................................33
§77k(b)(3)(A) ...................................................................................................14
§77k(b)(3)(B)(i) ...........................................................................................5, 41
§77l .................................................................................................................21
§77l(a)(2) ...........................................................................................14, 22, 33
§77l(b) .............................................................................................................14
§77o ................................................................................................................45
§78j(b) ...............................................................................................27, 31, 37
§78n .................................................................................................................38
§78o ................................................................................................................45
§78t(a)(2) ........................................................................................................21
§7262(b) .....................................................................................................39, 40

Federal Rules of Civil Procedure

Rule 8(a) .....................................................................................................13, 25
Rule 9(b) ..........................................................................................................25
Rule 12(b)(6) ..............................................................................................13, 33
Rule 15(a)(2) ...................................................................................................45

17 C.F.R.

§210.2-02 ........................................................................................................38
§210.4-01(a)(1) .........................................................................................20, 38
§240.10b-5 ......................................................................................................27

## SECONDARY AUTHORITIES

Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1565 (2006) ..........................38

SEC Release No. 33-8810 (June 20, 2007) .................................................................................39

By this single consolidated opposition brief, plaintiffs hereby oppose the Regions Parties'
Motion to Dismiss the First Amended Complaint, the Joinder of the Underwriters Defendants' to the
Regions Parties' Motion to Dismiss the First Amended Complaint, and Ernst & Young LLP's
Motion to Dismiss.

## I.     INTRODUCTION

When it acquired AmSouth Corporation ("AmSouth") in 2006, Regions Financial
Corporation ("Regions" or the "Company") suddenly became heavily invested in the real estate
markets in the South, especially the over-heated markets of Florida and Georgia. Regions' timing
was terrible. It ended up paying a huge premium for a company that had a recent history of large
gains due to the real estate bubble – but was about to be decimated by the impending collapse in
mortgage-related asset values. Regions paid $10 billion for AmSouth, but an astounding 60% of that
price, or over $6 billion, was **not** based on the assets of the company, and therefore had to be
attributed to "goodwill."

The only way Regions could justify this massive goodwill was if the housing markets in
which AmSouth was heavily invested continued their rapid growth for years. But exactly the
opposite occurred. As the mortgage meltdown continued throughout 2007, a huge number of loans
from the over-heated Florida and Georgia markets began defaulting at a rapid pace. This required
Regions to increase its loan loss reserves and start taking significant steps to support its
mortgage-related assets. By the end of 2007, Regions was suffering greatly from the collapsing read
estate and credit markets, and its stock was trading at a market value below its book value – a clear
indication under the accounting rules that the Company's goodwill balance associated with the
AmSouth merger was impaired.

But at the end of 2007 Regions took only a meager increase in its loan loss reserves, and
refused to write down its goodwill. Instead defendants assured the market in Regions' 2007 Form

10-K, later incorporated by reference in to the Registration Statement, that the ongoing real estate and credit market collapse was having little or no impact on the $6 billion in goodwill associated with the AmSouth merger, and that the Company's $12.1 billion "stressed" loan portfolio[1] was adequately reserved for at the end of 2007. In support of these bold claims, defendants referred investors to the Company's internal control certifications, attesting to the fact that Regions' "disclosure controls and procedures" were effective and contained no material weaknesses.

In order to raise desperately needed capital, Regions issued trust preferred securities in late April 2008. But the Offering materials failed to adequately warn investors or account for the collapsing real estate markets where Regions was so heavily invested. The true facts omitted from the April 2008 Registration Statement and Prospectus were: (1) Regions failed to adequately reserve for mortgage-related exposure (losses), causing its balance sheet and statements of income to be grossly inflated; (2) the $6+ billion in "goodwill" Regions carried on its books from the AmSouth acquisition was grossly impaired and overstated; (3) Regions' failure to properly test for and write down the impaired goodwill caused the Company's balance sheet and statements of income to be artificially inflated; (4) Regions failed to accurately and timely increase its loan loss provision by at least $1 billion prior to the Offering, or to raise its allowance for loan losses as prudent accounting required; and (5) Regions was operating with woefully deficient internal controls, resulting in inaccurate and misleading financial disclosures by the Company, including improperly reporting its loan loss reserves and goodwill.

---

[1]     This "stressed" portfolio consisted of residential homebuilder loans, home equity loans secured by second liens in Florida, and condominium loans.  ¶136.

All paragraph references (¶__" or "¶¶__") are to the Corrected First Amended Complaint for Violations of the Federal Securities Laws (the "Complaint").

Because of these materially false and misleading statements and omissions, the Offering materials misrepresented the true nature of and the level of risk associated with plaintiffs' investments. The effect of these misrepresentations has since become apparent – in a single day Regions wrote off all $6 billion of its goodwill and increased its loan loss reserves by more than $1 billion. Regions had to be bailed out by U.S. taxpayers and the securities issued and underwritten by defendants in this case suffered a substantial decline.

In spite of all of this, defendants contend the 89-page complaint must be dismissed, because plaintiffs fail to properly allege even a single materially false or misleading statement.[2] In doing so, defendants mischaracterize the applicable law, ignore much of the Complaint's detailed allegations, and assert numerous factual contentions that are simply inappropriate at the pleading stage. Defendants' arguments for dismissal are without merit and should be rejected.

Seizing on an issue raised by the Court at an earlier hearing, all defendants principally argue that they cannot be liable for any of the false and misleading information in their financial statements incorporated into the Registration Statement, because the reported loan loss reserves and goodwill were simply matters of "opinion" or "judgment," and they cannot be faulted for errors in judgment. But this misstates the law, as even accounting principles that involve "opinions" or require "judgment" can be abused, gamed, or innocently misapplied in violation of the securities laws. In

---

[2]    Defendants' argument concerning plaintiff Alfred Fait (The Regions Parties' Memorandum in Support of Their Motion to Dismiss the First Amended Complaint ("Defs.' Mem.") at 21-23), has been rendered moot by the filing of Lead Plaintiff Howard M. Rensin's corrected Complaint (referenced above) on November 2, 2009. The corrected Complaint contains no substantive changes to plaintiff's First Amended Complaint for Violations of the Federal Securities Laws; it merely corrects two scrivener's errors concerning the identities of Lead Plaintiff and defendant Regions Financing Trust III.

truth, defendants simply raise a question of fact.  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 165 (2d Cir. 2000).

First, the Regions defendants contend their statements concerning loan loss reserves are nothing more than "opinions" and are not actionable because plaintiffs have not alleged defendants did not ***subjectively believe*** those "opinions."   But defendants' heavy reliance on *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), and other "fairness opinion" cases is misplaced.  The material misrepresentations and omissions at issue here are more akin to statements of fact – they involve objective accounting assessments governed by a rigorous set of defined standards – unlike the subjective fairness opinions at issue in *Virginia Bankshares*.  And even if loan loss reserve accounting does amount to nothing more than an opinion or projection, regardless of whether defendants "subjectively held" those opinions, plaintiffs allege numerous facts demonstrating that there was not a reasonable basis for the accounting "judgments" or "opinions" they disseminated in the offering materials.  This states a claim under the securities laws.  *In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998).

The Regions defendants take this argument one step further, lumping Regions' failure to write down its massive goodwill before the Offering into its "opinion" analysis, because according to defendants its accounting for goodwill was simply a "judgment" call.  But accounting for goodwill is clearly different from loan loss reserves, as goodwill is an asset that is valued ***as of the date of the balance sheet***.  Contrary to defendants' assertions, there is nothing predictive or forward-looking about it.  Undeniably, Regions should have (but did not) write down its goodwill in its 2007 Form 10-K, as even the Securities and Exchange Commission ("SEC") pointed out.  And, given the collapse of the credit markets and near bankruptcy of Bear Stearns shortly thereafter, Regions was obligated under Generally Accepted Accounting Principles ("GAAP") to test its goodwill gain for

impairment before the April 28, 2008 Offering.  Had defendants done so – and done so properly – defendants would have written down Regions goodwill substantially, if not entirely.

Not to be outdone, Ernst & Young LLP ("E&Y") has taken the wholly unsupported position that its certification of Regions' financial statements and internal controls is also simply an "opinion."  According to E&Y, because plaintiffs did not allege E&Y's audit "opinions" were not **subjectively believed** by E&Y, plaintiffs have failed to allege the statements are false.  Of course, E&Y is unable to cite a single case supporting such an interpretation of the federal securities laws – the law is clearly to the contrary.  *In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 237 (S.D.N.Y. 2004).  In truth, the statute creates an affirmative defense **for auditors to prove** they "had, after reasonable investigation, reasonable ground to believe and did believe" their statements were not misleading.  15 U.S.C. §77k(b)(3)(B)(i).[3]

Similarly, although whether a false statement is material or not is a question of fact, the Regions defendants contend they have demonstrated through stock price movement that every one of the alleged false statements and omissions is not material **as a matter of law**.  But defendants' Third Circuit Securities Exchange Act of 1934 ("Exchange Act") cases are not only inconsistent with Second Circuit precedent, they are also inconsistent with the law as it applies to Securities Act of 1933 ("Securities Act") cases in the Third Circuit.  *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 2009 U.S. App. LEXIS 23844 (3d Cir. 2009).

Last, defendants argue their false and misleading statements were forward-looking and protected by the "bespeaks caution" doctrine.  But, the "bespeaks caution" doctrine is inapplicable here.  The Offering materials contained material misrepresentations and omissions concerning

---

[3]    Emphasis is added and citations are omitted, unless otherwise noted.

Regions' then-current accounting for goodwill, mortgage-related exposure, loan loss reserves, and internal controls. These statements of current or historical facts are not shielded by the "bespeaks caution" doctrine. *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004). And, even assuming that some of Regions' statements are forward-looking, the boilerplate cautionary language accompanying these representations failed to "bespeak caution" in light of the material misstatements that there was no impairment to the goodwill associated with the AmSouth merger as of the date of the Offering, or that Regions' provision for loan losses "'is adequate to cover losses *inherent in the loan portfolio as of the balance sheet date*.'" ¶¶19-20.

In the end, none of defendants' arguments have merit. They have either ignored the allegations of the Complaint, or misapplied the law, or both. Defendants' motions to dismiss should be denied in their entirety.

## II.    FACTUAL BACKGROUND

In the spring of 2006, Regions agreed to purchase AmSouth, a bank heavily invested in real estate markets in the South, particularly Florida and Georgia. ¶¶4, 61, 68. Within five days of entering into a confidentiality agreement and commencing mutual "due diligence" regarding a merger, Regions' and AmSouth's CEOs agreed to an all-stock transaction in which AmSouth would merge into Regions. ¶66. Merrill Lynch, Regions' financial advisor in the acquisition and an underwriter in the subsequent Offering, had only five days to conduct due diligence and form an opinion as to the fairness of the exchange to Regions' shareholders. ¶67.

Consequently, neither Regions nor Merrill Lynch conducted an appropriate analysis of the merger, including meaningful due diligence or reliable checks on the credit quality and lending standards AmSouth had employed to grow its risky loan portfolio so quickly. *Id*. Proper due diligence was especially important in this merger because AmSouth had recently pledged to "double" its presence in the risky Florida real estate lending market and had just started

- 6 -

experimenting with adjustable rate mortgages ("ARMs"), including those with initial teaser rates. *Id*. Nonetheless, Regions agreed to pay $10 billion for AmSouth – an astounding 60% of that price, or over $6 billion, was **not** based on the assets of the company, and was therefore attributed to "goodwill." ¶¶5, 68-69.

The only way that amount of goodwill could reasonably be attributed to AmSouth was if the residential real estate markets that AmSouth was so heavily invested in continued their rapid growth for years into the future. But the exact opposite was happening. By the time the deal closed in November, 2006, the air was already coming out of the real estate bubble in the areas where AmSouth – and now Regions – was so heavily invested. ¶¶5, 82-83. The combination of a declining real estate market and a large number of ARMs meant that many of AmSouth's mortgages would default quickly. This problem was amplified because, since 2005, AmSouth had kept a large portion of ARMs on its books rather than selling them to investors. ¶67.

In late 2006 and into 2007, the mortgage crisis escalated; the situation was particularly dire in Florida and Georgia. ¶¶74-83. Real estate sales slowed, mortgage originations stalled, values began declining, and foreclosures began accelerating. As the collapse gained momentum throughout 2007, foreclosures skyrocketed, loan originators began going bankrupt, and the financial media publicly described the fallout from the lax mortgage requirements and salacious lending practices of the recent past. ¶¶78, 80-83, 86, 90-91, 93-95, 97. Nonetheless, Regions continued reporting record financial growth for the interim quarters during fiscal 2007, and continued reporting that the goodwill attributable to the AmSouth acquisition was not impaired. ¶88.

By early 2008, the mortgage meltdown was wildly out of control and bleeding into all of the financial markets. In early March 2008, the credit markets seized, causing the near bankruptcy of Bear Stearns. ¶108. In desperation, Bear Stearns had to be sold overnight to JP Morgan for $2 per

share, in a deal brokered by the U.S. government in which the government agreed to make good on $30 billion of Bear Stearns' losses – mostly attributable to mortgage-backed securities. *Id.*

Despite the utter implosion of the residential mortgage markets in the areas where the bulk of Regions' business was now focused, Regions failed to write down ***any*** of the massive goodwill it carried on its balance sheet from the AmSouth merger, and only marginally increased its loan loss reserves. ¶¶6, 10. In its 2007 Form 10-K, filed with the SEC on February 27, 2008, Regions carried $11.5 billion of "goodwill" on its balance sheet, more than $6.2 billion of which was attributable to the AmSouth merger – essentially reporting that its goodwill was not impaired. Concerning Regions' "allowance for loan losses," the Form 10-K reported the provision for loan losses only increased to $555 million, despite having $12.1 billion "stressed" loans on the Company's books. ¶¶10, 19, 21, 136.

The 2007 Form 10-K also included false and misleading certifications by defendant C. Dowd Ritter and Jackson W. Moore stating that they personally "designed" and "evaluated the effectiveness" of Regions' "disclosure controls and procedures" and reported no material weaknesses. ¶22. These certifications, along with Regions' 2007 financial statements, were also audited and attested to by E&Y, the Company's auditor since 1971. ¶¶23-24, 213.

In early 2008, many banks – especially those with significant mortgage related holdings such as Regions – became desperate to raise capital. One of the ways Regions did this was to issue "trust preferred securities." But the Registration Statement and Prospectus defendants used to issue the securities was defective. While it provided information about the securities themselves – how the trust worked, when interest payments would or would not be made, etc. – the Registration Statement negligently offered false and misleading information about the Company and its prospects.

The recently filed 2007 Form 10-K which was incorporated by reference into the Registration Statement, had vastly underestimated the Company's loan loss reserves, and the massive goodwill being carried on the balance sheet had never been written down after the AmSouth acquisition – in spite of the fact that the housing markets relied upon so heavily by AmSouth and Regions had utterly imploded.  Indeed, another full quarter had closed – Regions' 1Q08 ended March 31, 2008 – and still there was no write down of goodwill even though the credit markets froze and Bear Sterns had been wiped out by the mortgage and credit crisis.  ¶110.  These defects went unnoticed and unquestioned in the Offering because the underwriters performed almost no due diligence.  ¶¶67, 151.  As a result, the financial statements incorporated by reference into the Registration Statement overstated goodwill *by more than $6 billion*, and the loan loss reserves were understated *by more than $1 billion*.  ¶¶126-127, 158, 176.[4]

Several weeks after the April 28, 2008 Offering, the SEC sent Regions a comment letter concerning the Company's 2007 Form 10-K, and pointed out that as of year end 2007, *the Company's stock price was trading at a value below the Company's book value*, and demanding that the Company improve its disclosures to comply with Statement of Financial Accounting Standards ("SFAS") No. 142 (relating to calculation of goodwill).  ¶111.  While defendants offered an explanation to the SEC for not writing down Regions' goodwill, that explanation rings hollow.  Indeed, it is belied by their own statements and conduct.  *See* Hunter Decl., Ex. C at 63-64; Memorandum in Support of Ernst & Young LLP's Motion to Dismiss ("E&Y Mem.") at 24-25; *see also* §III(C)(1)(a).

---

[4]    The Company's 1Q08 preliminary financial results were issued two weeks before the Offering on April 15, 2008, and the Form 10-Q was filed nine days after the Offering, on May 7, 2008.  Declaration of Claire E. Hunter ("Hunter Decl."), Ex. O; ¶110.

As its capital position deteriorated further, Regions was required to seek government help.  In October 2008 the Company announced it would be bailed out by taxpayers, receiving $3.5 billion of TARP money.  ¶¶119-120, 123.  But with the government bailout came increased scrutiny.  On October 23, 2008, *Bloomberg* issued an article entitled "Regions Financial Must Think We're All Stoned," which criticized Regions' management for their failure to disclose the Company's true financial condition, expressed serious concern about the Company's goodwill valuation, and questioned how Regions' loan-loss allowance was not rising as a percentage of nonperforming assets.  ¶121.  Despite criticism from the financial community, Regions continued reporting a grossly inflated value for the goodwill attributable to the AmSouth acquisition, which resulted in its balance sheet and statements of income materially overstating assets, shareholder equity, and net income.  ¶122.

On November 7, 2008, the *Birmingham Business Journal* published an article entitled "Loan charge-offs mount at Birmingham banks," which noted that despite Regions' high level of charge-offs, its nonperforming assets continue to rise.  ¶125.  The article pointed out that "'Regions' hike in charge-offs indicate "the bank should probably have been writing off loans at a faster rate,"'" and "'[t]he fact that it did not do so indicates that the future write-offs and reserve builds will be sizable. This will meaningfully penalize earnings.'"" *Id.*

Then, on January 20, 2009, Regions was finally forced to write down its goodwill by $6 billion and increased its loan loss reserves by over $1 billion, all in a single day!  ¶¶126-127.  ***These charges wiped out all the earnings Regions had reported the prior three years***.  According to defendants' disclosure, the "'results of goodwill impairment testing at the end of the fourth quarter [***suddenly***] indicated that ***the estimated fair value of Regions' banking reporting unit was less than its book value***, ***requiring a $6 billion non-cash charge***.'" ¶127.  But $6 billion impairments do not

happen overnight, and Regions had falsely stated quarter after quarter that its goodwill was not impaired, and Regions' CEO and CFO falsely certified each quarter that those financial filings were accurate and that Regions' internal controls were effective. *Id.*

For its part, E&Y reviewed and certified the Company's financial reports filed with the SEC and earnings releases, yet never required Regions to properly test the enormous amount of goodwill being carried on its books following the AmSouth acquisition. ¶128. In reality, the Company's goodwill and earnings had been overstated since at least 2007 due to Regions' overvaluing of AmSouth's loan portfolio, inadequate level of loan loss reserves, and inadequate internal accounting controls. ¶129. According to the Company's 2008 Form 10-K, filed February 29, 2009, defendants admitted the deteriorating real estate market was the cause of these huge charges (especially in Florida and Georgia), ***and that it had been a problem for the Company since at least 2007***. ¶¶135-136. This case follows.

## III.    ARGUMENT

### A.    Defendants' Extraneous Materials in Support of Their Motion to Dismiss Should Be Disregarded

On a motion to dismiss, a court may only consider: (i) the complaint; (ii) statements or documents incorporated into the complaint by reference, including public disclosure documents filed with the SEC, in order to demonstrate what was disclosed (but not to resolve disputed factual issues); and (iii) matters of which a court may take judicial notice. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *United States SEC v. Power*, 525 F. Supp. 2d 415, 418 n.2 (S.D.N.Y. 2007) (refusing to consider news reports attached to attorney declaration because they were not attached to or referenced in plaintiffs' complaint); *see also Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1161 n.7 (S.D. Cal. 2008) (declining to consider news articles, remarks by chairman of Federal Reserve Bank, and material related to non-defendant

companies); *In re StockerYale Sec. Litig.*, 453 F. Supp. 2d 345, 348 (D.N.H. 2006) (denying judicial notice of, and granting motion to strike, market commentary).  A court may not consider documents outside of the foregoing.  *See Oneida Indian Nation v. New York*, 691 F.2d 1070, 1086 (2d Cir. 1982) (extrinsic evidence not proper basis upon which to grant motion to dismiss without affording plaintiffs an evidentiary hearing).

Notwithstanding these well-established principles, defendants bombard the Court with extraneous materials in support of their motions to dismiss.  Defendants mistakenly rest their arguments on the purported truth of these statements.  *See, e.g.*, *Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 425 (2d Cir. 2008) (court may not judicially notice extraneous materials for "the truth of their contents").  Indeed, in presenting fact-intensive and highly contested theories of what happened to Regions, defendants are in effect going beyond summary judgment and presenting trial arguments seeking to refute plaintiffs' claims.  Defendants ask the Court to conclude (without a developed record) that: (1) the collapse of the housing market was unforeseeable to the entire marketplace and regulatory community (Defs.' Mem. at 10, 16); (2) no other market participant took the risk management measures that Regions failed to take (*id.* at 10); and (3) the losses to Regions' investors were caused entirely by macroeconomic events rather than any untrue statement or omission in the Registration Statement (*id.*).[5]  This is wholly improper, and the exhibits should be disregarded.  *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1173-74 (C.D. Cal. 2008) ("[i]t is not the Court's role to speculate on the causes of the current economic situation," and

---

[5]     For example, defendants rely on such arguments as "[t]he Court can take judicial notice that the CEOs and directors of almost every financial institution in our country also failed to predict the events of the second half of 2008."  Defs.' Mem. at 10.

rejecting defendants' arguments based on "an 'unprecedented' external 'liquidity crisis'" and "other macroeconomic arguments").[6]

### B.  Legal Standards Applicable to Defendants' Motion to Dismiss

Securities Act claims are governed by the notice pleading standard set forth in Fed. R. Civ. P. 8(a).  *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d, 189, 206 (S.D.N.Y. 2004).  As such, a complaint need only "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949.

On a Rule 12(b)(6) motion to dismiss, the court must "accept[] all factual allegations in the complaint" (*ATSI*, 493 F.3d at 98), and "draw all reasonable inferences in favor of the plaintiff." *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  It is not the court's function on a motion to dismiss "'to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient.'"  *In re WorldSpace Sec. Litig.*, No. 07 Civ. 2252 (RMB), 2008 U.S. Dist. LEXIS 56224, at *11 (S.D.N.Y. July 21, 2008).  To survive such a motion, factual allegations need only "'raise a right to relief above the speculative level.'"  *ATSI*, 493 F.3d at 98 (citing *Bell*, 550 U.S. at 555).

---

[6]    *See also In re New Century*, 588 F. Supp. 2d 1206, 1230 (C.D. Cal. 2008); *Atlas*, 556 F. Supp. 2d at 1161 n.7 (information "that purport[s] to summarize 'non-prime lending industry events'" was "neither referenced in Plaintiff's complaint nor the subject of a proper request for judicial notice," and thus "may not be considered on a motion to dismiss"); *In re StockerYale*, 453 F. Supp. 2d at 359 ("Defendants' reference to a wide range of economic and other factors that may have caused or contributed to the decline in price of StockerYale shares raises issues that will be addressed at later stages of this litigation . . . .").

Section 11 of the Securities Act "places a relatively minimal [pleading] burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). In order to state a violation of §11, plaintiffs need only "allege that he purchased the security and that the registration statement contains false or misleading statements concerning a material fact." *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000).[7] Upon such a showing, the issuer is ***strictly liable*** for any material misstatement or omission in a registration statement. 15 U.S.C. §77k(b)(3)(A); *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 (1976). Others subject to §11 liability, including directors, accountants, and underwriters, bear the burden to prove, on a factual record, reasonable diligence. 15 U.S.C. §77l(b).[8] "Fraud is not an element or a requisite to a claim under Section 11 or Section 12(a)(2)," so a plaintiff "need allege no more than negligence to proceed under Section 11 or Section 12(a)(2)." *Rombach*, 355 F.3d at 171. Plaintiffs have done so here.

### C.    The Complaint Alleges False and Misleading Statements and Omissions in the Registration Statement and Prospectus

The Complaint adequately alleges that the Registration Statement and Prospectus contained untrue statements of material facts and omitted to state material facts necessary to make the statements therein not misleading. ***First***, the Registration Statement stated that Regions' goodwill from the AmSouth merger was not impaired, when it was. ¶¶20, 27, 84. ***Second***, the Registration Statement stated Regions' mortgage-related exposure and loan loss provisions were properly

---

[7]    *See also In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 407-08 (S.D.N.Y. 2003) (finding it sufficient for purposes of pleading a §11 claim for plaintiff to allege that "'material facts have been omitted' from a registration statement or 'presented in such a way as to obscure or distort their significance'").

[8]    Section 12(a)(2) liability parallels the §11 standard for "any person who offers or sells securities by means of a prospectus containing material misstatements." *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 387 (S.D.N.Y. 2007).

accounted for and that Regions' internal controls were effective, when they were not. ¶¶127, 189, 218. ***Third***, the Complaint alleges that the auditors incorrectly stated the Company's accounting for goodwill and loan loss reserves complied with GAAP, E&Y's audit complied with Generally Accepted Accounting Standards ("GAAS"), and the Company's internal controls over its accounting were effective. Indeed, the Complaint specifies each false and misleading statement in the Offering materials and provides a factual basis describing why each statement was false and misleading. Nothing more is required.

### 1. The Complaint Alleges False and Misleading Statements and Omissions Regarding Regions' Goodwill

#### a. Regions' False and Misleading 2007 Form 10-K Goodwill Assessment

Regions failed to recognize an impairment in the amount of goodwill it recorded from its acquisition of AmSouth in the year following the acquisition as it was required to do under GAAP. In fact, Regions not only failed to decrease its goodwill balance but actually ***increased*** the balance by a net $337 million, increasing the goodwill associated with the AmSouth acquisition to $6.6 billion for year end 2007. ¶154. It did so despite substantial evidence indicating that serious problems existed with AmSouth's loan portfolio – a loan portfolio that accounted for over 71% of AmSouth's assets. ¶¶153-154.

The significant market disruption in the mortgage and credit markets that began in 2006 worsened throughout 2007. ¶¶78, 80-83, 86, 90-91, 93-95, 97. This unprecedented turmoil constituted an "event" or "change in circumstance" which indicated Regions' goodwill balance might be impaired within the meaning of SFAS No. 142 (¶28), and therefore required Regions to test the goodwill and record a charge for impairment. ¶155.

Regions argues that it did in fact conduct a goodwill impairment test and included the Company's assessment in the 2007 Form 10-K, incorporated by reference into the Registration

Statement. Defs.' Mem. at 12-13. According to Regions, the Company's impairment evaluation for FY 2007 correctly indicated that none of its goodwill was impaired. *Id*. But this assessment was fatally flawed. At year end 2007, when Regions' annual impairment test was scheduled, the Company performed a test but utilized assumptions so unreasonable that it resulted in no impairment charge at all related to its AmSouth operations. ¶156. One of these flawed assumptions included the likelihood of a "potential" suitor that would offer the Company an unrealistic premium for their banking business. Defs.' Mem at 19. Given the deterioration of the banking sector by the end of 2007, the fact that Regions was trading at a market value that was below its book value as of the end of 2007, and other factors, it defies logic that the goodwill balance would not be impaired. ¶158.

In fact, defendants conceded in their 2007 Form 10-K that there were no signs of improvement in the housing market and that there was a heightened risk of recession for the overall economy. *See* Hunter Decl., Ex. C at 63-64. The Company was also fully aware of the $12.1 billion "stressed" loans on its books that were heavily concentrated in the troubled geographic regions of Florida and Georgia. ¶136. These "stressed" loans were largely derived from the mortgage portfolio acquired in the AmSouth merger. ¶67. Thus, defendants had access to, and should have been aware of, substantial information by the end of 2007 that undermined their statements concerning the financial assessment of goodwill.[9] *Id*.

Even the SEC questioned the validity of Regions' goodwill balance related to the AmSouth acquisition at the end of fiscal year 2007. On June 17, 2008 the SEC sent a comment letter to Regions after the agency reviewed the Company's Form 10-K filed on February 26, 2008. ¶111.

---

[9]    *See also* Defs.' Mem. at 11 (arguing that Regions' loan loss reserves "nearly quadrupled" from 2006 to 2007); *id*. at 15 (arguing that Regions disclosed, as "risk factors," the substantial effects of the housing meltdown and that "[m]anagement anticipates that the housing industry will remain weak throughout 2008").

The comment letter included a question asking Regions to explain how it determined its goodwill balance was not impaired at the end of 2007, *given the fact that the Company was trading at a market value that was below its book value*, and demanded that the Company improve its disclosures to comply with SFAS No. 142 (relating to calculation of goodwill) – *which it had not done*. *Id.*; *see also* ¶159 (" It was not until Regions' filing of its 2Q 08 Form 10-Q, after the Offering and after the SEC had sent its comment letter to Regions, that Regions made its goodwill disclosure more transparent.").

In its motion to dismiss, Regions relies exclusively on its response to the SEC as its factual basis for arguing Regions was not required to write down its goodwill. But that excuse is disingenuous, as later events demonstrated. Defendants told the SEC (and now claim) Regions concluded its goodwill was not impaired because a "potential" – but non-existent – buyer "would" offer a control premium for their business that would adequately cover the difference between the trading price and book value. Defs.' Mem. at 19. Defendants' excuse rings hollow.

As the stock price dropped precipitously shortly after the Offering – obviously overwhelming any "premium" the illusory "potential" buyer might offer – the Company *still* failed to write down its goodwill balance. For example, the goodwill balance at the end of 2Q08 (when the letter to the SEC was written) was still a stunning $11.5 billion, which was by then 58% of the Company's book value and *$3.9 billion more than what the stock market said the entire company was worth*![10] ¶114. However, using completely unreasonable assumptions and ignoring the grim reality of the market value of the Company, Regions must have concluded a massive and growing control

---

[10]    Plaintiffs calculate the market value of the Company by multiplying the closing price of $10.91 per share times the 694.8 million shares outstanding on June 30, 2008, for a total market value of approximately $7.58 billion.

premium still existed at the end of 2Q08 such that no goodwill impairment existed. Regions'
implicit assertion that a control premium *still* existed for its business after more than a 48% drop in
its stock price is complete nonsense. ¶¶28, 161. In truth, there never was a reasonable basis for
asserting a "control premium" would be offered by a non-existent purchaser in the first place –
especially in light of the status of the real estate and credit markets at that time. It was simply a ***post
hoc*** excuse offered to the SEC in July 2008 for failing to write down the goodwill at the end of
2007.[11]

Because plaintiffs' allegations are taken as true on this motion, defendants' argument that
Regions' goodwill was ***not*** impaired, and that its financial statements ***were*** prepared in accordance
with GAAP simply creates an issue of fact – especially where plaintiffs have adequately alleged
multiple violations of applicable accounting standards. *See, e.g.*, *In re Burlington Coat Factory Sec.
Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997) (whether accounting practices were consistent with
accounting standards is a question of fact that should not be addressed on a motion to dismiss); *Fla.
State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001) (the issue of
whether accounting practices amounted to recklessness should not be decided at the motion to
dismiss); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 656-57 (S.D.N.Y. 2007) ("'Although the
question of whether GAAP has been violated might appear to be a legal determination, the element
of what is "generally accepted" makes this difficult to decide as a matter of law.' . . . At the motion
to dismiss stage, the plaintiffs' assertion that certain practices were not generally accepted 'must be
taken as true.'"); *In re RAIT Fin. Trust Sec. Litig.*, No. 2:07-cv-03148-LDD, 2008 U.S. Dist. LEXIS

---

[11]     And, as even defendants concede, after reviewing the 2007 Form 10-K the SEC required the
Company to improve its goodwill disclosures to comply with SFAS No. 142. Thus, defendants
implicitly admit the goodwill disclosures in the 2007 Form 10-K were inadequate. *See* ¶¶111, 157;
Defs.' Mem. at 19-20.

103549, at *29 (E.D. Pa. Dec. 22, 2008) ("'[I]t is a factual question whether [a company's] accounting practices were consistent with GAAP,' and thus, we cannot determine this issue on a motion to dismiss.").

> **b.    Regions Admittedly Failed to Test for Goodwill Impairment Prior to the Offering**

Defendants also violated GAAP and their own internal "Critical Accounting Policies" by failing to properly test for and write down the goodwill associated with the AmSouth merger no later than April 2008, prior to the Offering. ¶¶140-163.  Pursuant to SFAS No. 142, companies must test goodwill for impairment annually, *and more often when circumstances arise indicating that goodwill could be impaired*. ¶147 (citing SFAS No. 142).  Specifically, defendants were required to test goodwill if changing circumstances "'*would more likely than not* reduce the fair value'" of goodwill. *Id.*  Defendants' own stated accounting policies required the Company to review goodwill for impairment "more often if events or circumstances indicate impairment *may* exist," such as "[a]dverse changes in the economic environment [or] declining operations of business unit." ¶¶20, 104.  In the Complaint, plaintiffs detail the circumstances – a significant adverse change in the economic environment *and* declining operations – that easily satisfy the "more likely than not" standard. ¶¶74-108, 147-154.

Indeed, as even defendants were forced to admit, severe macroeconomic changes amounting to further "'deterioration in the residential homebuilder portfolio and losses within the home equity portfolio'" had emerged by *at least* the end of 1Q08. ¶110; *see also* Hunter Decl., Ex. O.  By early 2008, the mortgage meltdown was wildly out of control and was bleeding into all of the financial markets. ¶¶101, 103, 108, 112, 115-118.  In early March 2008, the credit markets seized up, causing the near bankruptcy of Bear Stearns.  In desperation, Bear Stearns was sold overnight for $2 per

share, in a deal brokered by the U.S. government in which the government agreed to make good on $30 billion of Bear Stearns' losses – losses attributable to mortgage-backed securities.  ¶108.

Despite the continued downward spiral in the financial markets, the collapse of Bear Stearns, and the continued decline in Regions' stock price, Regions failed to conduct an impairment test and failed to properly record an impairment charge prior to the Offering.  ¶160.  Pursuant to the Company's own policies, defendants were required to properly test for goodwill impairment, ***at the very latest***, before issuing Regions' false and misleading Prospectus.  Defendants' failure to test for goodwill impairment until the following year-end converted the Company's own financial reporting policies into false statements.  Accordingly, the Complaint adequately alleges that the Registration Statement contained material untrue statements and omissions about Regions' financial results and compliance with GAAP.  *Goldstein v. MCI Worldcom*, 340 F.3d 238, 249 (5th Cir. 2003) ("[F]inancial statements that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.") (citing SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1)); *Refco*, 503 F. Supp. 2d at 656 (statement that financial statements conformed with GAAP held to be actionable under securities laws when plaintiffs sufficiently alleged that financial statements did not conform with GAAP).

Defendants dismiss plaintiffs' goodwill allegations as mere "fraud by hindsight" because Regions belatedly took impairments on these assets nine months after the April 2008 Offering. Defs.' Mem. at 24.  The Complaint's allegations, however, do not involve fraud and focus solely on events as of the April 2008 Offering.[12]  Contrary to defendants' assertions, these allegations do not

---

[12]     Defendants' "fraud by hindsight" authority is inapposite because scienter is not an element of plaintiffs' claims. *See* Defs.' Mem. at 24, 28; *see, e.g.*, *Bay Harbour Mgmt. LLC v. Carothers*, 282 Fed. App'x 71 (2d Cir. 2008) (securities fraud claims asserted); *Novak v. Kasaks*, 216 F.3d 300, 303 (2d Cir. 2000) (same); *DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990) (same).

rely solely on "hindsight" to establish that the Company's goodwill was impaired *at the time of the Offering*. Indeed, even by defendants own admission many of the factors that ultimately caused Regions to write down its goodwill and increase its loan loss reserves had been occurring *since at least 2007*. ¶136. In any event, "[t]he fact that plaintiff relies on evidence that post-date the [Registration Statement] does not vitiate the false or misleading nature of the registration statement." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 175 (S.D.N.Y. 2003).

Last, defendants argue that they cannot be liable because the accounting assessment of goodwill requires "matters of judgment." Defs.' Mem. at 25-28. This argument has been rejected numerous times. For instance, defendants in *Vivendi* argued that plaintiffs must allege *subjective* falsity, contending that "plaintiffs cannot establish that [defendants] knew it had overstated its reported goodwill in violation of §11 and §12(a)(2)." 381 F. Supp. 2d at 175; *see also* Defs.' Mem. at 29. The Court characterized this argument as "without merit" and held "[a]ctual knowledge is not an element of either §11 or §12 claims." *Vivendi*, 381 F. Supp. 2d at 175. In fact, courts have repeatedly held goodwill accounting violations are actionable where, as here, contemporaneous facts exist which contradict the "judgments" made by the reporting entity. *See, e.g.*, *id.* at 176-77; *see also In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975 (N.D. Cal. 2009) (denying motion to dismiss §10(b) case where plaintiffs alleged "impairment charges relating to misreporting of goodwill" violated GAAP); *In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350, 1369 (N.D. Ga. 2005) (upholding §11 claims where defendants failed to perform an impairment review of the company's goodwill and plaintiffs identified facts demonstrating possibility of impairment); *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1364 (S.D. Fla. 2001) ("Plaintiff's averments concerning the overvaluation of Unicapital's goodwill sufficiently allege a material

- 21 -

misrepresentation that is adequate to support a claim under §§11 and 12(a)(2) of the Securities Act."); §III.D., *infra*.

### 2. The Complaint Alleges False and Misleading Statements and Omissions Regarding Regions' Loan Loss Reserves

Plaintiffs also allege the Registration Statement materially misstated Regions' loan loss reserves. ¶¶164-185. As the Complaint explains, Regions was required under GAAP to evaluate on a regular basis the quality of the loans in its portfolio as part of the financial statement preparation process. If the Company determined that the loans were impaired for any reason, including because of credit risk, it was required to increase its provision for loan losses as a reserve against incurred and probable future losses inherent in the Company's loans held in its portfolio. ¶¶164-167. An increase in provisions for loan losses reduced, dollar for dollar, Regions' earnings, because such charges are recorded as an expense.

The Complaint alleges numerous facts demonstrating how Regions' 2007 Form 10-K failed to comply with GAAP and, as a result, rendered the Registration Statement and Prospectus materially false and misleading. ¶¶168, 171-182, 192-219. For example, the Complaint alleges that Regions' loan loss reserves from the first quarter of 2007 through the first three quarters of 2008 were materially inadequate and did not reflect the high risk of loss inherent in its mortgage loan portfolio, which included AmSouth's ARMs from the over-stimulated Florida real estate lending market between 2004 and 2006. ¶168. As of 1Q07, it was probable that a significantly greater portion of the loan portfolio containing the Florida (and Georgia) real estate loans acquired from the AmSouth acquisition were impaired and as a result, defendants were required, under GAAP, to estimate the loss exposure and set up appropriate reserves (in the form of a valuation allowance) at that time. ¶171.

In fact, *Bloomberg* columnist Jonathon Weil questioned Regions' accounting for its loan loss reserves due to its failure to keep up with its rapidly rising level of nonperforming assets throughout 2007 and 2008. ¶121. "'Common sense tells you a bank's loan-loss allowance, in an economic decline, should be rising as a percentage of nonperforming assets. It's the reserve a lender sets up on its balance sheet in anticipation of bad loans. At Regions, the allowance hasn't kept up.'" *Id.* For example, in the first quarter of 2007 the allowance as a percentage of nonperforming assets was 250%. ¶¶19, 21, 105. However, by the first quarter of 2008 the allowance as a percentage of non-performing assets in only one year had ***decreased*** to 114% due to the combination of a rising level of non-performing loans and the lack of establishing an adequate reserve for the allowance for loan losses. ¶110. By the end of the third quarter 2008 Regions' allowance was a meager 83% as a percentage of its non-performing assets, triggering Jonathon Weil to question Regions' accounting for its loan loss reserves. ¶121.

Regions disclosed in its 2007 Form 10-K that non-performing assets were ***a key determinant*** in the assessment of inherent losses and, as a result, "was ***an important factor*** in determining the allowance level." ¶¶21, 105. However, Regions violated its own internal accounting disclosures – its (understated) allowance for loan losses failed to keep up as the level of non-performing assets rose significantly over 2007 and 2008. ¶¶121, 125, 184. For example, non-performing assets between the first quarters of 2007 and 2008 rose by 185% while the allowance for loan losses over the same time period increased only 30%. ¶¶136, 184-85. The failure to adequately reserve for its non-performing assets rendered the Company's own stated financial reporting practices false statements.

In addition, Regions' increased the Company's provision for loan losses to a woefully inadequate $555 million in its 2007 Form 10-K, despite having $12.1 billion "stressed" loans on the

Company's books at the end of 2007. ¶¶19-20. By failing to accrue properly for over $1 billion in additional impaired loans, Regions' reported financial results incorporated into the Prospectus for the Offering were materially false and misleading, violating both GAAP and SEC rules. ¶173. In turn, the understated loan loss reserves resulted in overstatements of net income, retained earnings, total assets, and total shareholder's equity, as set forth on Regions' consolidated balance sheets and income statements. ¶168. Because those overstated balance sheet and income statement items were components of the Company's tier 1 capital ratio, Regions' capital ratios were also overstated at the time of the Offering. *Id*.

Again, defendants dismiss these allegations as mere "fraud by hindsight" because Regions did significantly increase its loan loss reserves many months after the April 2008 Offering. Defs.' Mem. at 24. But like plaintiffs' claims concerning goodwill, with the notable exception of defendants' admissions in the 2008 Form 10-K, the allegations concerning loan loss reserves focus solely on events prior to the Offering to establish that the assets were understated ***at the time of the Offering***.

The real crux of defendants' argument, however, is that they cannot be liable because accounting for loan loss reserves amounts to little more than an "opinion," and plaintiffs have not alleged the "opinion" was not ***subjectively*** held. *Id*. at 25-28. Again, this argument is meritless and inconsistent with recent authority directly on point. *See, e.g.*, *In re Wash. Mut.*, 259 F.R.D. 490, 507 (W.D. Wash. 2009) ("Although Allowance provisioning requires some exercise of judgment, allegations of misstatements regarding loan loss reserves are actionable under the Exchange Act. . . . It follows that such allegations are also actionable under the more permissive pleading standards of the Securities Act.") (citing *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 926 (9th Cir. 1993) (rejecting argument that loan loss reserves are subjective and thus inactionable, noting "[t]here is nothing

unique about representations and omissions regarding loan loss reserves that removes them from the purview of the antifraud provisions of the federal securities laws") (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 276-77 (3d Cir. 1992)).[13]

Last, E&Y contends that ***even more*** information is required concerning "specific loans held by Regions that were in peril at the end of 2007." E&Y Mem. at 20. But they are simply insisting that plaintiffs plead the type of detail that can only come from discovery, as it is solely in defendants' possession. Rule 8(a) does not require plaintiffs to plead evidence, it merely requires a "'short and plain statement'" sufficient to put defendants on notice of the factual basis for plaintiffs' claims. *Bell Atl.*, 550 U.S. at 555. Indeed, "[e]ven with the heightened pleading standard under Rule 9(b) and the Securities Reform Act we do not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). The Complaint here clearly satisfies Rule 8(a).

### 3.    The Complaint Alleges False and Misleading Statements and Omissions Regarding Regions' Internal Controls

The Complaint alleges the Offering documents contained materially misstated Sarbanes-Oxley Act of 2002 ("SOX") certifications, and other untrue statements regarding the effectiveness of Regions' internal controls at the time of the Offering. ¶¶22, 35, 106, 127, 189, 190, 192, 215. Material misstatements regarding internal controls appearing in SOX certifications are actionable. *See In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) (finding defendant's

---

[13]    *See also In re Converium Holding AG Sec. Litig.*, No. 04 CIV. 7897 (DLC), 2007 WL 2684069 (S.D.N.Y. Sept. 14, 2007) (understatement of insurance loss reserves actionable); *Atlas*, 556 F. Supp. 2d at 1150-52, 1154-55 (mortgage lender's understatements of its loan loss reserves are material and actionable); *RAIT*, 2008 U.S. Dist. LEXIS 103549, at *23-*34 (sustaining claims that company failed to properly value the assets collateralizing its CDOs); *New Century*, 588 F. Supp. 2d at 1215, 1226-27, 1239 (rejecting argument that misstatements of value of residual RMBS interests were judgmental and sustaining §11 claim for those misstatements).

SOX certification as to adequacy of internal controls an actionable "false certification" when such controls were revealed to be inadequate); *In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 U.S. Dist. LEXIS 15696, at *32-*33 (E.D. Pa. July 27, 2005) ("The Sarbanes-Oxley certifications are relevant because the Defendants claimed therein that all internal control deficiencies had been disclosed."); *see also In re S. Pac. Funding Corp. Sec. Litig.*, 83 F. Supp. 2d 1172, 1179 (D. Or. 1999) (denying motion to dismiss claims related to internal controls).

Specifically, the Company's 2007 Form 10-K misled investors regarding the effectiveness of the Company's disclosure controls and procedures, and internal controls over financial reporting. Defendants negligently misrepresented that the Company's disclosure controls and procedures, and internal controls over financial reporting were effective when they were not, for the reasons set forth in §III.C.1. and §III.C.2. E&Y's certification of the effectiveness of Regions' internal controls was also materially false and misleading because, among other things, Regions lacked adequate controls to ensure that its goodwill was properly tested for impairment, and whether its loan loss reserves properly accounted for $12.1 billion in "stressed" loans on the Company's books at the end of 2007. ¶¶88, 104, 127, 189. Thus, defendants' statements that Regions maintained effective internal controls were materially false and misleading.[14]

### D.    Defendants' False and Misleading Statements Are Actionable Whether They Are Statements of "Fact," "Opinion," "Judgment," or "Belief"

Defendants argue their false and misleading statements in the Registration Statement and Prospectus are not actionable because they are not statements of fact, but instead are statements of "opinion" or "belief." Defs.' Mem. at 25-29; E&Y Mem. at 10-15. But even statements of opinion

---

[14]    As this argument is raised only by E&Y, it is discussed in more detail below in §III.F.2.

or belief are actionable if: (a) they are not subjectively held; (b) are supported by specific statements of fact; *or* (c) there was not a reasonable basis for holding that opinion/belief.  As the Second Circuit pointed out in *IBM*:

> Statements that are opinions or predictions are not *per se* inactionable under the securities laws. . . .  Statements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees ***or are supported by specific statements of fact, . . . or if the speaker does not*** genuinely or ***reasonably believe them*** . . . .

163 F.3d at 107; *see also Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006) ("optimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted (*i.e.*, the opinion was without a basis in fact or the speakers were aware of facts undermining the positive statements)"); *In re Time Warner Sec. Litig.*, 9 F.3d 259, 266 (2d Cir. 1993) (falsity may be established by demonstrating that opinion statements were made "without a basis in fact").  Here, plaintiffs allege numerous facts demonstrating that defendants had information (or access to information) that undermined their statements regarding goodwill and loan loss reserves, such that it was not reasonable for defendants to hold those so-called "opinions."[15]

For example, the Complaint sets forth in detail the overwhelming evidence indicating that serious problems existed at the time of the acquisition with AmSouth's loan portfolio.  ¶¶5, 61-65, 74-81, 153-154.  The Complaint goes on to demonstrate the significant market disruption in the mortgage and credit market throughout 2007.  ¶¶78, 80-83, 86, 90-91, 93-95, 97.  As alleged, given

---

[15]    *See also Time Warner*, 9 F.3d at 267 ("We agree that a duty to update opinions and projections may arise if the original opinions or projections have become misleading as the result of intervening events."); *Darquea v. Jarden Corp.*, No. 06 CV 0722 (CLB), 2007 U.S. Dist. LEXIS 40247, at *22 (S.D.N.Y. May 31, 2007) ("While Defendants were permitted to remain optimistic about the future and to maintain a hopeful outlook, their public statements of optimism  should have been subject to what the current data indicated.").

the dramatic deterioration of the real estate and financial markets by the end of 2007, and the fact that Regions was trading at a market value that was below its book value as of the end of 2007, it defies logic that the goodwill balance would not be impaired at this time. ¶158. Even the SEC questioned the validity of Regions' 2007 Form 10-K goodwill impairment assessment in a comment letter issued after the Offering on June 17, 2008. ¶111.

But things only got worse in early 2008 when the credit markets seized up, causing the near bankruptcy of Bear Stearns. ¶¶101, 103, 108, 112, 115-118. Despite the continued decline in Regions' stock price, the continued downward spiral in the real estate markets and credit markets, and the collapse of Bear Stearns, Regions failed to conduct an impairment test and again failed to properly record an impairment charge in early 2008, prior to the Offering. ¶160. In light of all this, defendants had no reasonable basis in fact for reporting that none of its goodwill was impaired at the time of the Offering, and for ***not even testing for it*** despite the significant adverse changes in the economic environment and declining operations relating to the Company's mortgage exposure.

The same can be said for defendants' statements concerning loan loss reserves. The Complaint alleges numerous facts demonstrating how Regions' loan loss reserves from the first quarter of 2007 through the first three quarters of 2008 were materially inadequate and did not reflect the high risk of loss inherent in its mortgage loan portfolio, which included AmSouth's ARMs from the over-stimulated Florida market between 2004 and 2006. ¶¶164-185. Eventually, even *Bloomberg* columnist Weil questioned Regions' accounting for its loan loss reserves due to its failure to keep up with its rapidly rising level of non-performing assets throughout 2007 and 2008. ¶121; *see also* ¶125. The failure to adequately reserve for its known non-performing assets rendered the Company's statements regarding loan loss reserves false and misleading.

Indeed, by defendants' own admission many of the factors that ultimately caused Regions to write down its goodwill and increase its loan loss reserves had been occurring *since at least 2007*. ¶¶135-136. As such, defendants had access to, and should have been aware of, substantial information by the time of the April 2008 Offering that undermined their statements concerning the financial assessments of goodwill and loan loss reserves.[16]

This is not so different from what the Supreme Court relied upon to uphold the plaintiffs' verdict in *Virginia Bankshares*. In *Virginia Bankshares* the Supreme Court concluded that the evidence plaintiffs submitted was sufficient to support a jury verdict that defendants' "opinion" statements were false. *See* 501 U.S. at 1094-98. In so doing, the Court did not rely upon a single item that bore on the defendants' *subjective* beliefs; instead, all of the evidence the Court found sufficient to prove the falsity of the fairness opinion demonstrated the unreasonableness of defendants' stated opinions. *See id*. at 1094, 1098 (evidence of recalculation of book value, evidence that certain market prices were unreliable, and evidence of defendants' access to that information). Thus, *Virginia Bankshares* demonstrates that even fairness opinions will be undermined by facts demonstrating those opinions were unreasonable. Indeed, this standard has always been applied in opinion cases, even prior to *Virginia Bankshares*. As the Third Circuit explained, "[w]hen a representation is made by professionals or 'those with greater access to information or having a special relationship to investors making use of the information,' there is an obligation to disclose data indicating that the opinion or forecast may be doubtful." *Eisenberg v. Gagnon*, 766 F.2d 770, 776 (3d Cir. 1985) (quoting *Chris-Craft Indus. v. Piper Aircraft Corp.*, 480 F.2d 341, 363-66 (2d Cir. 1973)).

---

[16]     As a result, defendants' statements that Regions maintained effective internal controls over financial reporting were also objectively false and misleading when made.

### E.    The False and Misleading Statements Are Material

The Regions defendants – but not E&Y – contend the false and misleading statements and omissions were not material as a matter of law.[17]  "In order to determine whether a misleading statement is material, courts must engage in a fact-specific inquiry."  *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).  That is, "'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  Context is everything.  In its analysis, the court considers "all relevant circumstances."  *Ganino*, 228 F.3d at 162.  Thus, in order to prevail on a motion to dismiss, defendants have the burden to demonstrate that the false statements or omissions "'are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"  *Id.*

Ignoring "all relevant circumstances," defendants rely exclusively upon stock price movement from a single day, and even that evidence undermines their argument.  *See* Defs.' Mem. at 34.  After demonstrating that the securities plummeted from $21.30 to $18.45 (or 13%) when the Company reported on January 20, 2009 that it wrote down its goodwill by $6 billion and increased its loan loss reserves by over $1 billion, defendants argue that this stock drop is "clearly *de minimis*" and therefore *per se* immaterial.  Defs.' Mem. at 4, 34.  Defendants' assertion is not only puzzling on its face – because it is contradicted by their own evidentiary showing – but Regions' materiality analysis is "clearly" inconsistent with Second Circuit authority.  *See, e.g.*, *Ganino*, 228 F.3d at 162

---

[17]    E&Y's failure to contest materiality is not surprising, since whether or not a company's financial statements comply with GAAP is undeniably material.  *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 494 (S.D.N.Y. 2005).

(court should consider "all relevant circumstances"); *ECA*, 553 F.3d at 204 ("both quantitative and qualitative factors must be considered in determining materiality"). So while stock price movement may be considered, "'[t]here is no requirement that stock prices fluctuate as a result of a defendant's misstatements or omissions in order for them to be material.'" *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 279 (S.D.N.Y. 2008) (quoting *SEC. v. DCI Telecomms.*, 122 F. Supp. 2d 495, 499 (S.D.N.Y. 2000)); *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) ("whether a public company's stock price moves up or down or stays the same after the [statement is made] does not establish the materiality of the statements made").

And defendants' heavy reliance on Third Circuit authority is completely misplaced.[18] First, according to the Third Circuit, in its materiality analysis "[o]ur Court, as compared to other courts of appeals, has one of the 'clearest commitments' to the efficient market hypothesis." *Merck*, 432 F.3d at 269. Unlike this Circuit, the Third Circuit looks almost exclusively to stock price movement to determine materiality in an efficient market (*i.e.*, §10(b)) case. *Id*. Yet, even in the Third Circuit, in the context of a Securities Act claim ***where no efficient market has been alleged*** – as is the case here – stock price movement says nothing about the materiality of a statement. *Constar*, 2009 U.S. App. LEXIS 23844. In *Constar*, the court specifically held "while materiality can be shown by a drop in price in reaction to a disclosure in an efficient market, that does not mean that it is necessary to consider the efficiency of a market in assessing materiality in a §11 case, whether an individual or

---

[18]    *See In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 274 (3d Cir. 2005); *Burlington Coat*, 114 F.3d at 1425.

class action. Indeed [] it is not at all relevant." *Id.* at *16. As such, defendants' arguments

concerning materiality should be rejected.[19]

### F.    The Complaint Alleges Regions' 2007 Financial Statements Certified by E&Y and E&Y's Audit Opinion Were False

If a registration statement contains a false or misleading statement or omission, liability will

lie against

> ***every accountant*** . . . who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement, in such registration statement, report, or valuation, which purports to have been prepared or certified by him . . . .

15 U.S.C. §77k(a)(4). In other words, accountants are responsible for (a) false statements that they

themselves prepare, and (b) false statements by others (such as the issuer) that they certify. By its

terms, §11 requires no evaluation of the veracity of a "certification" or any search into the subjective

beliefs of the auditor; liability based on a certification follows the truth or falsity of the underlying

statement being certified.

Here, E&Y certified Regions' 2007 financial statements and prepared E&Y's own audit

report on those financial statements, and the certified financial statements and audit report were

included in the Registration Statement with E&Y's consent. ¶¶109, 192, 205. Thus, E&Y is liable

under §11 for the material misstatements and omissions in Regions' 2007 financial statements. *In re*

*Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 480-82 (S.D.N.Y. 2004); *Wash. Mut.*, 259

F.R.D. at 505.

---

[19]    Plaintiff addresses defendants' remaining materiality argument concerning the "bespeaks caution" doctrine in §III.G.

### 1.    E&Y Claimed Its Audit Complied with Generally Accepted Auditing Standards When It Did Not

The Complaint alleges that, in addition to falsely certifying Regions' financial results, E&Y also falsely claimed to have complied with GAAS in conducting its audit. Courts routinely hold that auditors are liable for failing to comply with GAAS when conducting audits. *See, e.g.*, *WorldCom*, 352 F. Supp. 2d at 494; *Ponce v. SEC*, 345 F.3d 722, 729 (9th Cir. 2003); *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 361, 364 (D.N.J. 1999). The Complaint sets forth facts demonstrating E&Y's failure as an independent auditor to identify red flags of improper accounting, including unreasonable assumptions regarding Regions' accounting for its goodwill and its loan loss reserves. ¶¶191-219. E&Y's reports and approval of the financial results were false and misleading due to its negligent failure to comply with GAAS, and specifically Statements on Auditing Standards ("AU") §711. Because Regions' financial statements were ***not*** prepared in conformity with GAAP, issuing the reports or approving Regions' financial results violated GAAS and SEC rules. ¶209.

E&Y argues that it cannot be held liable because it reasonably believed that the statements in the Offering documents were true and complete. E&Y Mem. at 9-10. Such an argument is improper at the pleading stage. Under §§11(b)(3) and 12(a)(2), defendants' claimed "reasonable belief" that the statements were true and complete (or claimed lack of knowledge that the statements were untrue and incomplete at the time of the Offering) is an ***affirmative defense*** for which defendants bear the burden of proof ***at trial***. *See Herman & MacLean*, 459 U.S. at 382; *Ernst & Ernst*, 425 U.S. at 208. This argument has been flatly rejected as "an affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d

Cir. 2004); *see also In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1369 (N.D. Ga. 2005).[20]

### 2.    E&Y's Certification of Regions' Internal Controls Was False and Misleading

E&Y is also liable for its misleading certification of Regions' internal controls. E&Y audited Regions' 2007 Form 10-K, consented to inclusion of its audit opinions in the Registration Statement, and certified that Regions "maintained, in all material respects, effective internal control over financial reporting" as of December 31, 2007. ¶23. E&Y's certification of the effectiveness of Regions' internal controls was materially false and misleading because, among other things, Regions lacked adequate controls to ensure that its loan loss reserves properly accounted for risky ARM loans as well as the actual deterioration in its loan portfolio's performance in 2007-2008. ¶¶215-219.

The Complaint alleges that E&Y failed to follow GAAS in its audit of the internal controls. ¶¶215-219. For example, the Complaint alleges that "[d]espite E&Y's 'clean' audit reports for FY 2007 and its assessment as to the effectiveness of Regions' internal controls, Regions announced significant charges related to its goodwill, its loan loss reserves and an SEC inquiry into its accounting subsequent to the issuance of E&Y's audit opinion in February 2008." ¶219. Thus, the

---

[20]    In each of the cases cited by defendants relating to mismanagement with respect to loan loss reserves, unlike here, the complaint alleged in conclusory fashion that the company's reserves were inadequate, without explaining the precise manner in which the company violated GAAP and the amount of the misstatements. *See In re CIT Group, Inc.*, 349 F. Supp. 2d 685, 687 (S.D.N.Y. 2004) (complaint merely alleged that reserves were inadequate because company later increased them); *Ciresi v. Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991) (complaint pled only "[u]nsupported conclusory allegations" that, because reserves were later increased, they must have been misstated), *aff'd without op.*, 956 F.2d 1161 (2d Cir. 1992); *Hinerfeld v. United Auto Group*, No. 97 CIV. 3533(RPP), 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) (allegation of "inadequacy of the reserves" was "conclusory and unsupported by additional factual allegations"); *DiLeo*, 901 F.2d at 629 ("[b]oilerplate" fraud allegations failed to plead scienter). But none of these cases involved the auditor's "belief."

Complaint adequately alleges that E&Y's statements that the controls were effective and that E&Y complied with GAAS in auditing the controls were objectively false and misleading.

E&Y's reliance on *Monroe v. Hughes*, 31 F.3d 772 (9th Cir. 1994), for the proposition that auditors are liable only for untrue statements in the audited financial statements is misplaced. E&Y Mem. at 28. That 1994 case was decided long before SOX established the requirement that auditors attest to the effectiveness of internal controls. Moreover, in *Monroe* the court expressly found that the auditor defendant there complied with all applicable disclosure requirements then in effect relating to internal controls. *See* 31 F.3d at 774-75; *see also In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1294-95 (E.D. Wash. 2007) (denying motion to dismiss claims based on auditor's failure to disclose internal control deficiencies, and distinguishing *Monroe* because auditor there took additional steps to ensure reliability of audit in light of deficient internal controls); *Adam v. Silicon Valley Bancshares*, 884 F. Supp. 1398, 1403-04 (N.D. Cal. 1995) (denying motion to dismiss claims against auditor based on inadequate loan loss reserve where auditor disregarded deficiencies in internal controls). Accordingly, E&Y is liable for its false and misleading certification of the effectiveness of Regions' internal controls.

### 3. Plaintiffs Need Not Allege E&Y Subjectively Knew Its Statements Were False and Misleading

Section 11 states that liability will lie against "every accountant . . . *with respect to the statement*, in such registration statement, report, or valuation, *which purports to have been prepared or certified by him*." 15 U.S.C. §77k(a)(4). This section makes accountants (and other experts) liable for false statements they themselves prepare, *and* the false statements of *others* that they certify. Thus, though statements prepared directly by an expert must be evaluated for truth or falsity, the question as to whether *certifications* are opinions, or whether they are subjectively believed by

the expert, is irrelevant; the statutory text holds experts responsible for the truth or falsity of the *underlying statements* being certified.

The Complaint alleges E&Y falsely represented that it had complied with GAAS in conducting Regions' audits, and plaintiffs have detailed the procedures E&Y failed to follow. ¶¶191-219. E&Y also certified Regions' 2007 financial statements and management's attestations regarding the effectiveness of the Company's internal controls. Because plaintiffs have adequately pled that both the underlying financial statements and the underlying management attestations were false, no further inquiry is necessary. *See Herman & MacLean*, 459 U.S. at 381 n.11 (auditors are liable for "matters which purport to have been prepared or certified by them"); *Monroe*, 31 F.3d at 774 ("Section 11 of the 1933 Act permits an action against an accountant . . . as to those portions of the [registration] statement that purport to have been prepared or certified by the accountant."); *WorldCom*, 352 F. Supp. 2d at 492 ("an accountant has responsibility under Section 11 for the accuracy of the financial statements she certifies"). Auditors' liability under §11 is co-extensive with the falsity of the underlying statements certified by them. *See, e.g.*, *In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 900 (M.D. Tenn. 2005); *White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982, 984-86 (E.D. Wis. 2002); *Cendant*, 60 F. Supp. 2d at 364.

Defendants' cited authority also supports plaintiffs' position. In *AOL*, the court specifically measured the auditor's liability under §11 *based solely on the falsity of the financial statements it certified*. 381 F. Supp. 2d at 237; *see also In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, No. 2:08-MD-1919 MJP, 2009 WL 3517630, at *21-*22 (W.D. Wash. Oct. 27, 2009) (the holding in *AOL* is "instructive on the division between factual and opinion statements," noting "the subjective falsity standard applie[s] to the fairness opinion, *but not to the [auditor] certification*").

E&Y argues that the certification of a financial statement must itself be evaluated for truth or falsity, distinct from the truth or falsity of the underlying financial statement, and, further, that a certification should be treated as a statement of opinion for the purposes of assessing falsity. E&Y Mem. at 10-11. E&Y has not cited a single §11 case that supports either of these positions, and with good reason: it would lead to the absurd result that plaintiffs would have to allege the *subjective* falsity of an audit report in order to state a claim under §11 against the auditor based on the report, but would not have to allege the subjective falsity of the underlying financial statements certified by the auditor in order to state such a claim based on the underlying financial statements. *See, e.g.*, *AOL*, 381 F. Supp. 2d at 243-44 (§11 claim concerning *fairness opinion*); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 195 (S.D.N.Y. 2003) (same); *In re Harmonic, Inc. Sec. Litig.*, No. C 00 2287 PJH, 2006 WL 3591148, at *15 (N.D. Cal. Dec. 11, 2006) (§11 claim concerning board's statement that a proposed corporate transaction was "in the best interests of [the company's] shareholders"), *aff'd in part, rev'd in part*, 2002 WL 31974384 (N.D. Cal. 2002); *Stumpf v. Garvey*, No. 02-MDL-1335-PB, 2005 WL 2127674, at *17 (D.N.H. Sept. 2, 2005) (§11 claim concerning *analysts' reports*); *CIT*, 349 F. Supp. 2d at 690 (§11 claim concerning company's loan loss reserves statements *but not auditor defendants*).[21]

E&Y's false and misleading statements are not opinions; *compliance with GAAP is a statement of fact*. *See Burlington Coat*, 114 F.3d at 1421 (Alito, J.); *RAIT*, 2008 U.S. Dist. LEXIS 103549, at *26-*29. And the simple designation of a factual assertion as a statement of "belief" or "opinion" does not automatically transform it into a statement of opinion. *See In re Oxford Health*

---

[21]    Indeed, even for claims brought under §10(b) of the Exchange Act, courts do not evaluate auditor certifications under a subjective standard. *See In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 214 (1st Cir. 2005); *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1331-32 (M.D. Fla. 2002).

*Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) ("It is disingenuous to suggest that factual assertions are puffery and opinion . . . simply because Oxford claims only to have stated that it believes in their truth."); *cf. SEC v. Okin*, 137 F.2d 862, 864-65 (2d Cir. 1943) (inserting "in my opinion" in fact statement does not fundamentally alter statement).  After all,

> not every sentence that has the word "opinion" in it, or that refers to motivation for directors' actions, leads us into [a] physic thicket.  Sometimes such a sentence actually represents facts as facts rather than opinions – and in that event no more need be done than apply the normal rules for § 14(a) liability.  I think that is the situation here.

*Virginia Bankshares*, 501 U.S. at 1109 (Scalia, J., concurring).

The auditor certifications here are very different from the fairness opinion at issue in *Virginia Bankshares*.  A fairness opinion states "that a specified transaction is within a range of values encompassing financial fairness," with no specific standard of "fairness" provided. Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1565 (2006).  This is a classic statement of opinion.  Scholars have strongly criticized the subjectivity and bias in fairness opinions (*see id*. at 1606-10), and recommend that, at the very least, a quasi-public body – analogous to the body that formulates GAAP – be created to impose meaningful standards (*see id*. at 1615).

By contrast, when an auditor represents that financial statements comply with GAAP and accurately present the company's financial position (¶¶192, 209, 218), the auditor is referencing a rigorous set of defined standards and making factual assertions regarding the company's health. *Cf.* SEC Regulation S-X, Item 4-01(a)(1), 17 C.F.R. § 210.4-01(a)(1) ("Financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate . . . .").  Indeed, the standards for GAAP (and GAAS, which is also a required certification (*see* 17 C.F.R. §210.2-02)) are highly regimented, greatly reducing opportunities for auditor subjectivity.

At the time E&Y certified Regions' financial statements, GAAP consisted of numerous pronouncements from the Financial Accounting Standards Board ("FASB"), statements from the Accounting Principles Board, FASB Interpretations, FASB Technical Bulletins, Staff Implementation guidance standards, plus countless Accounting Principles Board Opinions, Statements from the Emerging Issues Task Force, Financial Accounting Standards, FASB Interpretations, FASB Concepts Statements, Statements of Position, and Audit and Accounting Guides.  The American Institute of Certified Public Accountants and Derivatives Implementation Group also issued numerous additional standards.  And all of these standards were overlayed by SEC Regulations and Staff Accounting Bulletins.  *See* SFAS No. 162 (The Hierarchy of Generally Accepted Accounting Principles).  Thus, the strict guidelines under which accountants audit a publicly-traded company cannot be compared to the unregulated process for issuing fairness opinions.[22]

Similarly, and again after a supposedly thorough review, E&Y stated that Regions' internal controls were effective "based on the criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission." ¶23.  Here, E&Y's representation was that ***according to a specific set of criteria***, Regions' internal controls provided reasonable assurance regarding the reliability (*i.e.*, accuracy) of financial reporting.  *See* SEC Release No. 33-8810, 2007 WL 1791162 (June 20, 2007) (defining internal controls).  This is a carefully regimented evaluation performed in accordance with standards mandated by the SOX.  *See* 15 U.S.C. §7262(b); Public Company Accounting Oversight Board ("PCAOB") Auditing Standard

---

[22]    And because auditor certifications are subject to such controls, their precise wording varies little from financial statement to financial statement.  *See Deephaven Private Placement Trading Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168, 1170 n.1 (10th Cir. 2006).

("AS") No. 2.  SOX §404(b) provides that auditors' attestations of internal controls must comply

with "standards for attestation engagements issued or adopted by the [PCAOB]."  15 U.S.C.

§7262(b).  The PCAOB's AS No. 2, provides that "the auditor must plan and perform the audit to

obtain reasonable assurance about whether the company maintained, in all material respects,

effective internal control over financial reporting as of the date specified in management's

assessment."  AS No. 2, ¶4.  AS No. 2 also provides that "[t]he auditor should be aware that persons

who rely on the information concerning internal control over financial reporting include

investors . . . ."  *Id.*, ¶6.  Nothing in E&Y's attestation suggests it has the inherent subjectivity of an

"opinion."

     Moreover, E&Y's audit reports in the 2007 Form 10-K included numerous detailed factual

statements about the procedures it performed, as required by AS No. 2.  ¶23.  For example, E&Y

represented in its audit report on internal controls that:

> We conducted our audit in accordance with the standards of the
> [PCAOB]. . . . Our audit included obtaining an understanding of internal control
> over financial reporting, assessing the risk that a material weakness exists, testing
> and evaluating the design and operating effectiveness of internal control based on the
> assessed risk, and performing such other procedures as we considered necessary in
> the circumstances.

*Id.*  Not only are these factual statements actionable in their own right, but, taken with E&Y's

representation that "[w]e believe that our audit provides a reasonable basis for our opinion" any

element of supposed "opinion" in E&Y's attestation reports was presented as a conclusion based on

facts, not a mere subjective notion.  *Id.*; *see also Wash. Mut.*, 2009 WL 3517630, at *21-*22 (where

defendant auditor made false and misleading statements that the company's internal control reports

were audited in accordance with PCAOB and GAAP, plaintiffs' §11 claims against the auditor

turned on statements of fact, and the "subjective" falsity standard did not apply).

Finally, E&Y's argument is inconsistent with §11, which grants "experts" like E&Y an affirmative defense that they "had, after reasonable investigation, reasonable ground to believe and did believe" that the expertise section was not misleading.  15 U.S.C. §77k(b)(3)(B)(i).  The plain language of the statute requires the ***defendant*** – not the plaintiff – prove both prongs of the test to establish the affirmative defense.  *Global Crossing*, 313 F. Supp. 2d at 211 ("[S]ection 11 provides a defense where an [auditor] has 'no reasonable ground to believe and did not believe' that the statements were false or misleading," "the statute expressly provides that the burden of proof is on defendants to establish this defense," and "plaintiffs need not negate such an affirmative defense in their pleading.").  Treating auditor statements as "opinions" as a matter of law would reverse the statutory burden of proof in §11 cases against auditors.

### G.    The Bespeaks Caution Doctrine Is Inapplicable

Defendants contend that certain disclosures in the Registration Statement nullified the falsity of their statements because they adequately warned of the risks plaintiffs allege were omitted from the Registration Statement.  This contention evokes the "bespeaks caution" doctrine, which only renders forward-looking "'misrepresentations in a stock offering [] immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.'"  *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004) (quoting *Halperin v. eBanker USA.COM, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)); *see also Faulkner v. Beer*, 463 F.3d 130, 133-35 (2d Cir. 2006) (bespeaks caution doctrine does not apply where cautionary statements were in materials most investors did not receive).

The bespeaks caution doctrine is applied sparingly. It does not render immaterial either omissions, or statements of present or historical fact. *P. Stoltz*, 355 F.3d at 96-97.[23] Further, for the doctrine to apply, "the cautionary language must be examined in the context of the representations to determine whether the language warns of the specific contingency that lies at the heart of the alleged misrepresentation." *Id.* at 97 (citing *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998)).[24]

The "bespeaks caution" doctrine is inapplicable here. The Registration Statement and Prospectus contained material misrepresentations and omissions concerning Regions' goodwill, mortgage-related exposure, loan loss reserves, and internal controls. These statements of then-current or historical facts are not shielded by the "bespeaks caution" doctrine. *See In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 236 (S.D.N.Y. 2006) ("affirmative representations about the current or historical performance" are not considered forward-looking); *see also Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*, No. 99 CIV 12046 WHP, 2001 WL 300733, at *8-*9 (S.D.N.Y. Mar. 28, 2001) (warnings of specific risks are insufficient to shelter a defendant

---

[23]    In adopting a limited application of this doctrine to forward-looking statements only, the Second Circuit followed the guidance of its sister circuits and district courts within this Circuit. *P. Stoltz*, 355 F.3d at 96-97 ("'By its terms, the "bespeaks caution" doctrine . . . is directed only to forward-looking statements.'") (citing *EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 874 (3d Cir. 2000)); *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001) (noting that the "bespeaks caution" doctrine applies "to forward-looking statements **only**, and not to material omissions or misstatements of historical fact") (emphasis in original).

[24]    *See also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 321-22 (S.D.N.Y. 2009) (cautionary language must be specific, prominent, and must directly address the specific risk that plaintiffs claim was not disclosed, especially considering that most, if not all securities offerings contain cautionary language) (citing *Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 5-6 (2d Cir. 1996)); *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007).

from liability where they fail to disclose specific facts necessary to appreciate the magnitude of the risk); *see, e.g.*, ¶¶19-21 (loan loss reserves and goodwill are "as of the balance sheet date").

Even assuming that some of Regions' representations are forward-looking and are properly identified as such in the Registration Statement (they are not), the bespeaks caution doctrine will not immunize defendants from liability for those statements because they (1) lack sufficient cautionary language, and (2) the future risks supposedly cautioned against already existed. *See Rombach*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

Cautionary language is only "meaningful" when it is "'sufficiently specific to render reliance on the false or omitted statement unreasonable.'" *In re Globalstar Sec. Litig.*, No. 01 CIV. 1748 (SHS), 2003 WL 22953163, at *8 (S.D.N.Y. Dec. 15, 2003). "General risk disclosures in the face of specific known risks which border on certainties do not bespeak caution." *In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (cautionary language "must precisely address the substance of the specific statement or omission that is challenged"). The so-called "risk factors" which defendants claim are prominently disclosed in the Company's 2007 Form 10-K regarding Regions' goodwill and loan loss reserves simply provide a litany of general risks.[25]  *See* Hunter Decl., Ex. C at 13-17.  Additionally, the statements regarding the "effectiveness" of Regions' internal controls failed to bespeak caution in light of the material misstatements that there was no impairment to the goodwill associated with the AmSouth merger as of the date of the Offering or that Regions' provision for loan losses "'is adequate to cover losses inherent in the loan portfolio as of the balance sheet date.'"  ¶¶19-20.

---

[25]    Indeed, even defendants concede that they did not consider loan loss reserves or goodwill to be "forward-looking statements" in the Offering materials.  Defs.' Mem. at 33.

This is plainly insufficient. *Halperin*, 295 F.3d at 359 (cautionary language is insufficient to trigger the "bespeaks caution" doctrine where it fails to expressly warn of or does not directly relate to the risk that caused plaintiffs' loss). Like the so-called "risk disclosures" in this case, "cautionary language that did not expressly warn of, or directly relate to, the risk that Plaintiffs allege brought about their loss . . . cannot trigger the 'bespeaks caution' doctrine and shield Defendants from liability." *In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 571 (S.D.N.Y. 2009). In truth, the cautionary risks relied upon by defendants are those that may impact "the business and economic environment" of any financial services company and are simply too general to sufficiently bespeak caution with respect to Regions' undisclosed substantial exposure to AmSouth's "stressed" loan portfolio. *See* Hunter Decl., Ex. C at 13-17 (disclosing risk factors such as interest rates, exchange rates, consumer spending, business investment, real estate market, government spending, the volatility and strength of the capital markets, and terrorism).[26]

Lastly, E&Y's assertion that it is protected by the bespeaks caution doctrine is particularly meritless. E&Y Mem. at 23-26. Auditors cannot be immunized by the warnings of third-parties (*i.e.* the company issuer and underwriters) in documents the auditors did not draft. Not surprisingly, all of the authority E&Y relies upon involves either an issuer or underwriter invoking the protections of the bespeaks caution doctrine – it has never been expanded to a third-party auditor. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157-58 (2008). It is entirely contradictory for E&Y to argue on one hand that it cannot be liable for the underlying financial

---

[26] This argument applies with equal import to defendants' assertion that such statements are also protected under the Private Securities Litigation Reform Act of 1995's ("PSLRA") safe harbor provision. Defs.' Mem. at 33; *see Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244 (5th Cir. 2009) ("Congress clearly intended that boilerplate cautionary language not constitute 'meaningful cautionary' language for the purpose of the safe harbor analysis.").

- 44 -

statements made by the Company, but on the other hand that it should be protected by the boilerplate cautionary language that follows the same statements at issue.

### H. The Complaint Alleges a Violation of §15 Against Regions and the Individual Defendants

The Complaint pleads a claim for control person liability under §15 of the Securities Act by alleging both a primary violation of the Securities Act and that the individual defendants and Regions controlled the primary violators. *See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MD 1529 (LMM), 2007 WL 2615928, at *10 (S.D.N.Y. Sept. 10, 2007); 15 U.S.C. §77o. Defendants' sole argument is that the Complaint fails to state a claim for a predicate primary violation of the Securities Act. Therefore, if the Court finds that plaintiffs have stated a claim under §§11 or 12 of the Securities Act, it need not make any further inquiry to determine plaintiffs have adequately pleaded control person claims against the individual defendants and Regions, and defendants' motion to dismiss the control person claims should be denied.

## IV. CONCLUSION

For the reasons set forth above, plaintiffs respectfully request the Court deny defendants' motions to dismiss in their entirety. Should this Court perceive any portion of the Complaint to be deficient, plaintiffs respectfully request leave to amend the Complaint and cure such perceived deficiencies. Fed. R. Civ. P.15(a)(2) ("The court should freely give leave when justice so requires.").

DATED: December 21, 2009              Respectfully submitted,

                                      COUGHLIN STOIA GELLER
                                        RUDMAN & ROBBINS LLP
                                      ANDREW J. BROWN
                                      ERIC I. NIEHAUS
                                      LUCAS F. OLTS


                                      s/ANDREW J. BROWN
                                      ANDREW J. BROWN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Lead Counsel for Plaintiffs

S:\CasesSD\Regions Pfd 8.875\secy\BRF 00063486 MTD Opposition_newest.doc

CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 21, 2009.

s/ ANDREW J. BROWN
ANDREW J. BROWN

COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:andrewb@csgrr.com

# Mailing Information for a Case 1:09-cv-03161-LAK

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Andrew J. Brown**
  andrewb@csgrr.com,nhorstman@csgrr.com,e_file_sd@csgrr.com

- **Scott Alexander Edelman**
  sedelman@milbank.com

- **Mauricio Alejandro Espana**
  mespana@mayerbrown.com,jmarsala@mayerbrown.com

- **Justin Bishop Grewell**
  jgrewell@mayerbrown.com

- **Douglas W. Henkin**
  dhenkin@milbank.com

- **Claire Elizabeth Hunter**
  hunterc@sullcrom.com

- **Matthew Montgomery**
  mattm@csgrr.com

- **Eric I. Niehaus**
  ericn@csgrr.com

- **Lucas F. Olts**
  lolts@csgrr.com

- **Stanley J. Parzen**
  sparzen@mayerbrown.com

- **David Avi Rosenfeld**
  drosenfeld@csgrr.com,e_file_ny@csgrr.com

- **Samuel Howard Rudman**
  srudman@csgrr.com,e_file_ny@csgrr.com

- **William J. Snipes**
  snipesw@sullcrom.com

- **John Joseph Tharp , Jr**
  jtharp@mayerbrown.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Darren J. Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101